# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                           :
In re:                                     :    Chapter 11
                                           :
                                           :    Case No. 10-10250 (MFW)
PCAA PARENT, LLC, et al.,¹                  :
                                           :    Joint Administration Requested
                                           :
                                           :
                   Debtors.                :
------------------------------------------------------------x
```

Proposed Bidding Procedures Hearing: February 17, 2010 at 10:00 a.m. (EST)
Proposed Objection Deadline for Bidding Procedures: February 9, 2010 at 4:00 p.m. (EST)
Proposed Date of Auction: April 20, 2010 at 10:00 a.m. (EDT)
Proposed Objection Deadline for Auction and Selection of Successful Bidder: April 26, 2010 at 12:00 noon (EDT)
Proposed Sale Approval Hearing: April 28, 2010 at 10:00 a.m. (EDT)
Proposed Objection Deadline for Sale Approval: April 23, 2010 at 4:00 p.m. (EDT)

## MOTION FOR (I) ORDER (A) ESTABLISHING BIDDING PROCEDURES RELATING TO SALE OF SUBSTANTIALLY ALL OF PCAA'S ASSETS, (B) APPROVING STALKING HORSE PROTECTIONS, (C) AUTHORIZING AND SCHEDULING DATE AND TIME FOR AUCTION, (D) SCHEDULING DATE AND TIME FOR HEARING ON SALE ORDER, (E) APPROVING ASSIGNMENT AND CURE PROCEDURES, AND (F) SETTING OBJECTION DEADLINES AND (II) ORDER APPROVING SALE OF SUBSTANTIALLY ALL OF PCAA'S ASSETS

PCAA Parent, LLC, together with its affiliated debtors and debtors in possession

(collectively, "PCAA") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"),

hereby submits this motion (the "Motion"), pursuant to sections 105, 363, 365 and 1146 of

title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"),

Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (as

amended, the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of the Bankruptcy Court

---

¹     The PCAA entities, along with the last four digits of their respective federal tax identification numbers (as applicable), are as follows: PCAA Parent, LLC (8827); PCAA Chicago, LLC (0860); PCAA GP, LLC (4237); PCAA LP, LLC (none); PCAA Properties, LLC (0617); PCAA SP, LLC (3465); Airport Parking Management, Inc. (7571); PCAA Missouri, LLC (5702); PCAA SP-OK, LLC (none); PCAA Oakland, LLC (9451); Parking Company of America Airports, LLC (9249); PCA Airports, Ltd. (8348); Parking Company of America Airports Phoenix, LLC (8343); and RCL Properties, LLC (2006). The mailing address for PCAA is 621 North Governor Printz Boulevard, Essington, PA 19029.

for the District of Delaware (as amended, the "Local Rules"), for (i) entry of an order, substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order"), (a) establishing bidding procedures, substantially in the form attached to the proposed Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures"), for the sale of substantially all of PCAA's assets (the "Sale"), (b) approving the Stalking Horse Provisions (as defined below), (c) authorizing and scheduling a date and time to hold an auction to solicit higher or otherwise better bids for PCAA's assets (the "Auction"), (d) scheduling a date and time for a hearing (the "Sale Hearing") to consider the Proposed Sale Order (as defined below),[2] (e) approving assignment and cure procedures, and (f) setting objection deadlines; and (ii) entry of an order, substantially in the form attached hereto as Exhibit B (the "Sale Order"), approving a Sale of the Purchased Assets (as defined below) to the winning bidder at the Auction, or, if no Auction is held, to the Stalking Horse Purchaser (as defined below).  In support of the Motion, PCAA states as follows:

## Background

### A.  Chapter 11 Cases

1.      On January 28, 2010 (the "Petition Date"), each of the PCAA entities filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The PCAA entities continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  A motion seeking joint administration of the Chapter 11 Cases for procedural purposes only is pending before this

---

[2]      As noted below, this Motion is the first stage of PCAA's exit strategy.  PCAA is currently finalizing the terms of a chapter 11 plan and related disclosure statement with its major creditor constituents that it expects to file in the near term.  It is currently contemplated that PCAA will seek entry of the Sale Order at the same time as confirmation of its chapter 11 plan.

Court. No request for the appointment of a trustee or examiner has been made and no committees have been appointed or designated in PCAA's Chapter 11 Cases.

## B.    PCAA's Business Operations

2.    PCAA runs the largest domestic off-site airport parking business, operating 31 off-site airport parking facilities comprising over 40,000 parking spaces near 20 major airports across the United States. PCAA owns or leases its off-airport parking facilities in, among other states, California, Arizona, Colorado, Texas, Georgia, Tennessee, Pennsylvania, Connecticut, New York, New Jersey, and Illinois. PCAA's locations are strategically positioned near major metropolitan airports and designed to offer customers an efficient and affordable alternative to on-site airport parking. PCAA has facilities located at seven of the ten busiest domestic airports. PCAA owns the underlying real property at approximately 70% of its facilities, equating to ownership of nearly two-thirds of its aggregate parking spaces. The remaining facilities are typically leased on a long-term basis. Operations on owned land or long-term leased property account for a majority of PCAA's operating income.

3.    PCAA, which operates under the trademarked banners "AviStar," "FastTrack," and "SkyPark," provides parking and related services that attempt to maximize convenience for corporate and recreational travelers. PCAA provides customers with 24-hour secure parking close to airport terminals, as well as frequent transportation via shuttle bus to and from their vehicles and the terminal. Customers either park their own cars or utilize the company's valet parking services. Indoor, outdoor, and covered parking options are available at PCAA's facilities. A shuttle bus fleet provides transit from the parking facility to the airport terminal or from the terminal to the parking facility, as the case may be. In addition to reserved

3

parking and shuttle services, PCAA provides ancillary services such as car washes, gas stations, and auto repairs at some parking facilities.

## C. Additional Information

4.     Additional information regarding PCAA's businesses, capital structure and the circumstances leading to the filing of these Chapter 11 Cases is contained in the Declaration Of Charles Huntzinger In Support Of PCAA's Chapter 11 Petitions And Various First Day Applications And Motions, filed contemporaneously with PCAA's "first-day" pleadings (the "Huntzinger Declaration").

### Jurisdiction And Venue

5.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

6.     By this Motion, PCAA seeks entry of the following two orders:

a.     Bidding Procedures Order:  PCAA seeks entry of the Bidding Procedures Order (a) approving the Bidding Procedures; (b) approving the Stalking Horse Provisions; (c) authorizing the Auction and scheduling the Auction date on or about April 20, 2010; (d) scheduling the Sale Hearing; (e) approving assignment and cure procedures; and (f) setting objection deadlines; and

b.     Sale Order:  PCAA seeks entry of the Sale Order at the conclusion of the Sale Hearing authorizing, among other things, PCAA to assume, assign, and sell the Purchased Assets (as defined below) to the winning bidder at the Auction in accordance with the Sale Agreement (as defined below); provided however, that, in the event no Auction is held, PCAA will seek entry of an order authorizing PCAA to assume, assign and sell the Purchased Assets to the Stalking Horse Purchaser (as defined below) under the Sale Agreement.

