## Exhibit A

## Sale Agreement

**Exhibit B**

**Schedule of Purchased Contracts**

## Exhibit C

## Cure Amounts For Purchased Contracts as of Sale Hearing Date

**Exhibit C**

EXHIBIT C

## FORM OF TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "Agreement") is made and entered into as of [＿＿＿＿], 2010 (the "Effective Date"), by and among PCAA Parent, LLC, a Delaware limited liability company ("PCAA Parent"), the subsidiaries of PCAA Parent set forth on the signature pages hereto (together with PCAA Parent, the "Sellers"), and Corinthian-Bainbridge ZKS Holdings, LLC, a Delaware limited liability company ("Purchaser"). Sellers and Purchaser are referred to herein individually as a "Party" and collectively as the "Parties".

WHEREAS, Sellers and Purchaser are parties to that certain Asset Purchase Agreement, dated January [＿], 2010 (the "Purchase Agreement"), providing for the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities between Sellers and Purchaser, all upon the terms and conditions set forth in the Purchase Agreement;

WHEREAS, in order to ensure an orderly transition in effecting the transactions contemplated by the Purchase Agreement, Purchaser desires to procure certain services from Sellers, and Sellers are willing to provide such services to Purchaser for the transitional period described herein, on the terms and conditions set forth in this Agreement; and

WHEREAS, in order to ensure an orderly transition in effecting the transactions contemplated by the Purchase Agreement, Sellers desire to procure certain services from Purchaser, and Purchaser is willing to provide such services to Sellers for the transitional period described herein, on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the covenants contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows.

## ARTICLE 1
## DEFINITIONS

**1.1**  **Defined Terms**. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement.

## ARTICLE 2
## PROVISION OF THE TRANSITION SERVICES

**2.1**  **Provision of the Transition Services**. Sellers shall use commercially reasonable efforts to provide, or cause to be provided, the services specified in Schedule 1 (the "Seller Services"). Purchaser shall use commercially reasonable efforts to provide, or cause to be provided, the services specified in Schedule 2 (the "Purchaser Services" and, collectively with the Seller Services, the "Transition Services"). Each Party responsible for providing Transition Services (each, a "Providing Party") shall use commercially reasonable efforts to provide, or cause to be provided, such Transition Services in a reasonable and diligent manner consistent with the quality and level of service with which such Party or its affiliates provides, or causes to be provided, services for themselves. Notwithstanding anything in this Agreement to the contrary, in no event shall any Providing Party be obligated to (a) make any modifications to, or refrain from making any modifications to, any such services such Providing Party provides to itself, (b)

acquire additional assets, equipment, rights or properties, (c) hire additional employees or (d) maintain or support any assets, equipment, rights or property that are not owned or leased by such Providing Party. Notwithstanding the foregoing or any other provision in this Agreement, (i) neither Party shall be in breach of this Agreement if such Party does not provide, or cause to be provided, any Transition Services as a result of any refusal to give, or material delay in providing (after reasonable notice), any consent reasonably requested with respect to any matter under this Agreement on the part of the Party receiving such Transition Services (each, a "Receiving Party") and (ii) a Providing Party is not required to provide any Transition Service if the provision thereof would violate any applicable law.

**2.2**    **Nature of the Transition Services**. Each Party acknowledges and understands that the Transition Services are transitional in nature and are furnished by the Providing Party for the purpose of facilitating the consummation of the transactions contemplated by the Purchase Agreement and the wind down of the Business immediately following the Closing. Purchaser acknowledges that it is required to transition the Seller Services to its own internal organization or any other third party service providers as promptly as practicable after the Closing.

**ARTICLE 3**
**MANAGEMENT AND CONTROL**

**3.1**    **Cooperation**.    The Receiving Party shall provide all cooperation and assistance reasonably required by the Providing Party or any of its Affiliates or subcontractors to enable the Providing Party to provide, or cause to be provided, the Transition Services. Each Party shall provide reasonable access to the other Party to its premises, officers and employees, and books and records during normal business hours and upon reasonable advance notice to enable the other Party to perform its obligations under this Agreement.

**3.2**    **Contract Managers**. Each Party shall appoint an individual to act as the primary point of operational contact for the administration and operation of this Agreement (each, a "Contract Manager"). Each Contract Manager shall have overall responsibility for coordinating, on behalf of Sellers or Purchaser, as applicable, all activities undertaken by Sellers or Purchaser, as applicable, hereunder, for coordinating the provision of the Transition Services, for acting as a day-to-day contact with the other Party's Contract Manager, for making available to the Providing Party the data, facilities, resources and other support services required for the Providing Party to be able to provide the Transition Services in accordance with the requirements of this Agreement, and for handling disputes in accordance with Section 3.3. Either Party may change its Contract Manager by providing written notice thereof to the other Party in accordance with Section 8.8.

**3.3**    **Dispute Resolution**.    The Parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by negotiations in accordance with this Section 3.3.

   **3.3.1**    Contract Managers.  In the event that a dispute arises, the Contract Managers shall first consider and attempt to resolve the dispute for a period up to 15 days following receipt of a notice from either Party specifying the nature of the dispute.

**3.3.2** <u>Senior Management</u>. In the event that the dispute is not resolved by the end of the 15 day period referred to in <u>Section 3.3.1</u>, either Party may submit the dispute for consideration by senior executives of the Parties who do not have direct responsibility for administration of this Agreement (collectively, "<u>Senior Executives</u>"). Thereupon, the Contract Managers shall promptly prepare and send to the Senior Executives a reasonably detailed notice describing (i) the issues in dispute and each Party's position thereon, (ii) a summary of the evidence and arguments supporting each Party's position (attaching all relevant documents), and (iii) a summary of the negotiations that have taken place to date. The Senior Executives shall meet for negotiations (which may be held telephonically) as often as the Senior Executives deem reasonably necessary to resolve the dispute. In the event that the dispute is not resolved within 30 days after the date that the Contract Managers first considered the dispute, either Party may pursue any and all rights and remedies available to it at law or in equity.

## ARTICLE 4
## FEES AND PAYMENT

**4.1** <u>Fees</u>. The Providing Party shall invoice the Receiving Party, and the Receiving Party shall pay to the Providing Party, for the reasonable, actual, out-of-pocket costs and expenses (the "<u>Fees</u>") incurred by the Providing Party (without markup or margin to such costs and expenses incurred by the Providing Party) in connection with providing the applicable Transition Services to be provided by the Providing Party hereunder. In addition, Sellers shall pay to Purchaser on a monthly basis the amount of $5,000 (the "<u>Monthly Fee</u>") during the term of this Agreement, as consideration for the Purchaser Services provided during the preceding month. Except as expressly set forth in this <u>Section 4.1</u>, neither Party shall have any obligation to reimburse the other Party for any costs or expenses incurred by the other Party in providing the applicable Transitions Services, or to pay any fees or make any other payments to any other Party.

**4.2** <u>Payment and Invoices</u>. The Providing Party shall, on a monthly basis, submit to the Receiving Party for payment a billing invoice setting forth the applicable Transition Services provided during such period, the corresponding amounts owed for such Transition Services and, in the case of Purchaser as the Providing Party, the Monthly Fee. Payment of all such undisputed amounts owed (it being understood that the Monthly Fee may not be disputed) shall be remitted within ten Business Days after the date on which the Receiving Party receives the Providing Party's invoice. If the Receiving Party elects to terminate its right to receive one or more categories of Transition Services pursuant to <u>Section 5.2</u>, any Fees payable to the Providing Party for such Transition Service shall be reduced by the amount attributed to such terminated category of Transition Service on <u>Schedule 1</u> or <u>Schedule 2</u>, as applicable.

**4.3** **Taxes**. The Fees do not include any taxes. In addition to the Fees, the Receiving Party shall be responsible for payment of all taxes chargeable in respect of such Transition Service, including, but not limited to, value-added taxes, tariffs, duties, export or import fees, sales taxes, use taxes, service taxes, but excluding taxes based on the net income of the Providing Party.

## ARTICLE 5
## TERM AND TERMINATION

**5.1** **Term**.

**5.1.1** **Term of Agreement**. The term of this Agreement shall begin on the Effective Date and end on [_____, 2011][1] (the "Termination Date"); provided that the Parties may agreed to extend the Termination Date in their sole discretion.

**5.2** **Termination**.

**5.2.1** **Termination for Convenience**. Either Party may terminate its right to receive any particular Transition Service for any or no reason by providing the other Party not less than 30 days prior written notice setting forth the termination date for such Transition Service; provided, however, that such termination shall in no way affect the terminating Party's obligation to provide Transition Services to the other Party hereunder.

**5.2.2** **Termination for Breach**. In the event that a Party materially breaches any of its obligations under this Agreement, and does not cure such breach within 10 days after receiving written notice thereof from the non-breaching Party, then the non-breaching Party may, in addition to any other remedies available to it, terminate any Transition Service affected by such breach or this Agreement in its entirety by providing written notice of termination to the other Party, which termination shall be effective immediately.

**5.2.3** **Bankruptcy Termination**. This Agreement may be terminated by either Party upon at least 30 days prior written notice in the event that the other Party (or any successor entity) is declared insolvent or bankrupt, or makes an assignment for the benefit of creditors, or a receiver is appointed or any proceeding is demanded by, for or against such other Party (or any successor entity) under any provision of the Bankruptcy Code.