4

## I.    Sale Of Assets And Sale Agreement[3]

7.    Prior to the Petition Date, PCAA embarked on a comprehensive restructuring effort, including exploring various strategic alternatives, such as a transaction involving a sale of all or a portion of PCAA's assets.  These sale-related efforts included, without limitation, (i) entering into confidentiality agreements with multiple parties, (ii) creating an electronic data room for diligence of PCAA, and (iii) reviewing multiple letters of intent and negotiating with multiple parties prior to agreeing to enter into the Sale Agreement with the Stalking Horse Purchaser.

8.    In connection therewith, PCAA has also been working with the administrative agent (the "Administrative Agent") for the lenders under that certain prepetition loan agreement, dated September 1, 2006 (as supplemented by certain co-lending agreements), among certain PCAA entities and the lenders party thereto, to, among other things, (i) obtain financing for PCAA's operations as a bridge to a sale of all or substantially all of its assets and (ii) finalize the terms of an exit strategy, in the form of a chapter 11 plan and disclosure statement, that PCAA anticipates filing with this Court in the near term, which will pave the way for an exit from chapter 11 in the next few months.

9.    The chapter 11 plan that PCAA anticipates filing shortly will contemplate a sale of all or substantially all of PCAA's assets and otherwise provide for the liquidation of PCAA's remaining assets.  Part of such strategy includes a stalking horse asset purchase agreement (the "Sale Agreement"), substantially in the form attached hereto as Exhibit C, between PCAA and Bainbridge/ZKS Holding Company, LLC (the "Stalking Horse Purchaser"). PCAA believes that the Stalking Horse Purchaser's agreement to purchase substantially all of

---

[3]    The Huntzinger Declaration filed shortly after the commencement of these Chapter 11 Cases contains additional information with respect to the efforts by PCAA with respect to the sale of assets and the Sale Agreement.

PCAA's assets presents PCAA with significant value and is in the best interests of its estates and creditors.

10. Under the terms of the Sale Agreement, PCAA will sell, transfer, assign, convey and deliver to the Stalking Horse Purchaser all of PCAA's right, title and interest in, to and under the assets primarily used or held for use in the conduct of PCAA's business (the "Purchased Assets") including, without limitation, all accounts receivable, real property, Purchased Contracts (as defined in the Sale Agreement), Purchased Intellectual Property (as defined in the Sale Agreement), tangible personal property, documents, permits, agreements (including non-disclosure, confidentiality, and non-compete or non-solicitation agreements), claims and causes of action, rights under warranties, representations and guarantees, and refunds, and including certain liabilities to be assumed by the Stalking Horse Purchaser (the "Assumed Liabilities"), but excluding certain assets (the "Excluded Assets").

11. Certain of the key terms of the Sale, Sale Agreement and Sale Order are highlighted as follows[4]:

| | |
|---|---|
| Structure:<br><br>Sale Agreement § 2.1<br><br>Sale Order ¶ 6 | Purchaser shall purchase from Sellers, and Sellers shall sell to Purchaser title to and all of Sellers' right, title and interest in, to and under the assets used or held for use in the conduct of the Business, including the Purchased Assets, free and clear of all Liens to the extent provided in the Sale Order and subject to Permitted Exceptions. |
| Consideration:<br><br>Sale Agreement § 3.1<br><br>Sale Order ¶ O | The aggregate consideration for the Purchased Assets shall be (a) an amount in cash equal to (i) subject to Section 3.1(f) of the Sale Agreement, $111,500,000.00 (the "Base Purchase Price"), plus (ii) the amount of Pre-Paid Deposits, plus (iii) the amount of Car on Lot Revenue, minus the amount of Pre-Paid Revenue (the Base Purchase Price as adjusted, the "Purchase Price") and (b) the assumption of the Assumed Liabilities. |

---

[4] Capitalized terms in this paragraph not otherwise defined in the Motion shall have the meaning assigned to them in the Sale Agreement; to the extent that the Motion and the Sale Agreement are inconsistent, the Sale Agreement shall control.

| | |
|---|---|
| Deposit:<br><br>Sale Agreement §§ 3.2, 3.4 | Upon the execution of the Sale Agreement, Purchaser, Sellers and Wells Fargo Bank NA (the "Escrow Agent") shall enter into the Escrow Agreement, and in accordance therewith, Purchaser shall immediately deposit with the Escrow Agent an amount equal to 5% of the Base Purchase Price. In the event the Closing occurs on or before the 14th calendar day following the entry of the Sale Order, Purchaser shall be entitled to deposit an amount equal to $500,000 of the Purchase Price with an escrow agent for reimbursement of reasonable expenses. |
| Closing and Closing Date:<br><br>Sale Agreement § 4.1 | The closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in the Sale Agreement (the "Closing") shall take place at the offices of Milbank, Tweed, Hadley & McCloy LLP located at 1 Chase Manhattan Plaza, New York, New York 10005 or at such other place as the parties may designate in writing at 10:00 a.m. (New York City time) on the date that is two Business Days following the satisfaction (or the waiver thereof by the party entitled to waive that condition) of the Closing Conditions (as defined below), unless another time or date, or both, are agreed to in writing by the parties (the "Closing Date"). |
| Closing Conditions:<br><br>Sale Agreement §§ 10.1-10.4 | Purchaser's and Sellers' obligations to consummate the transactions contemplated by the Sale Agreement are subject to certain conditions including, but not limited to (collectively, the "Closing Conditions"):<br><br>• Purchaser and Seller shall have performed and complied in all material respects with all obligations and agreements required under the Sale Agreement;<br><br>• the expiration of any applicable waiting period under the HSR Act;<br><br>• Owned Real Properties and Leased Real Properties giving rise to any Individual Property Failures shall not, individually or in the aggregate, constitute properties accounting for revenues in excess of $6,800,000 (based on the contribution of such properties as set forth in 2009 Base Plan Revenue); and<br><br>• entry of the Bidding Procedures Order and Sale Order; |
| Termination:<br><br>Sale Agreement § 4.4 | The Sale Agreement may be terminated by Purchaser or Sellers if, among other things:<br><br>• the Closing shall not have occurred by the close of business on May 19, 2010 (the "Initial Termination Date"); provided, however, that if the Closing shall not have occurred due to a failure of the conditions set forth in Section 10.2(e), Section 10.3(b), Section 10.3(c) or Section 10.3(d) of the Sale |

Agreement, and provided that all other conditions to the respective obligations of the parties to close hereunder that are capable of being fulfilled by the Initial Termination Date (other than deliveries to be made at the Closing) shall have been so fulfilled or waived, then no party may terminate this Agreement prior to June 21, 2010 (the Initial Termination Date, together with any extension thereof pursuant to this proviso, the "Termination Date");

- Purchaser and Sellers mutually consent to such termination;

- Purchaser is not the Successful Bidder (as defined in the Bidding Procedures), and the Bankruptcy Court enters an Order approving the Alternative Transaction; or

- Sellers file a stand-alone Chapter 11 Plan with the Bankruptcy Court or Sellers file any Chapter 11 Plan that involves approval of a sale of substantially all or a material portion of the Purchased Assets to a party other than Purchaser.