**5.2.4** **Effect of Termination**. Any termination of this Agreement shall be without prejudice to any rights or obligations of the Parties accruing prior to such termination, including the right to payment of unpaid amounts owing for services performed prior to termination.

## ARTICLE 6
## LIMITATION OF LIABILITY

**6.1** **LIMITATION OF LIABILITY**. EXCEPT IN THE CASE OF FRAUD, GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR INTENTIONAL ABANDONMENT OF THIS AGREEMENT, THE LIABILITY OF EACH PARTY AND THEIR AFFILIATES UNDER THIS AGREEMENT, WHETHER ARISING FROM CONTRACT, TORT, WARRANTY,

---

[1] The 15 month anniversary of the Closing Date.

NEGLIGENCE OR OTHERWISE, SHALL BE LIMITED TO THE AMOUNTS PAID BY THE OTHER PARTY FOR THE TRANSITION SERVICES PROVIDED TO IT HEREUNDER, OR $60,000, WHICHEVER IS GREATER.

**6.2    CONSEQUENTIAL DAMAGES**.    NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, EXCEPT IN THE CASE OF FRAUD, GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR INTENTIONAL ABANDONMENT OF THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY OR ITS AFFILIATES BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES IN CONNECTION WITH THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, LOST TIME, LOST MONEY, LOST PROFITS, OR GOODWILL, REGARDLESS OF THE FORM OF THE ACTION OR THE BASIS OF THE CLAIM, EVEN IF A PARTY OR ITS AFFILIATE HAS BEEN APPRISED OF THE POSSIBILITIES OF SUCH DAMAGES, AND WHETHER OR NOT SUCH COULD HAVE BEEN FORESEEN OR PREVENTED.

## ARTICLE 7
## INDEMNIFICATION

**7.1    Indemnification Obligation**.    Each Party (the "Indemnifying Party") shall protect, defend, hold harmless and indemnify the other Party (the "Indemnified Party") from and against any and all claims, losses, damages and liabilities arising out of or resulting from (i) the Indemnifying Party's breach of this Agreement or (ii) the Indemnifying Party's fraud, gross negligence, willful misconduct or intentional abandonment of this Agreement.

**7.2    Indemnification Procedure**.    The Indemnified Party shall promptly notify the Indemnifying Party in writing of any claim, action, demand or lawsuit for which the Indemnified Party intends to claim indemnification hereunder (however, failure to give such notice will not relieve the Indemnifying Party from its obligations hereunder, except to the extent that (and only to the extent that) the Indemnifying Party is prejudiced by such delay). The Indemnifying Party shall have the right to take control of the defense of all actions that are indemnified against hereunder; provided, however, that the Indemnifying Party shall not have the right to settle or compromise any claim without the written consent of the Indemnified Party, which consent shall not be unreasonably withheld, conditioned or delayed, excluding, however, a compromise or settlement based solely on the payment of money in exchange for a complete release of the Indemnified Party without any further obligations being imposed on the Indemnified Party. The Indemnified Party shall cooperate with the Indemnifying Party and its legal representatives in the investigation and defense of any action covered by this indemnification.

## ARTICLE 8
## GENERAL

**8.1    Confidentiality**. The confidentiality provisions set forth in Section 8.5 of the Purchase Agreement shall apply to this Agreement as if fully set forth herein.

**8.2    Force Majeure**. The Providing Party shall not be liable to the Receiving Party for any breach of this Agreement or failure to perform any obligation under this Agreement resulting

#4837-4197- 7348v6
RLF1 3532794v.1

from an event beyond the reasonable control of the Providing Party, including, but not limited to, war, fire, explosion, flood, strike, riot, act of governmental authority, act of God, act of terror or other contingency.

**8.3** **Relationship of the Parties**. Each Party, in performance of this Agreement, is acting as an independent contractor to the other Party, and not as a partner, joint venturer or agent. The Parties do not intend to create by this Agreement an employer-employee relationship. Each Party retains control over its personnel, and the employees of one Party shall not be considered employees of the other Party. Neither Party shall be bound by any representation, act or omission of the other Party. Neither Party shall have any right, power or authority to create any obligation, express or implied, on behalf of the other Party.

**8.4** **Subcontracting**. The Providing Party may use subsidiaries or contractors, subcontractors, vendors or other third parties under contract with the Providing Party to provide some or all of such Transition Service. If the Providing Party delegates any of its responsibilities under this Agreement to any of its subsidiaries or generally uses contractors, subcontractors, vendors or other third parties in the performance thereof on behalf of the Providing Party, then the cost thereof, reasonably calculated, may be billed to the Receiving Party, provided that the Providing Party shall not incur any such costs in any given month in excess of the Monthly Fee without the prior written consent of the Receiving Party; provided, further, that the Providing Party shall remain fully responsible for the actions and performance of such subsidiary or contractor, subcontractor, vendor or other third party to the extent the Providing Party would be responsible hereunder if performing such obligations itself and such subsidiary or contractor, subcontractor, vendor or other third party shall be deemed the Providing Party hereunder for purposes of defining its performance obligations.

**8.5** **Binding Effect; No Third Party Beneficiaries; No Assignment**. This Agreement shall be legally binding upon and inure to the benefit of the Parties and their respective successors and assigns. Nothing herein shall create or be deemed to create any third party beneficiary rights in any Person that is not a Party. No assignment hereof or of any rights or obligations hereunder may be made by any Party (by operation of law or otherwise) without the prior written consent of the other Party and any attempted assignment without such required consent shall be without effect.

**8.6** **Survival**. Articles 4, 6, 7 and 8 shall survive termination or expiration of this Agreement.

**8.7** **Amendment; Waiver**. This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, each of the Parties hereto. No waiver by any Party of any breach of any covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent breach of any covenant hereunder or affect in any way any rights arising by virtue of any such prior or subsequent occurrence.

**8.8** **No Setoff**. Each Party agrees that it will perform its obligations hereunder without setoff, deduction or withholding of any kind for amounts owed or payable by the other Party, whether under this Agreement or otherwise.

**8.9  Notices.** All notices and other communications hereunder shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) when sent by facsimile (with written confirmation of transmission) or (c) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Sellers, to:

> PCAA Parent, LLC
> 621 North Governor Printz Boulevard
> Essington, PA 19029
> Attention:     Mark Shapiro

With a copy (which shall not constitute notice) to:

> Todd Weintraub
> Director of PCAA Parent
> c/o Macquarie Infrastructure Company LLC
> 125 West 55th Street
> New York, NY  10019
> Facsimile:     (212) 231-1838

> Milbank, Tweed, Hadley & McCloy LLP
> 1 Chase Manhattan Plaza
> New York, NY 10005
> Facsimile:     (212) 822-5491
>                       (212) 822-5194
> Attention:     John D. Franchini
>                       Matthew S. Barr

If to Purchaser, to:

> Bainbridge | ZKS Holding Company, LLC
> 3570 Carmel Mountain Road, Suite 100
> San Diego, CA  92130
> Facsimile:     (858) 430-2491
> Attention:     Nick Chini

> Bainbridge | ZKS Holding Company, LLC
> 2060 Mt. Paran Road, Suite 101
> Atlanta, Georgia 30327
> Facsimile:     (770) 754-1314
> Attention:     Frederick D. Clemente

> Corinthian Capital Group, LLC
> 601 Lexington Avenue, 59th Floor
> New York, New York 10022
> Attention: C. Kenneth Clay
> Facsimile: (212) 920-2399

**8.10    Severability**. In the event that any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any of the Parties. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

**8.11    Entire Agreement**. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between Sellers and Purchaser with respect to the subject matter hereof.

**8.12    Governing Law; Submission to Jurisdiction**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that State, except as may be governed by the Bankruptcy Code. Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 8.9 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

**8.13    WAIVER OF JURY TRIAL**. EACH OF THE PARTIES HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**8.14    Counterparts**. This Agreement may be executed (including by facsimile transmission) in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by an authorized representative as of the Effective Date.

CORINTHIAN-BAINBRIDGE ZKS HOLDINGS, LLC

By:  _____
Name:
Title:

PCAA PARENT, LLC

By: _____
      Name: _____
      Title: _____

RCL PROPERTIES, LLC

By: _____
      Name: _____
      Title: _____

PCAA GP, LLC

By: _____
      Name: _____
      Title: _____

PCAA AIRPORTS, LTD.

By: _____
      Name: _____
      Title: _____

PARKING COMPANY OF AMERICA
AIRPORTS, LLC

By: _____
      Name: _____
      Title: _____

PCAA CHICAGO, LLC

By: _____
      Name: _____
      Title: _____

PCAA LP, LLC

By: _____
      Name: _____
      Title: _____

PARKING COMPANY OF AMERICA
AIRPORTS, PHOENIX, LLC

By: _____
      Name: _____
      Title: _____

PCAA SP, LLC

By: _____
      Name: _____
      Title: _____

PCAA OAKLAND, LLC

By: _____
      Name: _____
      Title: _____

PCAA PROPERTIES, LLC

By: _____
   Name: _____
   Title: _____

PCAA MISSOURI, LLC

By: _____
   Name: _____
   Title: _____

AIRPORT PARKING MANAGEMENT, LLC

By: _____
   Name: _____
   Title: _____

PCAA SP-OK, LLC

By: _____
   Name: _____
   Title: _____

## SCHEDULE 1

## SELLER SERVICES

### Description of Service

The Sellers shall preserve their books and records and all Documents that do not constitute Purchased Assets under the Purchase Agreement, or copies thereof, during the term of this Agreement, and, during the term of this Agreement, provide reasonable access to Purchaser, its officers, representatives and agents, to (a) such books, records and Documents, subject to restrictions based on applicable confidentiality obligations and applicable law (it being understood that the terms of Section 8.1 of this Agreement shall apply to all such books, records and Documents), and (b) Sellers' officers, employees, representatives and agents, in the case of each of (a) and (b), during normal business hours and upon reasonable advance notice, in order to reasonably assist Purchaser in Purchaser's preparation of customary financial statements relating to the Business, and Purchaser's preparation and making of necessary filings and disclosures relating to the Business and required under applicable Law to be made after the Closing Date by Purchaser.