The Sale Agreement may be terminated by Purchaser if, among other things:

- Purchaser is in compliance with its obligations under the Sale Agreement and there shall be a breach by Sellers of any representation, warranty, covenant or agreement of Sellers contained in the Sale Agreement which would result in a failure of certain Closing Conditions, and which breach is not or cannot be cured in accordance with the Sale Agreement;

- either (i) the Bidding Procedures Order shall not have been entered by the Bankruptcy Court by February 19, 2010, (ii) the Sale Order shall not have been entered by the Bankruptcy Court by the Termination Date, or (iii) the Confirmation Order shall not have been entered by the Bankruptcy Court by the Termination Date, provided that if all other Closing Conditions shall have been so fulfilled or waived, then Purchaser shall not be entitled to terminate pursuant to the foregoing clauses (ii) or (iii); or

- the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, a trustee or examiner with expanded powers is appointed pursuant to the Bankruptcy Code or the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any portion of the Purchased Assets having an aggregate fair market value in excess of $1,000,000 or which results in the loss of a

| | material benefit reasonably expected to be received by Purchaser. |
|---|---|
| | The Sale Agreement may be terminated by Sellers, if Sellers are in compliance with their obligations under the Sale Agreement and there shall be a breach by Purchaser of any representation, warranty, covenant or agreement of Purchaser which would result in a failure of certain Closing Conditions, and which breach is not and cannot be cured in accordance with the Sale Agreement. |
| Break-Up Fee and Expense Reimbursement:<br><br>Sale Agreement § 7.1<br><br>Sale Order ¶ 19 | Following the entry of the Bidding Procedures Order, in the event that the Sale Agreement is validly terminated (pursuant to certain of the termination provisions above), Sellers shall:<br><br>a. reimburse Purchaser for the reasonable and documented out-of-pocket costs and expenses (including legal, accounting, and other consultant fees and expenses) incurred by Purchaser and/or its Representatives in connection with the transactions contemplated hereby in an amount up to $750,000 (the "Expense Reimbursement"), and<br><br>b. subject to approval by the Bankruptcy Court, pay to Purchaser an amount equal to $3,345,000 (the "Break-Up Fee"). |
| Employee Matters:<br><br>Sale Agreement § 9.1 | Prior to the Closing, Purchaser shall make an offer of employment to substantially all of the Employees who remain employed by Sellers immediately prior to the Closing to commence immediately following the Closing. Any such employment offers will (i) be contingent on the Closing occurring and (ii) be subject to and in compliance with Purchaser's human resources policies and procedures and have terms and responsibilities determined by Purchaser in its sole discretion. |
| Regulatory Matters:<br><br>Sale Agreement § 8.4 | Purchaser and Sellers shall make or cause to be made all filings required under any applicable law (including the HSR Act) so as to enable the Closing to occur. |
| Representations and Warranties:<br><br>Sale Agreement Articles V and VI; § 12.1 | The Sale Agreement contains representations and warranties of Sellers regarding the Business and the Purchased Assets as typically found in transactions of this nature, including, without limitation, in respect of property title and rights, material contracts, compliance with laws, and environmental matters. The representations and warranties do not survive the Closing, except for those covenants and agreements that by their terms are to be satisfied after the Closing Date and as otherwise provided in Section 4.6(a) of the Sale Agreement, which covenants and agreements shall survive until satisfied in accordance with their terms. |
| | |

RLF1 3532765v.1

| | |
|---|---|
| <u>Allocation of Proceeds</u>:<br><br>Sale Agreement § 3.3<br><br>Sale Order ¶ 26 | The Purchase Price shall be allocated among the businesses conducted at the properties of Sellers before the Closing in accordance with <u>Schedule 3.3(b)</u> of the Sale Agreement. |
| <u>Tax Exemption</u>:<br><br>Sale Agreement § 11.1<br><br>Sale Order ¶¶ P, V, 5 | Sellers shall seek to include in the Sale Order and Confirmation Order a provision under Bankruptcy Code section 1146, the transfer of the Purchased Assets shall be free and clear of any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated hereby (collectively, "<u>Transfer Taxes</u>"). Sellers shall be solely responsible in all instances for all Transfer Taxes. |
| <u>Avoidance Actions</u>:<br><br>Sale Agreement §§ 1.1; 4.2<br><br>Sale Order ¶¶ Y, 17 | At the Closing, Sellers shall release all claims, causes of action and rights of Sellers under sections 544 through 553 of the Bankruptcy Code set forth on <u>Schedule 2.1(i)</u> of the Sale Agreement. |
| <u>Limitations on Successor Liability</u>:<br><br>Sale Agreement § 2.4<br><br>Sale Order ¶¶ T, 9, 10 | The transfer of the Purchased Assets from the Sellers to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Purchased Assets) to any liability for Interests (as defined in the Sale Order) against the Sellers or the Sellers' Interests in such Purchased Assets by reason of such transfer or otherwise under applicable laws of the United States or any state, territory, possession thereof, or the District of Columbia applicable to such Transaction, including, without limitation, any successor liability or similar theories. Further, Purchaser shall not assume or be liable for any Excluded Liabilities. |
| <u>Free and Clear Sale</u>:<br><br>Sale Agreement § 2.1<br><br>Sale Order ¶¶ P-Q, 4, 16 | The Sale shall be free and clear of all Liens and Interests (as defined in the Sale Order). |
| <u>Preservation of Records</u>:<br><br>Sale Agreement § 8.6<br><br>Sale Order ¶ 25 | Sellers and Purchaser agree that each of them shall preserve and keep the records relating to the Business for a period of seven years from the Closing Date and shall make such records and personnel available to the other as may be reasonably requested by such party. |

RLF1 3532765v.1

| | |
|---|---|
| Relief from Bankruptcy Rule 6004(h) and 6006(d): <br><br> Sale Order ¶¶ K, 24 | Sellers seek relief from the 14-day stay imposed by Bankruptcy Rules 6004(h) or 6006(d). |
| Provisions Regarding Management or Key Employees: | Prior to the Closing, except for the Management Incentive Plan, (a) the Sellers may not materially increase the annual level of compensation for any employee of any Seller or (b) other than in the Ordinary Course of Business or as contemplated by the Sellers' existing bonus plans, grant any bonus, benefit or other direct or indirect compensation to any employee, director or consultant. |

12.  The Sale Agreement, and the key terms summarized above, is designed to, subject to a bidding and auction process, maximize value for PCAA's estates and its creditors.