## SCHEDULE 2

## PURCHASER SERVICES

### Description of Service

Purchaser shall preserve its books and records and all Documents that constitute Purchased Assets under the Purchase Agreement, or copies thereof, during the term of this Agreement, and, during the term of this Agreement, provide reasonable access to Sellers, their officers, representatives and agents, to (a) such books, records and Documents, subject to restrictions based on applicable confidentiality obligations and applicable law (it being understood that the terms of Section 8.1 of this Agreement shall apply to all such books, records and Documents), and (b) Purchaser's officers, employees, representatives and agents, in the case of each of (a) and (b), during normal business hours and upon reasonable advance notice, in order to reasonably assist Sellers in:

1. the Sellers' cancellation, termination or winding-down of any Contracts of Sellers that are not Purchased Contracts under the Purchase Agreement;

2. the Sellers' efforts to effect any sale, or other disposition, of any Tangible Personal Property or Real Property of the Sellers that does not constitute Purchased Assets under the Purchase Agreement;

3. the Sellers' and their affiliates' preparation of customary financial statements relating to the Business, and the Sellers' and their affiliates' preparation and making of necessary filings and disclosures relating to the Business and required under applicable Law to be made after the Closing Date by any of the Sellers or their affiliates, including tax and regulatory filings and audits and environmental disclosures;

4. the retrieval of records and research of transactions in connection with, among other things, the pursuit of certain causes of action by Sellers, the Creditors' Committee or any liquidating trustee that is established, or the defense of any claims by unrelated third parties against Sellers, the Creditors' Committee or any liquidating trustee;

5. the administration of employee-related matters, including WARN Act notifications, benefits administration, COBRA notifications and administration, and immigration records; and

6. any other matter as may be reasonably requested by Sellers.

**Exhibit D**

FORM OF ASSIGNMENT AND BILL OF SALE

ASSIGNMENT AND BILL OF SALE, dated as of [_____] [__], 2010 (this "Assignment and Bill of Sale"), among PCAA Parent, LLC, a Delaware limited liability company ("PCAA Parent"), the Subsidiaries of PCAA Parent set forth on the signature pages hereto (together with PCAA Parent, the "Sellers"), and Corinthian-Bainbridge ZKS Holdings, LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, Purchaser and the Sellers have entered into an Asset Purchase Agreement, dated as of January [__], 2010 (as amended, modified or supplemented from time to time in accordance with its terms, the "Asset Purchase Agreement"; capitalized terms used but not defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement);

WHEREAS, pursuant to, and in accordance with the terms of, the Asset Purchase Agreement, the Sellers have agreed to sell, transfer and assign to Purchaser, and Purchaser has agreed to purchase, acquire and assume from the Sellers, pursuant to sections 363 and 365 of the Bankruptcy Code, all of the Purchased Assets and Assumed Liabilities;

WHEREAS, the Sellers intend to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware and become debtors-in-possession under the Bankruptcy Code, and the Sellers and the Purchaser intend that the transactions contemplated by the Asset Purchase Agreement will be consummated pursuant to a plan of liquidation or reorganization, subject to the satisfaction of the conditions set forth in the Asset Purchase Agreement; and

WHEREAS, the Sellers desire to sell, transfer, convey, assign and deliver to Purchaser the Purchased Assets described in Section 2.1 of the Asset Purchase Agreement and Purchaser desires to accept the sale, transfer, conveyance, assignment and delivery thereof.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereby agree as follows:

1.  Assignment. Upon the terms and subject to the conditions of the Asset Purchase Agreement, each of the Sellers hereby irrevocably sells, transfers, conveys, assigns and delivers to Purchaser all of such Seller's right, title and interest in, to and under the Purchased Assets described in Section 2.1 of the Asset Purchase Agreement, free and clear of all Liens to the extent provided in the Sale Order and subject to the Permitted Exceptions. Purchaser hereby accepts the sale, transfer, conveyance, assignment and delivery of the Purchased Assets.

2.  Asset Purchase Agreement. Nothing contained in this Assignment and Bill of Sale shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of PCAA Parent, the Sellers or the Purchaser contained in the Asset Purchase Agreement. If any conflict or other difference exists between the terms of this

Assignment and Bill of Sale and the Asset Purchase Agreement, then the terms of the Asset Purchase Agreement shall govern and control.

3.    Successors and Assigns. No Person other than the Sellers, and their respective successors and assigns shall have any rights under this Assignment and Bill of Sale or the provisions contained herein.

4.    Further Assurances. The Sellers and the Purchaser shall execute and deliver, or cause to be executed and delivered, from time to time hereafter, upon reasonable request and without further consideration, all such further documents and instruments and shall do and perform all such acts as may be reasonably necessary to give full effect to the intent of this Assignment and Bill of Sale.

5.    Governing Law. This Assignment and Bill of Sale shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State, without giving effect to any choice-of-law principles that would require the application of the laws of another jurisdiction, except as may be governed by the Bankruptcy Code.

6.    Counterparts. This Assignment and Bill of Sale may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

7.    Miscellaneous. The section headings contained in this Assignment and Bill of Sale are solely for the purpose of reference, are not part of the agreement of the parties hereto and shall not affect in any way the meaning or interpretation of this Assignment and Bill of Sale.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have caused their duly authorized officers to execute this Assignment and Bill of Sale on the day and year first above written.

CORINTHIAN-BAINBRIDGE ZKS HOLDINGS, LLC

By: _____

Name: _____

Title: _____

PCAA PARENT, LLC

By: _____

Name: _____

Title: _____

PCAA CHICAGO, LLC

By: _____

Name: _____

Title: _____

RCL PROPERTIES, LLC

By: _____

Name: _____

Title: _____

PCAA LP, LLC

By: _____

Name: _____

Title: _____

PCAA GP, LLC

By: _____

Name: _____

Title: _____

PARKING COMPANY OF AMERICA
AIRPORTS, PHOENIX, LLC

By: _____

Name: _____

Title: _____

PCAA AIRPORTS, LTD.

By: _____

Name: _____

Title: _____

PCAA SP, LLC

By: _____

Name: _____

Title: _____

PARKING COMPANY OF AMERICA
AIRPORTS, LLC

By: _____

Name: _____

Title: _____

PCAA OAKLAND, LLC

By: _____

Name: _____

Title: _____

PCAA PROPERTIES, LLC

By: _____

Name: _____

Title: _____

PCAA SP-OK, LLC

By: _____

Name: _____

Title: _____

AIRPORT PARKING MANAGEMENT, LLC

By: _____

Name: _____

Title: _____

PCAA MISSOURI, LLC

By: _____

Name: _____

Title: _____

**Exhibit E**

## FORM OF ASSUMPTION AGREEMENT

ASSUMPTION AGREEMENT, dated as of [_____] [__], 2010 (this "Assumption Agreement"), among PCAA Parent, LLC, a Delaware limited liability company ("PCAA Parent"), the subsidiaries of PCAA Parent set forth on the signature pages hereto (together with PCAA Parent, the "Sellers"), and Corinthian-Bainbridge ZKS Holdings, LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, Purchaser and the Sellers have entered into an Asset Purchase Agreement, dated as of January [__], 2010 (as amended, modified or supplemented from time to time in accordance with its terms, the "Asset Purchase Agreement"; capitalized terms used but not defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement);

WHEREAS, pursuant to, and in accordance with the terms of, the Asset Purchase Agreement, the Sellers have agreed to sell, transfer and assign to Purchaser, and Purchaser has agreed to purchase, acquire and assume from the Sellers, pursuant to sections 363 and 365 of the Bankruptcy Code, all of the Purchased Assets and Assumed Liabilities;

WHEREAS, the Sellers intend to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware and become debtors-in-possession under the Bankruptcy Code, and the Sellers and the Purchaser intend that the transactions contemplated by the Asset Purchase Agreement will be consummated pursuant to a plan of liquidation or reorganization, subject to the satisfaction of the conditions set forth in the Asset Purchase Agreement;

WHEREAS, Purchaser has agreed, in partial consideration for the Purchased Assets, to assume the Assumed Liabilities described in Section 2.3 of the Asset Purchase Agreement by executing this Assumption Agreement; and

WHEREAS, pursuant to Section 4.3(b) of the Asset Purchase Agreement, Purchaser is required to execute and deliver to the Sellers this Assumption Agreement whereby Purchaser assumes the Assumed Liabilities.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereby agree as follows:

1.    Assumption. Purchaser hereby undertakes and agrees from and after the date hereof, subject to the limitations contained herein, to assume and to pay, perform and discharge when due the Assumed Liabilities described in Section 2.3 of the Asset Purchase Agreement.