## II.  Proposed Bidding Procedures

13.  The Bidding Procedures were developed following consultation with PCAA, the Administrative Agent, the Stalking Horse Purchaser and each of their respective professionals.  PCAA believes that the adoption of the Bidding Procedures will assist in the evaluation of the "stalking horse" bid and solicitation of third-party overbids for the Purchased Assets.  PCAA further believes that the proposed Bidding Procedures constitute a reasonable and effective method of maximizing a return on the Purchased Assets though a competitive sale process.

14.  Certain of the key terms of the Bidding Procedures are highlighted as follows[5]:

| | |
|---|---|
| Assets to be Sold: | The sale of substantially all of the assets of the Sellers and the assumption of certain liabilities of the Sellers as set forth in the Sale Agreement, together with the transfer of the Sellers' rights and interests under certain related executory contracts and unexpired leases. |

---

[5]  Capitalized terms in this paragraph not otherwise defined in the Motion shall have the meaning assigned to them in the Bidding Procedures; to the extent that the Motion and the Bidding Procedures are inconsistent, the Bidding Procedures shall control.

| | |
|---|---|
| Participation Requirements: | To ensure that only bidders with a serious interest in purchasing Sellers' assets participate in the bidding process, the Bidding Procedures provide for certain minimal requirements for a Potential Bidder to become a Qualified Bidder. These requirements include delivery to Sellers' financial advisor, SSG Capital Advisors, LLC, of: (i) an executed confidentiality agreement in form and substance satisfactory to the Sellers; (ii) the identity of the ultimate equity owner of the Potential Bidder; and (iii) financial statements demonstrating, to Sellers' satisfaction, financial capability to consummate the Sale within a time frame acceptable to the Sellers. The Stalking Horse Purchaser is deemed to be a Qualified Bidder. |
| Due Diligence: | All Qualified Bidders that submit an Expression of Interest and whom Sellers determine to be reasonably likely to make a bona fide offer for the Assets that may result in a higher or otherwise better offer than that memorialized in the Sale Agreement shall be afforded reasonable due diligence access. |
| Bid Deadline: | PCAA is requesting a deadline for submission of bids by **4:00 p.m. (Eastern Time) on April 10, 2010** (the "Bid Deadline"). |
| Bid Requirements and Qualified Bids: | • A bid is a written irrevocable offer from a Qualified Bidder (i) stating that such Qualified Bidder is prepared to purchase the Assets and assume the Assumed Liabilities upon the terms and conditions set forth in the asset purchase agreement substantially in the form of the Sale Agreement (except for the terms relating to the Break-Up Fee and Expense Reimbursement) including, without limitation, the transition services agreement substantially in the form of the Transition Services Agreement, (ii) accompanied by copies of such materials marked to show those amendments and modifications to the Sale Agreement (the "Marked Agreement"), including, without limitation, the Transition Services Agreement (the "Marked Ancillary Agreements") that the Qualified Bidder proposes, in form and substance acceptable to the Sellers, and (iii) accompanied by (a) a certified or bank check, or wire transfer or other immediately available funds, in the amount of five percent (5%) of the purchase price payable to the order of the Sellers as a good-faith deposit (the "Good Faith Deposit"), and (b) written evidence of available cash, a firm irrevocable commitment for financing or such other evidence of ability to consummate the transaction and to provide adequate assurance of future performance under the Assumed Agreements as the Sellers may request.<br><br>• A bid will constitute a Qualified Bid only if the bid:<br><br>    a. provides for the purchase of all or substantially all Assets for |

an aggregate purchase price that is greater than the sum of (i) the Purchase Price offered by the Stalking Horse Purchaser in the Agreement and (ii) the Break-Up Fee and Expense Reimbursement ("Buyer's Purchase Price"), or alternatively provides for the purchase of a portion of the Assets that Sellers determine in consultation with their advisors when taken together with other Qualified Bids is in aggregate greater than the Buyer's Purchase Price;

b. is on terms that, in the Sellers' sole business judgment are substantially the same or better than the terms of the Agreement, including, without limitation, the Transition Services Agreement;

c. is not conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence with respect to the Assets or the Assumed Liabilities or the Business, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties or the satisfaction in all material respects at the closing of specified conditions, none of which shall be more burdensome when taken as a whole than those set forth in the Sale Agreement;

d. contain a commitment to consummate the Sale pursuant to a chapter 11 plan within not more than fifteen (15) days after the Sale Hearing;

e. is irrevocable (in the form resulting from any modifications that may be made at the Auction) until the earlier of (i) the end of the business day following the closing and (ii) the withdrawal of the Assets for sale by the Sellers (the "Revocability Date");

f. does not request or entitle the bidder, other than the Stalking Horse Purchaser, to any breakup fee, termination fee, expense reimbursement or similar type of payment;

g. acknowledges and represents that the bidder (i) has had an opportunity to inspect and examine the Assets and the Assumed Liabilities and to conduct any and all necessary due diligence with respect thereto prior to making its bid, (ii) in making its bid, has relied solely on its own independent review, investigation and/or inspection of the Assets and the Assumed Liabilities, and (iii) did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied or by operation of law or

| | |
|---|---|
| | otherwise regarding the Assets or the Assumed Liabilities, or the completeness of any information provided in connection therewith at the Auction, except as expressly stated in the Agreement or these Bidding Procedures;<br><br>h. fully discloses the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation; and<br><br>i. includes evidence, in form and substance satisfactory to the Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, delivery and closing of the Marked Agreement and the Marked Ancillary Agreements.<br><br>• The Sale Agreement shall be deemed a Qualified Bid. |
| Credit Bids: | No other Qualified Bidder will be allowed to credit bid (excluding Sellers' prepetition secured lenders who will be allowed to credit bid and participate in the auction notwithstanding anything else herein) any claims it may hold against Sellers. |
| Conduct of Auction: | If any Qualified Bid (other than the Sale Agreement) is received by the Bid Deadline, then PCAA will commence an Auction, on or about April 20, 2010, in accordance with the Bidding Procedures. |
| Selection of Successful Bid: | Immediately prior to the conclusion of the Auction, the Sellers, in consultation with their financial and legal advisors, shall (i) review each Qualified Bid on the basis of its financial and contractual terms and the factors relevant to the Sale process and the best interests of the Sellers' estate, including those factors affecting the speed and certainty of consummating the Sale, (ii) identify the Successful Bid, (iii) identify the next highest or otherwise best offer after the Successful Bid (the "Next Highest Bid"), provided that the Buyer, in its sole discretion, may decline to be designated Next Highest Bid, and (iv) notify all Qualified Bidders present at the Auction of the identities of the Successful Bidder and the bidder that has submitted the Next Highest Bid (the "Next Highest Bidder"), and the respective amounts of their bids. At the Sale Hearing, the Sellers shall present the Successful Bid to the Bankruptcy Court for approval. |

15.     The foregoing Bidding Procedures are designed to maximize value for

PCAA's estates, while ensuring an orderly sale process consistent with the Sale Agreement.