2.    Asset Purchase Agreement. Other than as specifically stated above or in the Asset Purchase Agreement, Purchaser assumes no debt, liability or obligation of the Sellers, including without limitation the Excluded Liabilities described in Section 2.4 of the Asset Purchase

Agreement, and it is expressly understood and agreed that all debts, liabilities and obligations not assumed hereby by Purchaser shall remain the sole obligation of the Sellers, or their respective successors and assigns. Nothing contained in this Assumption Agreement shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of PCAA Parent, the Sellers or the Purchaser contained in the Asset Purchase Agreement. If any conflict or other difference exists between the terms of this Assumption Agreement and the Asset Purchase Agreement, then the terms of the Asset Purchase Agreement shall govern and control.

3.    <u>Successors and Assigns</u>. No Person other than the Sellers, and their respective successors and assigns shall have any rights under this Assumption Agreement or the provisions contained herein.

4.    <u>Further Assurances</u>. The Sellers and the Purchaser shall execute and deliver, or cause to be executed and delivered, from time to time hereafter, upon reasonable request and without further consideration, all such further documents and instruments and shall do and perform all such acts as may be reasonably necessary to give full effect to the intent of this Assumption Agreement.

5.    <u>Governing Law</u>. This Assumption Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State, without giving effect to any choice-of-law principles that would require the application of the laws of another jurisdiction, except as may be governed by the Bankruptcy Code.

6.    <u>Counterparts</u>. This Assumption Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

7.    <u>Miscellaneous</u>. The section headings contained in this Assumption Agreement are solely for the purpose of reference and are not part of the agreement of the parties hereto and shall not affect in any way the meaning or interpretation of this Assumption Agreement.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have caused their duly authorized officers to execute this Assumption Agreement on the day and year first above written.

CORINTHIAN-BAINBRIDGE ZKS HOLDINGS, LLC

By: _____
    Name: _____
    Title: _____

PCAA PARENT, LLC

By: _____

Name: _____

Title: _____

PCAA CHICAGO, LLC

By: _____

Name: _____

Title: _____

RCL PROPERTIES, LLC

By: _____

Name: _____

Title: _____

PCAA LP, LLC

By: _____

Name: _____

Title: _____

PCAA GP, LLC

By: _____

Name: _____

Title: _____

PARKING COMPANY OF AMERICA AIRPORTS, PHOENIX, LLC

By: _____

Name: _____

Title: _____

PCAA AIRPORTS, LTD.

By: _____

Name: _____

Title: _____

PCAA SP, LLC

By: _____

Name: _____

Title: _____

PARKING COMPANY OF AMERICA
AIRPORTS, LLC

By: _____

Name: _____

Title: _____


PCAA OAKLAND, LLC

By: _____

Name: _____

Title: _____


PCAA PROPERTIES, LLC

By: _____

Name: _____

Title: _____


PCAA SP-OK, LLC

By: _____

Name: _____

Title: _____


AIRPORT PARKING MANAGEMENT, LLC

By: _____

Name: _____

Title: _____


PCAA MISSOURI, LLC

By: _____

Name: _____

Title: _____

**Form of Trademark Assignment**

# FORM OF TRADEMARK ASSIGNMENT

This TRADEMARK ASSIGNMENT (this "Assignment") is entered into this _____ day of [_____], 2010, by and between [_____], a Delaware limited liability company ("Assignee"), and [_____], a [_____] limited liability company ("Assignor").

## W I T N E S S E T H:

WHEREAS, Assignor is the current owner of record of United States trademark registrations and trademarks listed on Schedule A attached hereto (hereinafter referred to as "Registrations" and "Trademarks", respectively);

WHEREAS, Assignee and Assignor, among others, entered into an Asset Purchase Agreement dated as of January [__], 2010 (as amended, modified or supplemented from time to time in accordance with its terms, the "Asset Purchase Agreement"; capitalized terms used but not defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement), pursuant to and in accordance with the terms of which, Assignor has agreed to sell, transfer and assign to Assignee, and Assignee has agreed to purchase, acquire and assume from Assignor, pursuant to sections 363 and 365 of the Bankruptcy Code, all of the Purchased Assets and Assumed Liabilities, including the Registrations and Trademarks; and

WHEREAS, Assignee desires to obtain from Assignor and Assignor desires to transfer, assign and otherwise convey to Assignee any and all of Assignor's rights, title and interest in, to and under the Trademark, and the good will associated therewith, including the Registrations pursuant to this Assignment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor and Assignee agree as follows:

1.      Assignor does hereby, as of the date hereof, transfer, assign and otherwise convey to Assignee and Assignee hereby accepts the assignment and transfer of, all of Assignor's right, title and interest in, to and under (1) the Trademarks, together with the goodwill associated with and symbolized by the Trademarks, and all marks consisting of or comprising the Trademarks, and the Registrations, including any renewals and extensions thereof that may be secured under the laws of the United States and all foreign countries, now or hereafter in effect, together with all income, royalties or payments due or payable with respect to the Trademarks hereafter, and (2) all rights to sue for the infringement of the foregoing rights, including all claims for damages by reason of past, present or future infringement or other unauthorized use of the Trademarks, with the right to sue for, and collect the same for Assignee's own use and enjoyment and for the use and enjoyment of its successors, assigns, affiliates or other legal representatives.

2.      Assignor hereby agrees to perform all acts reasonably necessary and appropriate to assist Assignee in perfecting the rights hereby transferred, assigned and conveyed, and to promptly execute all papers as may be reasonably requested by Assignee in order to

obtain assignment documents in recordable form and to perfect the rights, title and interest hereby transferred, assigned and conveyed.

3.    This Assignment shall inure to the benefit of the successors and assigns of Assignee, and shall be binding upon the successors and assigns of Assignor.

IN TESTIMONY WHEREOF, Assignor has caused this Assignment to be executed effective as of this ___ day of [_____], 2010.

ASSIGNOR                                            ASSIGNEE


By: _____                        By: _____
    Name:                                               Name:
    Title:                                              Title:

Sworn to before me this ___ day                     Sworn to before me this ___ day
of [_____], 2010.                                of [_____], 2010.


_____                             _____
Notary Public                                       Notary Public

SCHEDULE A – TRADEMARKS

| Mark | App. Serial No. | Reg. No. |
|---|---|---|
| **FASTTRACK DIVIDENDS** | N/A | N/A |
|  | N/A | N/A |
| **FASTTRACK PREMIER PARKER** | N/A | N/A |
|  | N/A | N/A |
| **FASTTRACK AIRPORT PARKING** | 76/671,400 | N/A |
|  | 76/671,401 | N/A |
|  | 76/671,401* | N/A |

| Mark | App. Serial No. | Reg. No. |
|------|-----------------|----------|
|  | 76/671,401* | N/A |
|  | 76/671,401* | N/A |
|  | 76/671,401* | N/A |
|  | 76/671,401* | N/A |
|  | 76/671,401* | N/A |

| Mark | App. Serial No. | Reg. No. |
|---|---|---|
|  | 76/671,401* | N/A |
| AIRPORTDISCOUNTPARKING.COM<br><br> | 78/215,206 | 2,988,342 |
| PICCOLO | 76/094,590 (abandoned 07/23/08) | 2,596,999 |
|  | 75/449,390 | 2,764,485 |
| AVISTAR | 75/406,816 | 2,740,637 |
| ONEPAY | 76,240,117 (abandoned 10/15/08) | 2,637,027 |

| Mark | App. Serial No. | Reg. No. |
|---|---|---|
|  | 78/215,248 | 2,823,315 |
|  | 78/215,252 | 2,838,605 |
|  | N/A | N/A |
| PCAA | N/A | N/A |
|  | N/A | N/A |
|  | N/A | N/A |
| AIRPORT CORPORATE PARKING | N/A | N/A |
|  | N/A | N/A |
| SUNPARK | N/A | N/A |
|  | N/A | N/A |

| Mark | App. Serial No. | Reg. No. |
|---|---|---|
|  | | |
|  | 77/535,150* | 3,590,653* |
|  | 77/535,150 | 3,590,653 |
|  | 77/535,150* | 3,590,653* |
|  | 77/535,150* | 3,590,653* |

| Mark | App. Serial No. | Reg. No. |
|---|---|---|
|  | 77/535,150* | 3,590,653* |
|  | 77/535,150* | 3,590,653* |
|  | 77/535,150* | 3,590,653* |
|  | 77/538995 | 3586861 |
|  | N/A | N/A |

*Color is not claimed as a feature of the Mark, so technically all of these are covered if they are the same design no matter what the color scheme is.

#4839-9054-0549
RLF1 3532801v.1

-10-

## Escrow Agreement

ESCROW AGREEMENT

dated as of January 28, 2010

by and among

PCAA PARENT, LLC,

CORINTHIAN-BAINBRIDGE ZKS HOLDINGS, LLC

as Purchaser,

and

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Escrow Agent

**THIS ESCROW AGREEMENT,** dated as of January 28, 2010 (this "Escrow Agreement"), is by and among PCAA Parent, LLC, a Delaware limited liability company ("PCAA Parent"), in its capacity as representative of the Sellers (defined below), Corinthian-Bainbridge ZKS Holdings, LLC, a Delaware limited liability company ("Purchaser"), and Wells Fargo Bank, National Association, as escrow agent (the "Escrow Agent").