14

## III.   Stalking Horse Provisions

16.   After extensive arm's length negotiations, PCAA and the Stalking Horse Purchaser executed the Sale Agreement. The Motion is intended to approve the Stalking Horse Purchaser as the "stalking horse" bidder in connection with PCAA's solicitation of higher and better offers for PCAA's assets.

17.   To induce the Stalking Horse Purchaser to expend the time, energy and resources necessary to submit a stalking horse bid, PCAA has agreed to provide, and seeks this Court's approval of, certain bid protections provided to the Stalking Horse Purchaser under the Sale Agreement. Subject to this Court's approval, PCAA has agreed to provide the Stalking Horse Purchaser with the Break-Up Fee and Expense Reimbursement (together, the "Stalking Horse Provisions") under the conditions specified in the Sale Agreement. In accordance with the Sale Agreement, the Stalking Horse Purchaser shall be entitled to the Stalking Horse Provisions if the Sale Agreement is validly terminated by PCAA or the Stalking Horse Purchaser upon the occurrence of certain events, including, among other things, the Purchaser is not the Successful Bidder (as defined in the Bidding Procedures) and the Bankruptcy Court enters an order approving an Alternative Transaction (as defined in the Sale Agreement).

18.   The Stalking Horse Provisions are material inducements for, and a condition of, the Stalking Horse Purchaser's entry into the Sale Agreement. PCAA believes that the Break-Up Fee and the Expense Reimbursement are fair and reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation undertaken by the Stalking Horse Purchaser in connection with the transaction and (b) the fact that, if the Break-Up Fee is triggered, the Stalking Horse Purchaser's efforts will have increased the opportunity for PCAA to receive the highest or otherwise best offer for the Purchased Assets, to the benefit of PCAA's creditors.

15

## IV.    Proposed Notice Of Auction, Bidding Procedures, Sale Hearing

### a.    Procedures Notice

19.    PCAA proposes to serve the Bidding Procedures Order and a notice of the Bidding Procedures, the Auction and the Sale Hearing (the "Procedures Notice"), in substantially the form attached hereto as Exhibit D, within three (3) business days after entry of the Bidding Procedures Order, upon (i) the United States Trustee for the District of Delaware (the "U.S. Trustee"), (ii) counsel to the Administrative Agent and any other agent, trustee, or other representative, if any, for PCAA's prepetition lenders, (iii) those additional parties that have requested notice pursuant to Bankruptcy Rule 2002 (the "2002 List"), (iv) counsel to any official committee of unsecured creditors appointed in these Chapter 11 Cases (the "Creditors' Committee"), as applicable, (v) any party known to PCAA to possess, assert and/or exercise any rights in or control over any of the Purchased Assets, (vi) the Internal Revenue Service, (vii) all applicable federal, state, and local tax and other regulatory authorities that have a known interest in the relief requested in this Motion or jurisdiction over PCAA and/or the Purchased Assets, (viii) non-debtor parties to the Assumed Agreements (as defined in the Bidding Procedures), and (ix) any party known to PCAA to be a potential bidder for the Purchased Assets (collectively, the "Notice Parties").

### b.    Sale Agreement Notice

20.    After PCAA has determined the Successful Bid, pursuant to the terms of the Bidding Procedures, PCAA requests that notice of the Sale, the relief requested herein and the Procedures Notice be deemed adequate and sufficient, in addition to the other notices to be sent as described herein, if PCAA files with this Court a notice (the "Sale Agreement Notice"), in substantially the form attached hereto as Exhibit E, with the form of the Sale Agreement as finalized by the Successful Bidder within two (2) business days after the conclusion of the

16

Auction or as soon thereafter as practicable, but not later than one (1) business day prior to the Sale Hearing. Such notice shall constitute good and sufficient notice of the Bidding Procedures, the Auction, the Sale and the Sale Hearing and all proceedings to be held thereon.[6]

21.     Responses or objections, if any, to the relief sought in the Sale Order must be in writing, conform to the Bankruptcy Rules and the Local Rules, set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against PCAA's estates or property, the basis for the objection and the specific grounds therefore, and be served upon (collectively, the "Objection Notice Parties"): (a) PCAA at 621 North Governor Printz Boulevard, Essington, PA 19029, Attention: Mark Shapiro, (b) Milbank, Tweed, Hadley & McCloy LLP, One Chase Manhattan Plaza, New York, New York 10005, Attention: Matthew S. Barr and Michael E. Comerford, counsel for PCAA, (c) Richards, Layton & Finger, P.A., Attention: John H. Knight and Lee E. Kaufman, One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, (d) the Office of the U.S. Trustee, 844 King Street, Room 2207, Lockbox #35, Wilmington, DE 19899-0035, Attention: David Klauder, (e) counsel to the Creditors' Committee, as applicable, (f) counsel to the Administrative Agent and any other agent, trustee, or other representative, if any, for PCAA's prepetition lenders, (g) Wilmer Cutler Pickering Hale and Dorr LLP, 399 Park Avenue, New York, New York, 10022, Attention: Andrew Goldman, and (h) Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York, 10019, Attention: Gary Boss, Timothy Q. Karcher,, by April 23, 2010, at 4:00 p.m. (Eastern time) (the "Sale Objection Deadline"); provided, however, that objections as to the Auction or the selection of the highest or otherwise best bid shall be in writing, filed and served on the foregoing parties, so as to be actually received by the Objection Notice Parties by April

---

[6]     Notice will also be provided in connection with the filing of any disclosure statement and the chapter 11 plan process.

26, 2010, at 12:00 noon (Eastern time) (the "Auction Objection Deadline"). The failure of any party in interest to file its objection or response in accordance with the provisions of this paragraph shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, the Auction, the Sale Agreement Notice, the Sale Order, the Sale, or PCAA's consummation and performance of the transactions contemplated thereby.

## IV.  Assignment and Cure Procedures

22.    At the Sale Hearing, PCAA will seek entry of the Sale Order, among other things, authorizing and approving (a) the Sale of the Purchased Assets, free and clear of all liens, claims, encumbrances and interests of any kind to the Successful Bidder as determined by PCAA in accordance with the Bidding Procedures, and (b) the assignment by PCAA to the Successful Bidder at the Auction of the Assumed Agreements.

23.    The Sale Order will provide for a waiver of the 14-day stay period for the effectiveness of the order under Bankruptcy Rule 6004(h), as well as the 14-day stay period provided for in Bankruptcy Rule 6006(d). For the reasons set forth herein, PCAA submits that cause exists for such waivers.