## RECITALS

WHEREAS, PCAA Parent, the subsidiaries of PCAA Parent set forth on the signature pages thereto (together with PCAA Parent, the "Sellers"), and Purchaser have entered into an Asset Purchase Agreement dated as of even date herewith (the "Asset Purchase Agreement") pursuant to which the Sellers will sell, transfer and assign to Purchaser, and Purchaser will purchase, acquire and assume from the Sellers, pursuant to sections 363 and 365 of chapter 11, title 11 of the United States Code, 11 U.S.C. § 101 - 1532, the Purchased Assets and Assumed Liabilities;

WHEREAS, pursuant to Section 3.2 of the Asset Purchase Agreement, upon execution thereof by Purchaser and the Sellers, Purchaser will deposit an amount in cash equal to the Deposit with the Escrow Agent, which Deposit will be released and delivered by the Escrow Agent in accordance with the Asset Purchase Agreement and this Agreement;

WHEREAS, the Escrow Agent is willing to serve as an escrow agent in accordance with and subject to the terms and conditions set forth in this Escrow Agreement, and will hold and dispose of the Deposit and any Escrow Earnings as provided in this Escrow Agreement; and

WHEREAS, Purchaser, PCAA Parent and the Escrow Agent are entering into this Agreement as contemplated by the Asset Purchase Agreement.

NOW, THEREFORE, Purchaser, PCAA Parent and the Escrow Agent hereby agree as follows:

1.     Certain Defined Terms.  Capitalized terms used in this Escrow Agreement have the meanings specified in Section 9 of, or elsewhere in, this Escrow Agreement. Capitalized terms used in this Escrow Agreement and not otherwise defined herein have the meanings ascribed to them in the Asset Purchase Agreement, a copy of which is attached as Exhibit A to this Escrow Agreement.

2.     Appointment of the Escrow Agent; Escrow Agent Obligations.  PCAA Parent and Purchaser hereby irrevocably designate and appoint the Escrow Agent to serve as, and the Escrow Agent hereby agrees to act as, escrow agent under, and pursuant to the terms and conditions of, this Escrow Agreement and, as such, to receive, hold, invest, reinvest and disburse the Deposit and any Escrow Earnings upon the terms and

conditions of this Escrow Agreement. The Escrow Agent further agrees that it shall not cause or permit any disbursement or withdrawal of the Deposit or any Escrow Earnings except in accordance with the terms of this Escrow Agreement.

3.    Escrow Deposit; Certain Restrictions.

(a)    Deposit at Closing. Pursuant to the terms of the Asset Purchase Agreement and concurrently with the execution and delivery of this Escrow Agreement, Purchaser has caused the Deposit to be delivered to the Escrow Agent, and the Escrow Agent acknowledges receipt of an executed copy of the Asset Purchase Agreement and payment from Purchaser equal to $5,575,000 (such amount being referred to herein as the "Deposit") as provided in Section 3.2 of the Asset Purchase Agreement.

(b)    Deposit. The Escrow Agent shall hold the Deposit and any Escrow Earnings in an escrow account, which shall be a separate, segregated, trust account to which the Deposit and any Escrow Earnings are credited (the "Escrow Account"). The Deposit and any Escrow Earnings shall not be subject to Lien, attachment or any other judicial process of any creditor of any party (or any Affiliate of any party) to or any beneficiary of or under this Escrow Agreement, and shall be used solely for the purposes and subject to the terms and conditions set forth in this Escrow Agreement. The Deposit shall not be available to, and shall not be used by, the Escrow Agent to set off any obligations of either Purchaser or PCAA Parent owing to the Escrow Agent in any capacity.

4.    Investment of Deposit; Reporting; Taxes.

(a)    The Escrow Agent shall invest and reinvest all cash funds held from time to time as part of the Deposit and any Escrow Earnings in any of the following kinds of investments, or in any combination thereof, as jointly directed in writing by Purchaser and PCAA Parent: (i) bonds or other obligations of, or guaranteed by, the government of the United States of America or any State thereof or the District of Columbia, or agencies of any of the foregoing, having maturities of not greater than thirty (30) days; (ii) commercial paper rated, at the time of the Escrow Agent's investment therein or contractual commitment providing for such investment, at least P-1 by Moody's Investors Service, Inc. and A-1 by Standard & Poor's Corporation and having maturities of not greater than thirty (30) days; (iii) demand or time deposits in, certificates of deposit of or bankers' acceptances issued by (A) a depository institution or trust company incorporated under the laws of the United States of America, any State thereof or the District of Columbia or (B) a United States branch office or agency of a foreign depository institution or trust company if, in any such case, the depository institution, trust company or office or agency has combined capital and surplus of not less than one billion dollars ($1,000,000,000) (any such institution being herein called a "Permitted Bank") having maturities of not greater than thirty (30) days; or (iv) such other investments as Purchaser and PCAA Parent shall approve in writing. In the absence of other investment directions, the Deposit and any Escrow Earnings shall be deposited in a Wells Fargo Bank Money Market Deposit Account, as more fully

described on Exhibit D attached hereto. The Escrow Agent is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Escrow Agreement. The Escrow Agent shall have no responsibility or liability for any loss which may result from any investment or sale of investment made pursuant to this Escrow Agreement. The Escrow Agent is hereby authorized, in making or disposing of any investment permitted by this Escrow Agreement, to deal with itself (in its individual capacity) or with any one or more of its affiliates, whether it or any such affiliate is acting as agent of the Escrow Agent or for any third person or dealing as principal for its own account. Purchaser and PCAA Parent acknowledge that the Escrow Agent is not providing investment supervision, recommendations, or advice.

(b)     Taxes and Filings.

(i)     All taxes in respect of earnings on the Deposit shall be the obligation of and shall be paid when due by the party entitled to receive such earnings pursuant to Section 5, below, who shall indemnify and hold the other parties hereto, including the Escrow Agent, harmless from and against all such taxes.

(ii)     The Escrow Agent shall report to the IRS or any other authority, as applicable, any Escrow Earnings to the extent the Escrow Agent is required to do so under applicable Law, and the party entitled to receive such Escrow Earnings pursuant to Section 5, below, of the Asset Purchase Agreement shall make or cause to be made all other such reports or filings that may be required. PCAA Parent and Purchaser shall provide, or cause to be provided to, the Escrow Agent such assistance as may reasonably be requested by the Escrow Agent in (A) determining the amounts of any Tax withholding or remittance and (B) preparing any forms or filings required to be submitted by the Escrow Agent in order to comply with any reporting obligations under this Section 4 and the Escrow Agent may reasonably rely on any information provided by PCAA Parent or Purchaser with respect to such matters.

(c)     Certain Restrictions. The Escrow Agent shall not permit any property or assets of any kind held in the Escrow Account to be lent out, subject to a repurchase agreement or any similar transaction or used in any other way not provided for in this Escrow Agreement.

(d)     Disclaimer of Escrow Agent Liability for Investments. The Escrow Agent shall not have any liability for any Losses sustained by Purchaser and PCAA Parent as a result of any investment or reinvestment of the Deposit or Escrow Earnings pursuant to this Escrow Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of Purchaser or PCAA Parent to provide any Joint Written Instruction.

5.    Claims Against the Deposit.

        (a)     If the Closing shall occur, PCAA Parent and Purchaser shall jointly deliver to the Escrow Agent written instructions executed by a duly authorized officer of each of PCAA Parent and Purchaser (a "Joint Written Instruction") instructing the Escrow Agent to pay (i) the Deposit to PCAA Parent and (ii) all Escrow Earnings to Purchaser, in each case, by wire transfer of immediately available funds to a bank account of PCAA Parent's or Purchaser's, as applicable, designation. The Escrow Agent shall make such payments on the date specified in such Joint Written Instruction, or on the next Business Day after receipt by the Escrow Agent of such Joint Written Instruction, whichever is later. Such Joint Written Instruction shall, at a minimum, set forth:

        (i)     the amount of the disbursement proposed to be made to each of PCAA Parent and Purchaser;

        (ii)     a statement of both Purchaser and PCAA Parent authorizing the Escrow Agent to make the proposed disbursement; and

        (iii)the pa     yment instructions for Purchaser and PCAA Parent.

        (b)     If the Asset Purchase Agreement is terminated prior to the Closing in accordance with Section 4.4 of the Asset Purchase Agreement, the party that is entitled to the Deposit pursuant to Section 3.2 of the Asset Purchase Agreement (the "Requesting Party") may deliver written notice executed by a duly authorized officer of the Requesting Party thereof (a "Termination Notice") to the Escrow Agent (with a concurrent copy thereof to the party not entitled to the Deposit pursuant to Section 3.2 of the Asset Purchase Agreement (the "Non-Requesting Party")), instructing the Escrow Agent to pay to the Requesting Party the Deposit, together with the Escrow Earnings thereto (such aggregate amount, the "Total Deposit"). Such Termination Notice shall, at a minimum, set forth:

        (i)     the amount of the disbursement proposed to be made to the Requesting Party;

        (ii)     a statement of the Requesting Party that the Asset Purchase Agreement has been terminated and the reason for the termination;

        (iii)the a     pplicable provision under Section 3.2 of the Asset Purchase Agreement pursuant to which the Requesting Party is entitled to the Total Deposit; and

        (iv)     the payment instructions for Purchaser and PCAA Parent.

        (c)     If the Escrow Agent shall not, within five (5) Business Days following the later of the respective date of the Escrow Agent's or the non-Requesting

Party's receipt of a Termination Notice (the "Objection Period"), have received from the non-Requesting Party a written notice (with a concurrent copy thereof delivered to the Requesting Party) disputing the Requesting Party's entitlement to the Total Deposit (an "Objection Notice"), then the Escrow Agent shall, on the second Business Day next following the expiration of the Objection Period, pay over to the Requesting Party the Total Deposit by wire transfer of immediately available funds to a bank account(s) of the Requesting Party's designation.