24.    It is expected that the Successful Bidder will produce a competent witness at the Sale Hearing (and relevant subsequent hearings) to provide testimony, if necessary, to establish the ability of such bidder to provide "adequate assurance of future performance" to each non-debtor counterparty under the Assumed Agreements that are proposed to be assumed by PCAA and assigned to the Successful Bidder, to the extent required by sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

25.    As described herein, PCAA shall seek approval to implement certain procedures regarding the form and manner of notice of the assumption and assignment of

18

executory contracts and the process for determining any defaults and cure costs or other obligations owing or that may become owing to contract and lease counterparties upon assumption and assignment as set forth herein (the "Contract Procedures"). In connection therewith, PCAA shall file and serve by first-class mail, by no later than the Bid Deadline, and otherwise in accordance with the applicable Bankruptcy Rules, a notice (the "Assignment and Cure Notice") in substantially the form attached hereto as Exhibit F to all the non-debtor parties to the Assumed Agreements that (a) identifies each Assumed Agreement, (b) sets forth the dollar amount (the "Proposed Cure Amounts"), if any, that PCAA contends is necessary to be paid by PCAA in order to cure all the defaults, if any, under such contracts, and (c) the deadline by which such non-debtor parties must object.

26.     Responses or objections, if any, to the relief to be requested in the Assignment and Cure Notice must be in writing, conform to the Bankruptcy Rules and the Local Rules, set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against PCAA's estates or property, the basis for the objection and the specific grounds therefore, and be served upon the Objection Notice Parties by no later than 10 days after the Assignment and Cure Notice is mailed to the affected party (the "Assignment and Cure Objection Deadline"). The failure of any party in interest to file its objection or response to the Assignment and Cure Notice by the Assignment and Cure Objection Deadline in accordance with the provisions of this paragraph shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Assignment and Cure Notice, the Proposed Cure Amount or PCAA's consummation and performance of the transactions contemplated thereby.

27.     If no objections are received by the Assignment and Cure Objection Deadline, then the proposed assumption and assignment of the relevant Assumed Agreements

are authorized and the Proposed Cure Amounts set forth in the Assignment and Cure Notice shall be binding upon the non-debtor counterparty to the Assumed Agreement for all purposes and will constitute a final determination of total cure amounts required to be paid to such non-debtor counterparty in connection with the assignment to the Successful Bidder. In addition, each non-debtor party to such Assumed Agreement shall be forever barred from objecting to the cure information set forth in the Assignment and Cure Notice and the Proposed Cure Amounts, including, without limitation, the right to assert any additional cure or other amounts with respect to the Assumed Agreement arising or relating to any period prior to such assumption or assignment. If no objections to the assumption or assumption and assignment are received by the Assignment and Cure Objection Deadline, counsel for PCAA may submit to the Court a declaration of no objection and a form of order (collectively, the "Declaration of No Objection") granting the requested assumption and/or assignment of the Assumed Agreement, and serve such Declaration of No Objection on the counterparty to the Assumed Agreement. The order approving such assumption and/or assignment may then be entered by the Court twenty-four (24) hours after the Declaration of No Objection is filed.

28.     If a timely objection is received in accordance with the provisions of paragraph 26 above and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at a later date set by the Court. The pendency of a dispute relating to cure amounts will not prevent or delay the assumption and assignment of any Assumed Agreement. If an objection is filed only with respect to the Proposed Cure Amount listed on the Assignment and Cure Notice, PCAA may file a Declaration of No Objection as to assumption and assignment only and the dispute with respect to the cure amount will be resolved consensually, if possible, or if the parties are unable to resolve their dispute, before the Court.

RLF1 3532765v.1

PCAA intends to cooperate with the counterparties to Assumed Agreements to attempt to reconcile any difference in a particular cure amount.

## V.    Relief From Transfer Taxes Under Section 1146

29.    At the Sale Hearing, PCAA will seek a determination by the Bankruptcy Court that the proposed sale occurred "under" a chapter 11 plan, as such term is used in section 1146(a) of the Bankruptcy Code. Further, that the proposed sale is a transfer pursuant to section 1146(c) of the Bankruptcy Code, which shall not be taxed under any law imposing a stamp, transfer, recording or any similar tax.

### Basis For Relief

### A.    Proposed Bidding Procedures are Sound Exercise of PCAA's Business Judgment

30.    Bankruptcy Code section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Bankruptcy Code section 105(a) further provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Id. § 105.

31.    A debtor should be authorized to sell assets out of the ordinary course of business pursuant to Bankruptcy Code section 363 and in connection with the confirmation of a chapter 11 plan if it demonstrates a sound business purpose for doing so. See In re Federal Mogul Global, Inc., 293 B.R. 124, 126 (D. Del . 2003) (finding that a court should approve a debtor's use of assets outside ordinary course of business if debtor can demonstrate a sound business justification for proposed transaction); see also In re Montgomery Ward Holding Corp., 242 B.R. 147, 154 (Bankr. D. Del. 1999) (finding that in evaluating business purpose of a sale, Bankruptcy Court may consider effect of sale on reorganization).

21

32. The Bidding Procedures provide a framework for PCAA to entertain bids for the Sale of the Purchased Assets and, if it receives such bids, to conduct the Auction in a fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. The Bidding Procedures also set forth a schedule for achieving these objectives in an expeditious manner.

33. Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be made by private sale or by public auction. Consistent with the auction procedures approved routinely in this District, PCAA believes that the proposed Bidding Procedures are most likely to maximize the realizable value of the Purchased Assets for the benefit of PCAA's estates, creditors, and other parties in interest.

34. Accordingly, PCAA believes the Court should approve the Bidding Procedures. Similar procedures have been previously approved by this Court. See, e.g., In re Protostar Ltd., Case No. 09-12659 (MFW) (Bankr. D. Del. August 24, 2009); In re Midway Games Inc., Case No. 09-10465 (KG) (Bankr. D. Del. June 3, 2009); In re Intermet Corp., Case No. 08-11859 (KG) (Bankr. D. Del. May 12, 2009); VI Acquisition Corp., Case No. 08-10623 (KG) (Bankr. D. Del Apr. 3, 2008); Linens Holding Co., Case No. 08-10832 (CSS) (Bankr. D. Del May, 2, 2008); Global Home Products LLC., Case No. 06-10340 (KG) (Bankr. D. Del April 10, 2006); In re Russell-Stanley Holdings. Inc., Case No. 05-12339 (MFW) (Bankr. D. Del. Sept. 9, 2005); In re Ultimate Elecs., Inc., No. 05-10104 (PJW) (Bankr. D. Del. Mar. 24, 2005); In re Polaroid Corp., No. 01-10864 (PJW) (Bankr. D. Del. Nov. 19, 2001).