(d)     If the Escrow Agent shall have received an Objection Notice within the Objection Period, the Escrow Agent shall not pay over the Total Deposit until it has thereafter received either (x) a joint written notice (a "Resolution Notice") from Purchaser and PCAA Parent stating that Purchaser and PCAA Parent have agreed that the Total Deposit is payable to Purchaser or PCAA Parent, as applicable, or (y) a copy of a final, nonappealable order of a court of competent jurisdiction stating that the Total Deposit is payable to either Purchaser or PCAA Parent, as applicable (a "Final Court Order"). The Escrow Agent shall be entitled to receive and may conclusively rely upon an opinion of counsel to the presenting party to the effect that a court order is final and non-appealable and from a court of competent jurisdiction. The Escrow Agent shall, on the second Business Day next following receipt of a Resolution Notice or Final Court Order and opinion, as the case may be, pay over to Purchaser or PCAA Parent as applicable, the Total Deposit by wire transfer of immediately available funds to a bank account of Purchaser's or PCAA Parent's, as applicable, designation.

(e)     No Clawback. Absent manifest error, fraud by PCAA Parent or Purchaser or the gross negligence or willful or intentional misconduct of the Escrow Agent, at no time after the Deposit or any accrued investment income have been disbursed to either PCAA Parent or Purchaser, as applicable, pursuant to this Escrow Agreement, shall such released funds be subject to any claim or recourse by any party.

6.     Methods of Disbursement by the Escrow Agent; Reliance.

(a)     Wire Transfers. All disbursements required to be made by the Escrow Agent from the Escrow Account under this Escrow Agreement shall be made by wire transfer of immediately available funds denominated in U.S. dollars in accordance with the written funds transfer instructions delivered to the Escrow Agent as provided in Section 5 above.

(b)     Reliance on Bank Information. With respect to any party to which the Escrow Agent is to transfer funds hereunder, it is understood that the Escrow Agent and the bank of such party may rely solely upon any account numbers or similar identifying numbers provided by such Person, in each case to identify (A) the Person, (B) the Person's bank, or (C) an intermediary bank.

(c)     Reliance on Representatives. Concurrent with the execution of this Escrow Agreement, PCAA Parent and Purchaser shall deliver to the Escrow Agent

authorized signers' forms in the form of Exhibit B-1 and Exhibit B-2 to this Escrow Agreement.

7. Concerning the Escrow Agent.

(a) Fees and Expenses. Purchaser and PCAA Parent each shall pay the Escrow Agent 50% of the Escrow Agent's (i) fees (a schedule of which is attached as Exhibit C to this Escrow Agreement) for the services to be rendered hereunder and (ii) reasonable out-of-pocket expenses, disbursements and advances incurred or made by it in connection with carrying out its duties hereunder, including reasonable attorney fees and reasonable trading commissions and fees. If any amount due to the Escrow Agent hereunder is not paid within thirty (30) days of the date due, the Escrow Agent in its sole discretion may charge interest on such amount up to the highest rate permitted by applicable Law.

(b) Indemnification of Escrow Agent. Purchaser and PCAA Parent each shall reimburse and indemnify the Escrow Agent and its Affiliates and Representatives (collectively, the "Escrow Agent Indemnified Parties") for, and hold it harmless against, one-half (1/2) of any loss, liability, cost, damage and expense, including, without limitation, reasonable attorneys' fees and expenses or other professional fees and expenses which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent, arising out of or relating in any way to this Escrow Agreement or any transaction to which this Escrow Agreement relates; provided that notwithstanding the foregoing, neither Purchaser nor PCAA Parent shall be required to indemnify the Escrow Agent for any such loss, liability, cost or expense finally adjudicated to have been directly caused by the Escrow Agent's fraud, willful misconduct, gross negligence or intentional breach of this Agreement. This Section 7(b) shall survive the resignation or removal of the Escrow Agent or the termination of this Escrow Agreement.

(c) No Implied Duties; Other Agreements. The duties and responsibilities of the Escrow Agent hereunder shall be determined solely by the express provisions of this Escrow Agreement, which duties and responsibilities shall be deemed purely ministerial in nature, and no other or further duties or responsibilities shall be implied. Under no circumstances will the Escrow Agent be deemed to be a fiduciary to any party hereto or any other person under this Escrow Agreement. The Escrow Agent is not bound by, and is under no duty to inquire into, the terms or validity of any other agreements or documents, including the Asset Purchase Agreement and any agreements which may be related to, referred to in or deposited with the Escrow Agent in connection with this Escrow Agreement or the Asset Purchase Agreement. References in this Escrow Agreement to any other agreement, instrument, or document are for the convenience of PCAA Parent and Purchaser, and the Escrow Agent has no duties or obligations with respect thereto. The Escrow Agent may act in accordance with the terms and conditions hereof upon any Joint Written Instruction believed by it in good faith to be genuine, and to be signed or presented by the proper Persons, and shall not be liable for any act which the Escrow Agent may do or omit to do in connection with the

performance by it of its duties pursuant to the provisions of this Escrow Agreement, or for any mistake of fact or law, or for any error of judgment, or for the misconduct of its Representatives, except, in each case, in the event of its own willful misconduct, gross negligence or bad faith. No provision of this Escrow Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement. THE ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM THE ESCROW AGENT'S FRAUD, GROSS NEGLIGENCE, INTENTIONAL BREACH OF THIS AGREEMENT OR WILLFUL MISCONDUCT, OR (II) SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

(d)    Reliance on Counsel. The Escrow Agent shall be entitled to consult with counsel (whether such counsel shall be regularly retained or specifically employed) of its own selection (and so long as such fees and expenses are reasonable, at the expense of Purchaser and PCAA Parent) and such consultation with counsel shall be full and complete authorization and protection to the Escrow Agent in respect of any action taken or omitted by the Escrow Agent hereunder in good faith and in accordance with such opinion of counsel.

(e)    Resolution of Conflicting Instructions. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions with respect to the Deposit or any Escrow Earnings which it believes, in its sole discretion, to be in conflict either with other instructions received by it or with any provision of this Escrow Agreement, the Escrow Agent shall have the absolute right to suspend all further performance under this Escrow Agreement (except for the retention and safekeeping of the Deposit and any Escrow Earnings) until such uncertainty or conflicting instructions have been resolved to the Escrow Agent's sole satisfaction by a final non-appealable Governmental Order or the receipt of Joint Written Instructions. Notwithstanding the foregoing, the Escrow Agent reserves the right to file an interpleader action in any court of competent jurisdiction, and upon the filing thereof, the Escrow Agent shall be relieved of all liability as to the Deposit and the Escrow Earnings and shall be entitled to recover reasonable attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action in accordance with the provisions of Section 7(a). The Escrow Agent shall be entitled to act on any such agreement, court order, or arbitration decision without further question, inquiry, or consent.

(f)    Independent Contractor. The Escrow Agent is acting under this Escrow Agreement as an independent contractor only and shall be considered an independent contractor with respect to each other party to this Escrow Agreement. No term or provision of this Escrow Agreement is intended to create, nor shall any such term or provision be deemed to have created, any principal, trust, joint venture or partnership relationship between or among the Escrow Agent and any of the parties to this Escrow Agreement.

(g)    Attachment of Deposit and Escrow Earnings; Compliance with Legal Orders. In the event that any part of the Deposit or any Escrow Earnings shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the Deposit and Escrow Earnings, the Escrow Agent is hereby expressly authorized, in its reasonable discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction. In the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation, should, by reason of such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

8.    Resignation and Removal of Escrow Agent; Appointment of Successor.

(a)    Notice of Resignation or Removal; Prior Liabilities. The Escrow Agent may at any time resign for any reason by giving 30 calendar days' prior written notice of resignation to Purchaser and PCAA Parent. Purchaser and PCAA Parent may at any time, with or without cause, jointly remove the Escrow Agent by giving one calendar day's prior written notice signed by a duly authorized officer of each of Purchaser and PCAA Parent to the Escrow Agent. No such resignation or removal shall discharge any liability or obligations of the Escrow Agent arising prior to the effective date of such resignation or removal.

(b)    Successor Requirements and Appointment. If the Escrow Agent resigns or is removed, a successor escrow agent, which shall be a bank or trust company having offices in New York, New York and assets in excess of two billion U.S. dollars, shall be appointed jointly by Purchaser and PCAA Parent and notified to the Escrow Agent by a written instrument executed by a duly authorized officer of each of Purchaser and PCAA Parent and delivered to the Escrow Agent and to such successor escrow agent.

(c)    Transitional Obligations. All obligations of a predecessor Escrow Agent hereunder shall cease and terminate on the effective date of its resignation or removal and its sole responsibility thereafter shall be to hold the Deposit and any Escrow Earnings and to maintain proper records with respect thereto for a period of 30 calendar days (or such shorter period if a successor escrow agent has been appointed and assumed the maintenance of proper records) following the effective date of its resignation or removal, at which time, if a successor escrow agent has been appointed and has accepted

such appointment in a writing delivered to both Purchaser and PCAA Parent, then upon written notice thereof executed by a duly authorized officer of each of Purchaser and PCAA Parent delivered to the predecessor Escrow Agent, the predecessor Escrow Agent shall deliver the Deposit and any Escrow Earnings to the successor escrow agent and the successor escrow agent, without any further act, deed or conveyance, shall become vested with all right, title and interest to all property held hereunder of the predecessor Escrow Agent.