**B.     Stalking Horse Provisions are Reasonable and Necessary**

35. As stated above, PCAA seeks to provide the Stalking Horse Purchaser, in connection with its role in the bidding and Sale process, with the Stalking Horse Provisions in

22

the form of the Break-Up Fee and Expense Reimbursement. Break-up fees and other termination fees are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets.... In fact, because the... corporation ha[s] a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize values.

Official Committee of Subordinated Bondholders v. Integrated Resources, Inc., 147 B.R. 650, 659-60 (S.D.N.Y. 1992) (emphasis in original), appeal dism'd, 3 F.3d 49 (2d Cir. 1993) ("Integrated"). Specifically, "breakup fees and other strategies may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." In re 995 Fifth Ave. Assocs. L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (internal quotations omitted) ("995 Fifth Ave."); see also Integrated, 147 B.R. at 660-61 (break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); In re Hupp Indus., Inc., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . due diligence").

36.    Break-up fees are appropriate where they "provide some benefit to the debtor's estate," including (i) "induc[ing] a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely" and (ii) promoting more competitive bidding "by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Calpine Corp. v. O'Brien Envtl. Energy. Inc. (In re O'Brien Envtl. Energy. Inc.), 181 F.3d 527, 536-37 (3d Cir. 1999) ("O'Brien"). In connection

therewith, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id. at 537.

37.     Historically, bankruptcy courts have approved bidding incentives similar to the Break-Up Fee and Expense Reimbursement, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. See O'Brien, 181 F.3d at 534-35; Integrated, 147 B.R. at 657 ("break-up fee arrangements outside bankruptcy are presumptively valid under the business judgment rule"); 995 Fifth Ave., 96 B.R. at 28.

38.     In addition to the traditional business judgment rule, the Third Circuit established standards for determining the appropriateness of bidding incentives in the bankruptcy context. The Third Circuit has held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. See O'Brien, 181 F.3d at 535 ("We ... conclude that the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate. Therefore, we conclude that the business judgment rule should not be applied as such in the bankruptcy context. Nonetheless, the considerations that underlie the debtor's judgment may be relevant to the Bankruptcy Court's determination on a request for break-up fees and expenses.").

39.     Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Break-Up Fee and Expense Reimbursement

24

proposed herein passes muster. The Sale Agreement is the product of good faith, arm's-length negotiations between PCAA and the Stalking Horse Purchaser. The Break-Up Fee and Expense Reimbursement are fair and reasonable in amount, and are reasonably intended to compensate for the risk to the Stalking Horse Purchaser of being used as a stalking horse.

40.     The Stalking Horse Purchaser would not have entered into the Sale Agreement without the Break-Up Fee and Expense Reimbursement. Indeed, the Stalking Horse Provisions were designed to induce the Stalking Horse Purchaser to both research the value of PCAA and convert that value to a dollar figure on which other bidders could rely, and submit a bid (the Sale Agreement) without which bidding for the Purchased Assets might be more limited. See, e.g., Integrated, 147 B.R. 650; 995 Fifth Ave., 96 B.R. at 28. The Stalking Horse Provisions will compensate the Stalking Horse Purchaser for the benefit it provides to PCAA's estates in the event the Sale Agreement induces a third-party to submit a higher or otherwise better bid. PCAA believes that such fees are reasonable, given the benefits to the estates of having a definitive agreement with the Stalking Horse Purchaser and the risk to the Stalking Horse Purchaser that a third-party overbid ultimately may be accepted, and that the Break-Up Fee and Expense Reimbursement are necessary to preserve and enhance the value of PCAA's estates.

41.     Finally, the Bidding Procedures are fair and reasonable procedures reasonably intended to encourage competitive bidding, and any agreed upon Break-Up Fee and Expense Reimbursement will permit PCAA to insist that competing bids for the Purchased Assets made in accordance with the Bidding Procedures be materially higher or otherwise better than the Qualified Bid of the Stalking Horse Purchaser, to the benefit of PCAA's estates. Such measures will "increas[e] the likelihood that the price at which the [Purchased Assets will be] sold will reflect [their] true worth." O'Brien, 181 F.3d at 537.

42.     Furthermore, the Break-Up Fee and Expense Reimbursement are within the spectrum of termination fees approved by bankruptcy courts in chapter 11 cases, particularly when compared to sales of a similar magnitude. See e.g., In re Global Motorsport Group, Inc., Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) (court approved a maximum combined break-up fee and expense reimbursement of $650,000 in connection with sale, which amounted to approximately 4% of $16,000,000 purchase price); In re Global Home Products, Case No. 06-10340 (KG) (Ban. D. Del. July 14, 2006) (court approved a break-up fee of 3.3%, or $700,000, in connection with sale); In re Ameriserve, Case No. 00-0358 (PJW) (Ban. D. Del., September 27, 2000) (court approved a break-up fee of 3.64% or $4,000,000 in connection with $110,000,000 sale); In re Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Ban. D. Del. June 15, 1998) (court approved termination fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets). For the reasons set forth above, PCAA respectfully requests approval of the proposed Break-Up Fee and Expense Reimbursement to facilitate the Sale of the Purchased Assets.

43.     PCAA believes that all of the Bidding Procedures proposed herein, including the Stalking Horse Provisions, will increase the likelihood that PCAA will receive the greatest possible consideration for the Purchased Assets because they will ensure a competitive and fair bidding process. They also allow PCAA to undertake the Auction process in as expeditious a manner as possible, which PCAA believes is essential to maximizing the value of the estates.

44.     PCAA submits that the proposed Bidding Procedures are reasonable under the facts and circumstances of these cases, especially in light of the extensive marketing of the Purchased Assets that PCAA and its professionals have conducted.

26

## C. **Proposed Sale Should Be Free and Clear of All Liens**

45.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell or

transfer all or any part of its property free and clear of any and all liens in such property if

(i) such sale/transfer is permitted under applicable non-bankruptcy law, (ii) the party asserting

such a lien consents to such sale/transfer, (iii) the interest is a lien and the purchase price for the

property is greater than the aggregate amount of all liens on the property, (iv) the lien is the

subject of a bona fide dispute, or (v) the party asserting the lien could be compelled, in a legal or

equitable proceeding, to accept a money satisfaction for such interest. See 11 U.S.C. § 363(f); In

re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (section 363(f) written in disjunctive; therefore, court

may approve sale "free and clear" provided at least one of the subsections is met).

46.     If a creditor with an alleged lien does not object to the relief requested in

this Motion, such failure to object may be deemed consent under section 363(f) of the

Bankruptcy Code.  Moreover, PCAA requests that the liens asserted against the affected assets

by any creditor purporting to be a secured creditor be transferred and attached to the net sale

proceeds, in the same order and priority and with the same validity as they now have against the

assets, received by PCAA, against which the lien is alleged, subject to the rights, claims,

defenses and objections, if any, of any and all interested parties with respect thereto.