        (d)    <u>Failure to Appoint Successor</u>. If a successor escrow agent has not been appointed within 30 calendar days after the effective date of the predecessor Escrow Agent's resignation or removal, for any reason whatsoever, the predecessor Escrow Agent shall deliver the Deposit and any Escrow Earnings to a court of competent jurisdiction in New York County, or if delivery to New York County is not possible, to the county in which the Deposit and any Escrow Earnings are then being held and immediately give written notice of the same to Purchaser and PCAA Parent.

        (e)    <u>Unpaid Fees and Expenses</u>. The predecessor Escrow Agent shall be entitled to payment of any unpaid fees and reasonable expenses, in each case to the extent due and payable under <u>Section 7(a)</u>, and to reimbursement by Purchaser and PCAA Parent (as applicable pursuant to <u>Section 7(a)</u>), each, for 50% of any reasonable out-of-pocket expenses incurred in connection with the transfer of the Deposit and any Escrow Earnings pursuant to and in accordance with the provisions of this <u>Section 8</u>. Such unpaid fees shall be pro-rated as of the effective date of the resignation; provided, that if the Escrow Agent is removed by Purchaser and PCAA Parent, such unpaid fees shall not be pro-rated.

    9.    <u>Definitions</u>. For purposes of this Escrow Agreement, the following terms shall have the respective meanings indicated below:

        "<u>Action</u>" means any claim, action, suit, arbitration or proceeding by or before any Governmental Authority or arbitral body.

        "<u>Affiliate</u>" means, with respect to any specified Person, any other Person that, at the time of determination, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with such specified Person.

        "<u>Asset Purchase Agreement</u>" shall have the meaning ascribed thereto in the recitals.

        "<u>Business Day</u>" means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are authorized or required by Law to remain closed.

        "<u>Closing</u>" shall have the meaning set forth in the Asset Purchase Agreement.

"Closing Date" shall have the meaning set forth in the Asset Purchase Agreement.

"Control" means, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. The terms "Controlled by", "under common Control with" and "Controlling" shall have correlative meanings.

"Deposit" shall have the meaning ascribed thereto in Section 3(a).

"Escrow Account" shall have the meaning ascribed thereto in Section 3(b).

"Escrow Agent" shall have the meaning ascribed thereto in the preamble.

"Escrow Agent Indemnified Parties" shall have the meaning ascribed thereto in Section 7(b).

"Escrow Agreement" shall have the meaning ascribed thereto in the first paragraph of this Escrow Agreement.

"Escrow Earnings" means any interest, dividends, gains, profits or other amounts earned on any Deposit.

"Final Court Order" shall have the meaning ascribed thereto in Section 5(d).

"Governmental Authority" means any domestic or foreign governmental, legislative, judicial, administrative or regulatory authority, agency, commission, body, court or entity.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"IRS" means the U.S. Internal Revenue Service.

"Joint Written Instructions" shall have the meaning ascribed thereto in Section 5(a).

"Law" means any federal, state, local or foreign law, statute or ordinance, common law or any rule, regulation, standard, judgment, order, writ, injunction, ruling, decree, arbitration award, agency requirement, license or permit of any Governmental Authority.

"Losses" means all losses, damages, reasonable costs, reasonable expenses, liabilities, obligations and claims of any kind.

"Non-Requesting Party" shall have the meaning ascribed thereto in Section 5(b).

"Objection Period" shall have the meaning ascribed thereto in Section 5(c).

"Permitted Bank" shall have the meaning ascribed thereto in Section 4(a).

"Person" means any natural person, general or limited partnership, corporation, limited liability company, limited liability partnership, firm, association or organization or other legal entity.

"Purchaser" shall have the meaning ascribed thereto in the preamble.

"Representative" of a Person means the directors, officers, employees, advisors, agents, stockholders, consultants, accountants, investment bankers or other representatives of such Person and of such Person's Affiliates.

"Requesting Party" shall have the meaning ascribed thereto in Section 5(b).

"Resolution Notice" shall have the meaning ascribed thereto in Section 5(d).

"Seller" shall have the meaning ascribed thereto in the recitals.

"Tax" or "Taxes" means all income, excise, gross receipts, premium, ad valorem, sales, use, employment, franchise, profits, gains, property, transfer, use, payroll, stamp taxes or other taxes, (whether payable directly or by withholding) imposed by any Tax Authority, together with any interest and any penalties thereon or additional amounts with respect thereto.

"Tax Authority" means any United States (and any of its political subdivisions) Governmental Authority having jurisdiction over the assessment, determination, collection or imposition of any Tax.

"Termination Notice" shall have the meaning ascribed thereto in Section 5(b).

"Total Deposit" shall have the meaning ascribed thereto in Section 5(b).

"U.S. Dollars" means the lawful currency of the United States of America.

10.     Miscellaneous.

(a)     <u>Termination</u>. This Escrow Agreement shall terminate and, except as otherwise specified herein, be of no further force and effect, upon the complete disbursement after the Closing of the Deposit and all of the Escrow Earnings from the Escrow Account in accordance with this Escrow Agreement.

(b)     <u>Successors and Assigns</u>. If the Escrow Agent merges with or is acquired by any other Person, or sells or transfers its corporate trust business, its successor organization shall become a successor escrow agent under this Escrow Agreement without further action by any Person if such successor organization is qualified to act as a successor escrow agent under <u>Section 8(b)</u>. Any such successor escrow agent shall be subject to all of the terms and conditions of this Escrow Agreement.

(c)     <u>Notices</u>. All notices, requests, claims, demands and other communications under this Escrow Agreement shall be in writing and shall be given or made by delivery in person, by overnight courier service, by facsimile upon written confirmation of receipt (followed by delivery of an original via overnight courier service) or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 10(c)</u>):

If to PCAA Parent, to:

> PCAA Parent, LLC
> 621 North Governor Printz Boulevard
> Essington, PA 19029
> Attention: Mark Shapiro
>
> With a copy (which shall not constitute notice) to:
>
> Todd Weintraub
> Director of PCAA Parent
> c/o Macquarie Infrastructure Company LLC
> 125 West 55th Street
> New York, NY 10019
> Facsimile: (212) 231-1838
>
> Milbank, Tweed, Hadley & McCloy LLP
> 1 Chase Manhattan Plaza
> New York, NY 10014
> Facsimile: (212) 822-5491
>              (212) 822-5194
> Attention: John D. Franchini
>              Matthew S. Barr

If to Purchaser, to both:

Bainbridge | ZKS Holding Company, LLC
3570 Carmel Mountain Road, Suite 100
San Diego, CA 92130
Facsimile: (858) 430-2491
Attention: Nick Chini

And

Bainbridge | ZKS Holding Company, LLC
2060 Mt. Paran Road, N.W.
Atlanta, GA 30327
Facsimile: (770) 754-1314
Attention: Frederick D. Clemente

With a copy (which shall not constitute notice) to:

Fine and Block
2060 Mt. Paran Road, N.W.
Atlanta, Georgia 30327
Facsimile: 404-261-6960
Attention: A. J. Block, Jr., Esq.

Corinthian Capital Group, LLC
601 Lexington Avenue, 59th Floor
New York, New York 10022
Attention: C. Kenneth Clay
Facsimile: (212) 920-2399

And to both:

Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, NY 10022
Facsimile: (212) 230-8888
Attention: Andrew Goldman

Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019
Facsimile: (212) 259-6333
Attention: Gary Boss
            Timothy Q. Karcher

If to the Escrow Agent, to:

Wells Fargo Bank, National Association
45 Broadway, 14th Floor
New York, New York 10006-3007

Facsimile: (212) 509-1716
Attention: Lisa D'Angelo, Corporate Trust Department

All such notices, requests and other communications will (i) if delivered personally to the address as provided in this Section, be deemed given upon delivery, (ii) if delivered by facsimile transmission to the facsimile number as provided in this Section, be deemed given upon receipt, and (iii) if delivered by mail in the manner described above to the address as provided in this Section, be deemed given upon receipt (in each case regardless of whether such notice, request or other communication is received by any other Person to whom a copy of such notice is to be delivered pursuant to this Section). Any party from time to time may change its address, facsimile number or other information for the purpose of notices to that party by giving notice specifying such change to the other parties hereto.

(d)     Severability. If any term or other provision of this Escrow Agreement is invalid, illegal or incapable of being enforced under any Law or as a matter of public policy, all other conditions and provisions of this Escrow Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Escrow Agreement is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties to this Escrow Agreement shall negotiate in good faith to modify this Escrow Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Escrow Agreement be consummated as originally contemplated to the greatest extent possible.

(e)     Entire Agreement. This Escrow Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, with regard to such subject matter, except that this Escrow Agreement, the Asset Purchase Agreement and the other Transaction Documents constitute the entire agreement between Purchaser and PCAA Parent with respect to the subject matter thereof.

(f)     No Third Party Beneficiaries. Except as provided in Section 7(b) with respect to Escrow Agent Indemnified Parties, this Escrow Agreement is for the sole benefit of the parties to this Escrow Agreement and nothing in this Escrow Agreement, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Escrow Agreement.