## D. **Buyer Should Be Afforded All Protections Under**
## **Bankruptcy Code Section 363(m) As Good Faith Purchaser**

47.     Section 363(m) of the Bankruptcy Code provides that "the reversal or

modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or

lease of property does not affect the validity of a sale or lease under such authorization to an

entity that purchased or leased such property in good faith...."  11 U.S.C. § 363(m).

27

48. The terms of the Sale Agreement between PCAA and the buyer will be, or have been, as applicable, negotiated at arm's length and in good faith. Accordingly, PCAA requests that the Court determine that the buyer will have acted in good faith and be entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code. See In re UPI, No. 91 B 13955 (FGC), 1992 U.S. Bankr. LEXIS 842, at *3 (Bankr. S.D.N.Y. May 18, 1992) (finding that an asset purchase agreement negotiated in good faith and at arm's length is entitled to protection under section 363(m) of the Bankruptcy Code).

E. **Assumption and Assignment of Assumed Agreements Pursuant to Section 365**

49. The Sale Agreement requires PCAA to assume and assign the Assumed Agreements. Pursuant to sections 365(a), (b) and (f) of the Bankruptcy Code, but conditioned on the closing of the transaction described in the Sale Agreement, PCAA requests entry of an order approving the assumption by PCAA and the assignment by PCAA to the buyer of the Assumed Agreements.

50. Section 365(a) of the Bankruptcy Code authorizes a debtor in possession to assume an executory contract or unexpired lease subject to bankruptcy court approval. Section 365(a) of the Bankruptcy Code provides:

> Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a).

51. The standard that is historically applied in determining whether an executory contract or unexpired lease should be assumed is the debtor's "business judgment." Nostas Assoc. v. Costich (In re Klein Sleep Products, Inc.), 78 F.3d 18 (2d Cir. 1996); Orion Pictures Corp. v. Showtime Network (In re Orion Pictures Corp.), 4 F.3d 1095 (2d Cir. 1993);

28

see also NLRD v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional"); In re Child World, Inc., 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) ("A debtor may assume or reject an unexpired lease in accordance with 11 U.S.C. § 365(a) in the exercise of its best business judgment."); In re III Enterprises, Inc. V, 163 B.R. 453,469 (Bankr. E.D. Pa. 1994) (citations omitted) ("A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment."). That standard is clearly satisfied with respect to the assumption of the Assumed Agreements because, as discussed above, PCAA has determined in the exercise of its sound business judgment that entry into the Sale Agreement is in the best interest of its estate and creditors and the assumption and assignment of the Assumed Agreements is an integral part of such agreement.

**F.**     **Sale Should be Exempt from Applicable Transfer Taxes**

52.     Section 1146(c) of the Bankruptcy Code provides:

The issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax.

11 U.S.C. § 1146(c). Section 1146(c) of the Bankruptcy Code expressly exempts certain sales and transfers made under a plan of reorganization from stamp taxes and other applicable transfer taxes. The Supreme Court has construed section 1146(c) to apply only to transfers that occur within a plan context. See Florida Dept.of Revenue v. Piccadilly Cafeterias, Inc., 128 S.Ct. 2326 (U.S. 2008). In the instant case, as mentioned above, PCAA anticipates seeking entry of the Sale Order in conjunction with entry of the order confirming PCAA's chapter 11 plan, and the chapter 11 plan would be consummated in conjunction with the closing of the Sale. Moreover, the Sale is the first step in a plan exit strategy and thus the Sale should be exempted under section 1146(c)

29

of the Bankruptcy Code even if the Sale approval does not occur at and as part of the confirmation hearing.

53.     Certain states and localities in which assets to be sold pursuant to the Sale are located have or may have statutes or regulations requiring creditor notification before bulk transfers are conducted or other restrictions concerning the sale of PCAA's assets. PCAA has not conducted a comprehensive study of such requirements for every state, city and town in which the Sale assets are located. However, certain of the statutes and regulations may provide that if a bankruptcy sale is court authorized, then a company need not comply with such statutes or regulations. Moreover, in the context of bankruptcy cases such as these, where creditors are given notice of the proposed sale in advance, as well as an opportunity to be heard before this Court, the application of such statutes and regulations would be redundant and unnecessary. Accordingly, PCAA seek this Court's authorization to consummate the Sale without the necessity of complying with any state or local bulk transfer or other requirements.

**G.     Proposed Sale Notice is Appropriate Under Bankruptcy Rule 2002**

54.     A debtor is required to notify its creditors of any proposed sale of its assets, including a disclosure of the time and place of an auction, the terms and conditions of the sale, and the deadline for filing any objections. PCAA submits that the Procedures Notice fully complies with Bankruptcy Rule 2002 and includes information in the Bidding Procedures necessary to enable interested parties to participate in the Auction.

55.     PCAA submits that the notice to be provided through the Procedures Notice of the Bidding Procedures and the method of service proposed herein constitutes good and adequate notice of the Bidding Procedures and the other components of the Sale. Therefore, PCAA respectfully requests this Court approve the foregoing notice procedures.

30

**H.  Waiver of Stay Under Bankruptcy Rules 6004(h) and 6006(d)**

56.     PCAA also request that upon entry of the Sale Order, the Court waive the 14-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d).  As demonstrated by the facts of these cases and the general economic environment, it is crucial to PCAA's bankruptcy cases that the Sale be consummated as soon as possible.  For this reason, PCAA respectfully submits that the Court waive the 14-day stay requirements contained in Bankruptcy Rules 6004(h) and 6006(d).

**No Prior Request**

57.     No prior application for the relief sought herein has been duly made by PCAA to this or any other Court.

**Notice**

58.     Notice of this Motion has been provided to the following parties or their legal counsel (if known): (i) the U.S. Trustee, (ii) PCAA's prepetition secured lenders, and their respective agents, if any, (iii) the agents for PCAA's proposed debtor-in-possession lenders, (iv) the Stalking Horse Purchaser, (v) those creditors of PCAA holding the 20 largest unsecured claims, and (vi) all parties requesting notice pursuant to Bankruptcy Rule 2002.  PCAA submits that, in light of the relief requested, no other or further notice need be provided.

**WHEREFORE**, PCAA respectfully request entry of (i) the Bidding Procedures Order and (ii) the Sale Order, and (iii) any other and further relief as is just and appropriate.

Dated: January 28, 2010
Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
Lee E. Kaufman (No. 4877)
Zachary I. Shapiro (No. 5103)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

MILBANK, TWEED, HADLEY & McCLOY LLP
Matthew S. Barr
Michael E. Comerford
One Chase Manhattan Plaza
New York, NY 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

*Proposed Attorneys for PCAA Parent, LLC, et al.*

RLF1 3532765v.1