(g)     Amendment; Waiver. No provision of this Escrow Agreement may be amended, supplemented or modified except by a written instrument signed by the

Escrow Agent, Purchaser and PCAA Parent. No provision of this Escrow Agreement may be waived except by a written instrument signed by the party against whom the waiver is to be effective. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

(h)     <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that State, except as may be governed by the Bankruptcy Code. Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 9</u> hereof; <u>provided, however,</u> that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(i)     <u>No Arbitration</u>. Each party to this Escrow Agreement acknowledges and agrees that any controversy which may arise under this Escrow Agreement is likely to involve complicated and difficult issues, and therefore each such party irrevocably and unconditionally waives any right such party may have to arbitration in respect of any action directly or indirectly arising out of or relating to this Escrow Agreement or the transactions contemplated by this Escrow Agreement.

(j)     <u>WAIVER OF JURY TRIAL</u>. EACH PARTY TO THIS ESCROW AGREEMENT ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS ESCROW AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO

THIS ESCROW AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS ESCROW AGREEMENT.

(k) <u>Rules of Construction</u>. Interpretation of this Escrow Agreement shall be governed by the following rules of construction: (i) words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender as the context requires; (ii) references to the terms Article, Section, paragraph, Exhibit and Schedule are references to the Articles, Sections, paragraphs, Exhibits and Schedules to this Escrow Agreement unless otherwise specified; (iii) references to "$" shall mean U.S. dollars; (iv) the word "including" and words of similar import when used in this Escrow Agreement shall mean "including without limitation," unless otherwise specified; (v) the word "or" shall not be exclusive; (vi) the words "herein," "hereof" or "hereunder," and similar terms are to be deemed to refer to this Escrow Agreement as a whole and not to any specific section; (vii) the headings contained in this Escrow Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Escrow Agreement; (viii) this Escrow Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting or causing any instrument to be drafted; (ix) if a word or phrase is defined, the other grammatical forms of such word or phrase have a corresponding meaning; (x) references to any statute, listing rule, rule, standard, regulation or other law include a reference to (A) the corresponding rules and regulations and (B) each of them as amended, modified, supplemented, consolidated, replaced or rewritten from time to time; and (xi) references to any section of any statute, listing rule, rule, standard, regulation or other law include a reference to any successor to such section.

(l) <u>Counterparts</u>. This Escrow Agreement may be executed in one or more counterparts, and by the different parties to this Escrow Agreement in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Escrow Agreement by facsimile or other means of electronic transmission shall be as effective as delivery of a manually executed counterpart to this Escrow Agreement.

(m) <u>Force Majeure</u>. In the event that any party to this Escrow Agreement is unable to perform its obligations under the terms of this Escrow Agreement because of acts of God, strikes, equipment or transmission failure or damage reasonably beyond its control, or other cause reasonably beyond its control, such party shall not be liable for damages to the other parties for any unforeseeable damages resulting from such failure to perform or otherwise from such causes. Performance under this Escrow Agreement shall resume when the affected party is able to perform substantially that party's duties.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be signed as of the day and year first above written.

WELLS FARGO BANK, NATIONAL ASSOCIATION, as Escrow Agent

By: _____

Name: LISA D'ANGELO
Title: VICE PRESIDENT

CORINTHIAN-BAINBRIDGE ZKS HOLDINGS, LLC

By: _____

Name: _____
Title: _____

PCAA PARENT, LLC

By: _____

Name: _____
Title: _____

*[Escrow Agreement Signature Page]*

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be signed as of the day and year first above written.

WELLS FARGO BANK, NATIONAL
ASSOCIATION, as Escrow Agent

By: _____
     Name:
     Title:


CORINTHIAN-BAINBRIDGE ZKS
HOLDINGS, LLC

By: _____
     Name:
     Title:


PCAA PARENT, LLC

By: _____
     Name:
     Title:

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be signed as of the day and year first above written.

WELLS FARGO BANK, NATIONAL
ASSOCIATION, as Escrow Agent

By: _____
      Name: _____
      Title: _____


CORINTHIAN-BAINBRIDGE ZKS
HOLDINGS, LLC

By: _____
      Name: _____
      Title: _____


PCAA PARENT, LLC

By: _____
      Name:   Charles Huntzinger
      Title:   Chief Executive Officer

# Exhibit A

ASSET PURCHASE AGREEMENT

## Exhibit B-1

### CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of PCAA Parent and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit B-1 is attached, on behalf of PCAA Parent.

| Name / Title | Specimen Signature |
|---|---|
| Charles Huntzinger | |
| Name | Signature |
| CEO | |
| Title | |
| MARK SHAPIRO | |
| Name | Signature |
| CFO | |
| Title | |
| | |
| Name | Signature |
| | |
| Title | |
| | |
| Name | Signature |
| | |
| Title | |

## Exhibit B-2

### CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Purchaser and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit B-2 is attached, on behalf of the Purchaser.

Name / Title                                    Specimen Signature

Gerson R. Guzman
_____
Name                                             _____
                                                 Signature

_____
Title

C. Kenneth McClay
_____
Name                                             _____
                                                 Signature

_____
Title

Peter Van Raalte
_____
Name                                             _____
                                                 Signature

_____
Title

_____
Name                                             _____
                                                 Signature

_____
Title

## Exhibit C

### Escrow Agent Schedule of Fees

See attached.

Wells Fargo Corporate Trust Services
Fee Schedule for Escrow Agent Services for
## PCAA PARENT, LLC and CORINTHIAN-BAINBRIDGE ZKS HOLDINGS, LLC

Wells Fargo Bank is a leading provider of quality, cost-efficient Corporate Trust Services. Our staff is qualified and proficient, drawing on years of experience in the field.  Because we value your business, we are committed to bringing you personal and professional service.

| | |
|---|---|
| Acceptance Fee: | $1,000.00 |

Initial Fees as they relate to Wells Fargo Bank acting in the capacity of Escrow Agent – includes review and comment on the Escrow Agreement; acceptance of the Escrow appointment; setting up of the Escrow Account.

| | |
|---|---|
| Escrow Agent Administration Fee:<br>(based on a 6 month duration) | $2,500.00 |

For ordinary administration services by Escrow Agent – includes receiving, investing and disbursing funds pursuant to the requirements set forth in the Escrow Agreement.  Should the duration of the Escrow Agreement be longer than 6 months, a $2,500.00 semi-annual fee will apply.

Fees are due at the time of the Escrow Agreement execution. Fees will not be prorated in case of early termination.

| | |
|---|---|
| Fed Wires: | $25.00 per wire |

| | |
|---|---|
| Out-of-Pocket Expenses | At Cost |

We only charge for out-of-pocket expenses in response to specific tasks assigned by the client. Therefore, we cannot anticipate what specific out-of-pocket items will be needed or what corresponding expenses will be incurred. Outside counsel fee (if applicable) will be billed in addition to the above-stated fees, which may include, but are not limited to, costs and expenses relating to overnight couriers, reasonable fees and expenses of counsel, and the reasonable fees and expenses of other professionals retained by Wells Fargo, settlement charges for delivery of physical securities, travel costs and expenses of those representatives of Wells Fargo required closings. If our template Escrow Agreement is utilized and no significant changes are made, then no legal counsel will be required.  There are no charges for indirect-out-of-pocket expenses.

*This fee schedule is based upon the assumptions listed above which pertain to the responsibilities and risks involved in Wells Fargo undertaking the role of Escrow Agent. These assumptions are based on information provided to us as of the date of this fee schedule. Our fee schedule is subject to review and acceptance of the final documents. Should any of the assumptions, duties or responsibilities change, we reserve the right to affirm, modify or rescind our fee schedule. If the Account(s) does not open within three (3) months of the date shown below, this proposal will be deemed null and void.*

**Submitted on: January 21, 2010**

**I, on behalf of the Company, am duly authorized to sign on behalf of and bind the Company and hereby confirm receipt and agreement with all of the terms and conditions of this Schedule of Fees.**

**CORINTHIAN-BAINBRIDGE ZKS HOLDINGS, LLC**

By:

Title:

January 28, 2010

Date

**PCAA PARENT, LLC**

By:

Title:

Date

**Submitted on: January 21, 2010**

**I, on behalf of the Company, am duly authorized to sign on behalf of and bind the Company and hereby confirm receipt and agreement with all of the terms and conditions of this Schedule of Fees.**

## CORINTHIAN-BAINBRIDGE ZKS HOLDINGS, LLC

_____      _____
By:                                                                              Date
Title:

**PCAA PARENT, LLC**

_____      January 28, 2010
By:                                                                              Date
Title: CEO

## Exhibit D

### Agency and Custody Account Direction
### For Cash Balances
### Wells Fargo Money Market Deposit Accounts

Direction to use the following Wells Fargo Money Market Deposit Accounts for Cash Balances for the escrow account (the "Account") established under the Escrow Agreement to which this Exhibit D is attached.

You are hereby directed to deposit, as indicated below, or as we shall direct further in writing from time to time, all cash in the Account in the following money market deposit account of Wells Fargo Bank, National Association (Bank):

Wells Fargo Money Market Deposit Account (MMDA)

We understand that amounts on deposit in the MMDA are insured, subject to the applicable rules and regulations of the Federal Deposit Insurance Corporation (FDIC), in the basic FDIC insurance amount of $100,000 per depositor, per insured bank. This includes principal and accrued interest up to a total of $100,000. *Note: On May 20, 2009, FDIC deposit insurance temporarily increased from $100,000 to $250,000 per depositor through December 31, 2013.*

We acknowledge that we have full power to direct investments of the Account.

We understand that we may change this direction at any time and that it shall continue in effect until revoked or modified by us by written notice to you.