**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------x
:
In re:                                                    :          Chapter 11
:
:          Case No. 10-10250 (MFW)
PCAA PARENT, LLC, <u>et</u> al.,[1]                       :
:          (Jointly Administered)
:
Debtors.                  :
---------------------------------------------------------------x

**DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125 WITH RESPECT TO**
**JOINT CHAPTER 11 PLAN OF PCAA PARENT, LLC AND ITS AFFILIATED**
**DEBTORS AND DEBTORS IN POSSESSION**

**February 16, 2010**

MILBANK, TWEED, HADLEY &            RICHARDS, LAYTON & FINGER,
MᶜCLOY LLP                                      P.A.

Matthew S. Barr                                 Mark Collins (Bar No. 2981)
Michael E. Comerford                            John H. Knight (Bar No. 3848)
One Chase Manhattan Plaza                       Lee Kaufman (Bar No. 4877)
New York, NY  10005-1413                        One Rodney Square
920 North King Street
Wilmington, Delaware 19801

*Proposed Attorneys For PCAA Parent, LLC And Its*
*Affiliated Debtors And Debtors In Possession*

---

[1]     The PCAA entities, along with the last four digits of their respective federal tax identification numbers (as applicable), are as follows:  PCAA Parent, LLC (8827); PCAA Chicago, LLC (0860); PCAA GP, LLC (4237); PCAA LP, LLC (none); PCAA Properties, LLC (0617); PCAA SP, LLC (3465); Airport Parking Management, Inc. (7571); PCAA Missouri, LLC (5702); PCAA SP-OK, LLC (none); PCAA Oakland, LLC (9451); Parking Company of America Airports, LLC (9249); PCA Airports, Ltd. (8348); Parking Company of America Airports Phoenix, LLC (8343); and RCL Properties, LLC (2006).  The mailing address for PCAA is 621 North Governor Printz Boulevard, Essington, PA 19029.

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE CHAPTER 11 PLAN OF LIQUIDATION (THE "PLAN") OF PCAA PARENT, LLC AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION (COLLECTIVELY, "PCAA" OR THE "DEBTORS") IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (COLLECTIVELY, THE "CHAPTER 11 CASES"). PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF PCAA AND THE CONDITION OF PCAA'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. SEE 11 U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CLAIM AND INTEREST HOLDERS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING PCAA'S FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY PCAA OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS) AND THE PLAN IN THEIR ENTIRETY. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE EXECUTIVE SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND OTHER EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. ALL CREDITORS SHOULD READ CAREFULLY AND CONSIDER FULLY THE "CERTAIN RISK FACTORS TO BE CONSIDERED" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN. ***SEE SECTION VII, "CERTAIN RISK FACTORS TO BE CONSIDERED."***

THE STATEMENTS IN THIS DISCLOSURE STATEMENT ARE MADE BY PCAA ON THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT AFTER THE DATE DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN INFORMATION SET FORTH HEREIN. PCAA HAS NO DUTY TO UPDATE THIS DISCLOSURE STATEMENT UNLESS OTHERWISE ORDERED TO DO SO BY THE BANKRUPTCY COURT.

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF PCAA, IF ANY, SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT HAS NEITHER BEEN REVIEWED, APPROVED NOR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE U.S. SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE RESTRUCTURING OF PCAA AND FINANCIAL INFORMATION. ALTHOUGH PCAA BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY PCAA'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. PCAA IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

THE PURPOSE OF THIS DISCLOSURE STATEMENT IS TO PROVIDE (A) RELEVANT INFORMATION REGARDING THE HISTORY OF PCAA, ITS BUSINESS, AND THESE CHAPTER 11 CASES; (B) INFORMATION CONCERNING THE PLAN; (C) INFORMATION FOR THE HOLDERS OF CLAIMS AND INTERESTS REGARDING THEIR TREATMENT UNDER THE PLAN; AND (D) INFORMATION TO ASSIST THE BANKRUPTCY COURT IN DETERMINING WHETHER THE PLAN COMPLIES WITH

THE PROVISIONS OF CHAPTER 11 OF THE BANKRUPTCY CODE AND SHOULD BE CONFIRMED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS OR RECOMMENDATIONS OF PCAA OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO OR APPROVED BY SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS. NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, AND FOR PURPOSES OF ANY CONTESTED MATTER, ADVERSARY PROCEEDING, OR OTHER PENDING OR THREATENED ACTION, THE CONTENTS HEREOF SHALL CONSTITUTE STATEMENTS MADE IN FURTHERANCE OF SETTLEMENT NEGOTIATIONS AND SHALL BE SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND ANY SIMILAR RULE OR STATUTE. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING (OTHER THAN THE CHAPTER 11 CASE) INVOLVING PCAA OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN PCAA. YOU SHOULD CONSULT YOUR OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

**IRS CIRCULAR 230 NOTICE:** TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY PCAA OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

PCAA PRESENTLY INTENDS TO SEEK TO CONSUMMATE THE PLAN AS PROMPTLY AS POSSIBLE AND TO CAUSE THE EFFECTIVE DATE OF THE PLAN TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN.  THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE OF THE PLAN ACTUALLY WILL OCCUR. PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS AND INTERESTS IN CERTAIN CLASSES AND THAT COULD AFFECT THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS, ARE DESCRIBED IN ***SECTION V, "SUMMARY OF PLAN."***

[Remainder of Page Intentionally Left Blank]

TABLE OF CONTENTS

I. EXECUTIVE SUMMARY ..................................................................................................1

II. SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND
    INTERESTS UNDER PLAN ...................................................................................3

    A.    Non-Substantive Consolidation ................................................................3
    B.    Summary Of Classification And Treatment Of Claims And Interests ...................3
    C.    Solicitation And Acceptance Of Plan ........................................................9
    D.    Confirmation Hearing ...........................................................................11
    E.    Parties-In-Interest Support Plan ...............................................................11
    F.    Overview Of Chapter 11 Process ............................................................12

III. HISTORICAL INFORMATION .....................................................................................13

    A.    PCAA's Business ..................................................................................13
    B.    Prepetition Credit Facilities ....................................................................14
    C.    Events Leading To Chapter 11 Filing ......................................................17

IV. CHAPTER 11 CASES ......................................................................................................19

    A.    Case Administration ..............................................................................19
    B.    Continuation Of Business After Petition Date ...........................................19
    C.    Employee Incentive Plan .......................................................................21

V. SUMMARY OF PLAN ......................................................................................................22

    A.    Treatment Of Administrative Expense Claims And Priority Tax Claims ............22
    B.    Treatment Of Allowed Claims ................................................................24
    C.    The Liquidating Trust ............................................................................26
    D.    Directors and Officers Tail Insurance ......................................................28
    E.    Executory Contracts And Unexpired Leases .............................................28
    F.    Conditions Precedent To Confirmation and Effective Date Of Plan ................29
    G.    Release, Exculpation, Injunctive And Related Provisions .............................30
    H.    Miscellaneous Provisions .......................................................................32

VI. SUMMARY OF CERTAIN DISTRIBUTABLE ASSETS ...............................................34

    A.    Litigation ............................................................................................34
    B.    Sale Distributions .................................................................................34
    C.    Liquidating Trust Distributions ...............................................................34

VII. CERTAIN RISK FACTORS TO BE CONSIDERED .....................................................35

    A.    Risk That Distributions Will Be Less Than Estimated .................................35
    B.    Financial Information Disclaimer .............................................................36
    C.    Business Factors ...................................................................................36
    D.    Litigation Risks ....................................................................................37
    E.    Bankruptcy Risks .................................................................................38

VIII. VOTING REQUIREMENTS ...................................................................................39

    A.    Voting Deadline............................................................................40
    B.    Holders Of Claims Entitled To Vote ...................................................40
    C.    Vote Required For Acceptance By Class...............................................41
    D.    Voting Procedures........................................................................41

IX. CONFIRMATION OF PLAN ..................................................................................43

    A.    Hearing On Confirmation Of Plan At Confirmation Hearing ..............................43
    B.    Deadline To Object To Confirmation ...................................................43
    C.    Requirements For Confirmation Of Plan ...............................................44
    D.    Alternatives To Confirmation And Consummation Of Plan ..................................48

X. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN .........................49

    A.    Certain U.S. Federal Income Tax Consequences To Holders Of Claims In
        Connection With Implementation Of Plan ............................................50
    B.    Certain U.S. Federal Income Tax Consequences To Debtors In Connection
        With Implementation Of Plan........................................................51
    C.    Federal Income Tax Treatment Of Liquidating Trust And Holders Of
        Beneficial Interests....................................................................52
    D.    Information Reporting And Backup Withholding ...................................53

XI. CONCLUSION.....................................................................................................55

EXHIBITS TO DISCLOSURE STATEMENT

| Exhibit 1 | Chapter 11 Plan |
|---|---|
| Exhibit 2 | Proposed Disclosure Statement Order |
| Exhibit 3 | PCAA's Liquidation Analysis |

# I.

## EXECUTIVE SUMMARY

PCAA Parent, LLC and its affiliated debtors and debtors in possession (collectively, "PCAA" or the "Debtors") each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") on January 28, 2010 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). PCAA, as the proponent (the "Proponent"), submits this disclosure statement (the "Disclosure Statement")[1] pursuant to Section 1125 of the Bankruptcy Code to holders of claims against and equity interests in PCAA in connection with the solicitation of votes to accept or reject its chapter 11 plan (as the same may be amended, the "Plan"), attached as Exhibit 1 to this Disclosure Statement.[2]

These bankruptcy cases were commenced due to a confluence of adverse macroeconomic trends, including increasing fuel prices and decreasing travel among businesses and consumers, which resulted in a continued deterioration of PCAA's revenue and profitability in respect of its airport parking business. Despite such unfavorable conditions, PCAA maintained its operations and continued to provide high-quality services to its customers. PCAA's revenue, however, remained below sustainable levels due to the downturn in business and the United States economy in general. Further, PCAA struggled to maintain liquidity and support current debt levels due to its decreasing operating cash flows and increasing costs. PCAA's distressed operational performance and inability to service existing debt caused it to consider restructuring initiatives, including overhauling sales strategies, controlling costs, and searching for a purchaser for its business and assets. Such measures were facilitated by PCAA's negotiations with certain of its lenders who agreed to forbear from exercising any potential default remedies against PCAA, including, in the case of the Term Loan Lenders, defaults as a result of the non-payment of interest since in or around June of 2009.

The Plan is premised upon the sale of PCAA's assets. Contemporaneously with the filing of the chapter 11 petitions, PCAA filed a motion with the Bankruptcy Court seeking, among other things, authority to sell all or substantially all of PCAA's assets (the "Sale") and establish auction and bidding procedures in connection therewith. It is contemplated that the hearing to approve the Sale will be substantially contemporaneous with the hearing on confirmation of the Plan and that PCAA will seek entry of an order approving the Sale in connection with confirmation of the Plan.

The Debtors are commencing this solicitation after extensive negotiations with the Term Loan Lenders (collectively, the "Supporting Parties"). As a result of these negotiations, PCAA entered into that certain Restructuring Agreement, dated January 28, 2010 (as amended, the "Support Agreement") with the Supporting Parties. Pursuant to the terms of the Support Agreement, PCAA and the Supporting Parties agreed, among other things, to the contemplated

---

[1]     Capitalized terms used in this Disclosure Statement but not defined herein have the meanings ascribed to such terms in the Plan.

[2]     Headings are for convenience of reference and will not affect the meaning or interpretation of the Disclosure Statement.

going concern sale of PCAA's assets, which terms are embodied in the Plan. PCAA believes the Plan and related Sale are in the best interests of the estates and maximizes distributable value for all of PCAA's stakeholders, as evidenced, in part, by the execution of the Support Agreement by the Supporting Parties.

This solicitation is being conducted at this time in order to obtain sufficient votes to enable the Plan to be confirmed by the Bankruptcy Court. The Plan sets forth how Claims against and Equity Interests in PCAA will be treated upon consummation of the Plan if it is confirmed by the Bankruptcy Court and is thereafter consummated. This Disclosure Statement describes certain aspects of the Plan, PCAA's business operations, significant events leading to the Chapter 11 Cases and related matters. This Executive Summary is intended solely as a summary of the distribution provisions of the Plan and certain matters related to PCAA's business. **FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND ALL RELATED EXHIBITS AND SCHEDULES IN THEIR ENTIRETY.**

Attached as exhibits to this Disclosure Statement are copies of the following documents:

- The Plan (Exhibit 1);

- Proposed Order of the Bankruptcy Court approving this Disclosure Statement and establishing procedures with respect to the solicitation of votes on the Plan (the "Disclosure Statement Order"; Exhibit 2); and

- PCAA's Liquidation Analysis (Exhibit 3).

**PCAA BELIEVES THAT THE PLAN COMPLIES WITH ALL PROVISIONS OF THE BANKRUPTCY CODE AND WILL ENABLE IT TO SELL ITS ASSETS AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF PCAA, ITS ESTATES, ITS CREDITORS AND ITS INTEREST HOLDERS.**

On [_____], 2010, after notice and a hearing, the Bankruptcy Court issued the Disclosure Statement Order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of PCAA's creditors and equity holders to make informed judgments whether to accept or reject the Plan. Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan.

The Disclosure Statement Order sets forth in detail deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan. In addition, detailed voting instructions accompany each ballot. Each Holder of a Claim or Equity Interest entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order, all exhibits thereto and the instructions accompanying the ballot that were distributed to them in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Interests for voting purposes. No solicitation of votes to accept the Plan may be made except pursuant to Section 1125 of the

Bankruptcy Code. Upon confirmation, the Plan will be a legally binding arrangement and it should therefore be read in its entirety. Accordingly, solicited parties may wish to consult with their attorneys regarding the contents of the Plan.

**II.**

**SUMMARY OF CLASSIFICATION AND TREATMENT
OF CLAIMS AND INTERESTS UNDER PLAN**

**A.     Non-Substantive Consolidation**

The Plan is a joint plan that does not provide for substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for purposes thereof. Except as specifically set forth herein, nothing in the Plan or this Disclosure Statement shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor.

Additionally, claimants holding Claims against multiple Debtors, to the extent Allowed in each Debtor's case, will be treated as a separate claim against each Debtor's Estate; *provided*, *however*, that no Holder shall be entitled to receive more than payment in full of its Allowed Claim, and such Claims will be administered and treated in the manner provided for herein by the Debtors or otherwise.

**B.     Summary Of Classification And Treatment Of Claims And Interests**

The following table summarizes the classification and treatment of the Claims and Interests under the Plan. For a more detailed description of the classification and treatment for all Classes, please refer to the discussion in ***Section V, "Summary Of Plan***" and to the Plan itself.[3]

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| **Class 1 - Priority Non-Tax Claims** | *Unimpaired*. The Plan will not alter any of the legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims. Each Holder of an Allowed Priority Non-Tax Claim | No - deemed to accept. | $[] | 100% (or such other amount consented to by each Holder of a |

---

[3]     This table is only a summary of the classification, impairment and entitlement to vote of Claims and Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan and all exhibits thereto for a complete description of the classification and treatment of Claims and Interests. Accordingly, this summary is qualified in its entirety by reference to the entire Disclosure Statement and the Plan and all exhibits thereto.

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| | (including, as applicable, Allowed Employee Priority Claims) shall, in full and final satisfaction of such Priority Non-Tax Claim, be paid in full, in Cash, on or as soon as practicable following the Effective Date from the Sale Proceeds, unless the Holder of such Allowed Priority Non-Tax Claim consents to other treatment. | | | Priority Non-Tax Claim) |
| **Class 2 - Term Loan Secured Claims** | *Impaired*.  The Term Loan Secured Claims shall be Allowed under the Plan in an amount not less than $195,000,000 plus accrued and unpaid interest and fees.  Each Holder of an Allowed Term Loan Secured Claim shall receive, in full and final satisfaction of such Allowed Term Loan Secured Claim, its Pro Rata share of: (i) Cash on the Effective Date from the Sale Proceeds in respect of its Term Loan Collateral, or (ii) such other treatment as may be agreed upon with the Holder of such Allowed Term Loan Secured Claim, on the one hand, and the Debtors, on the other hand, in each case, after satisfaction of Administrative Expense Claims and Priority Claims, as applicable.  Pursuant to the Sale, it is contemplated that assets on which the Holders of Allowed Term Loan Secured Claims have Liens shall be sold to the Purchaser free and clear of such Liens, which Liens shall attach solely to the proceeds of such Holders' Collateral.  On the full payment or other satisfaction of the obligations set forth in this paragraph, the Liens securing the | Yes. | $199,495,292.83 | []%-[]% |

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| | Allowed Term Loan Secured Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. | | | |
| **Class 3 - Chicago Secured Claims** | *Unimpaired*. The Chicago Secured Claims shall be Allowed under the Plan in an amount not less than $3,967,000 plus accrued and unpaid interest and fees. Each Holder of an Allowed Chicago Secured Claim shall, in full and final satisfaction of such Allowed Chicago Secured Claim, (i) be paid in full, in Cash, on the Effective Date from the Sale Proceeds in respect of its Chicago Collateral, or (ii) receive such other treatment as may be agreed upon with the Holder of such Allowed Chicago Secured Claim, on the one hand, and the Debtors, on the other hand, in each case, after satisfaction of Administrative Expense Claims and Priority Claims, as applicable. Pursuant to the Sale, it is contemplated that assets on which the Holders of Chicago Secured Claims have Liens shall be sold to the Purchaser free and clear of such Liens, which Liens shall attach solely to the proceeds of such Holders' Collateral. On the full payment or other satisfaction of the obligations set forth in this paragraph, the Liens securing the Allowed Chicago Secured Claims shall be deemed | No - deemed to accept. | $3,975,586.33 | 100% (or such other amount consented to by each Holder of a Chicago Secured Claim) |

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| | released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. | | | |
| **Class 4 - RCL Secured Claims** | *Unimpaired*.  The RCL Secured Claims shall be Allowed under the Plan in an amount not less than $2,032,000 plus accrued and unpaid interest and fees.  Each Holder of an Allowed RCL Secured Claim shall, in full and final satisfaction of such Allowed RCL Secured Claims, (i) be paid in full, in Cash on the Effective Date from Sale Proceeds in respect of its RCL Collateral, or (ii) receive such other treatment as may be agreed upon with the Holder of such Allowed RCL Secured Claim, on the one hand, and the Debtors, on the other hand, in each case, after satisfaction of Administrative Expense Claims and Priority Claims, as applicable.  Pursuant to the Sale, it is contemplated that assets on which the Holders of RCL Secured Claims have Liens shall be sold to the Purchaser free and clear of such Liens, which Liens shall attach solely to the proceeds of such Holders' Collateral.  On the full payment or other satisfaction of the obligations set forth in this paragraph, the Liens securing the Allowed RCL Secured Claims shall be deemed released, terminated and extinguished, in each case without further notice | No - deemed to accept. | $2,036,197.80 | 100% (or such other amount consented to by each Holder of an RCL Secured Claim) |

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| | to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. | | | |
| **Class 5 - Other Secured Claims** | *Unimpaired*. Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim: (i) Cash on, or as soon as practicable following, the Effective Date, equal to the Allowed amount of such Other Secured Claim; (ii) treatment that leaves unaltered the legal, equitable and contractual rights to which such Allowed Other Secured Claim entitles the Holder of such Claim; (iii) reinstatement of the Allowed portion of such Other Secured Claim; or (iv) such other treatment as may be agreed upon with the Holder of such Allowed Other Secured Claim, on the one hand, and the Debtors, on the other hand. On the full payment or other satisfaction of the obligations set forth in this paragraph, the Liens securing the Allowed Other Secured Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. | No - deemed to accept. | $[] | 100% (or such other amount consented to by each Holder of an Other Secured Claim) |

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| **Classes 6 - 19 - General Unsecured Claims** | _Impaired_.  In full and final satisfaction of Allowed General Unsecured Claims (including any Term Loan Lender Deficiency Claim and Term Loan Guaranty Claim), each Holder of an Allowed General Unsecured Claim on, or as soon as practicable following, the Effective Date, shall receive its Pro Rata share of:<br><br>i.  Distributable value allocated to the specific Debtor entity such General Unsecured Claim is Allowed against for distribution purposes after satisfaction, as applicable, in full of all Allowed DIP Financing Claims, Allowed Administrative Expense Claims, Allowed Priority Claims, and Allowed Prepetition Lender Claims; _provided_, _that_, no Holder of a General Unsecured Claim shall receive any distribution in excess of the Allowed amount of its General Unsecured Claim; _provided_, _further_, that to the extent the Allowed amount of all General Unsecured Claims asserted against a specific Debtor entity has been satisfied in full, any residual value will be distributed to the equity of any such Debtor entity; and<br><br>ii.  100% of the Liquidating Trust Interests in the Liquidating Trust (as further set forth in Article V of the Plan). | Yes. | $[] | []%-[]% |

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| **Class 20 - Equity Interests and Related Claims** | *Impaired*. On the Effective Date, all Equity Interests of the Debtors (including any and all Claims subordinated under Section 510(b) of the Bankruptcy Code that are in any way arising from, of or in connection with such Equity Interests) shall be deemed cancelled and of no further force and effect, whether surrendered for cancellation or otherwise. Holders of Equity Interests of the Debtors shall not receive or retain any property under the Plan on account of such Equity Interests after giving effect to the transactions contemplated by the Plan (including any distribution of any residual value). | No - deemed to reject. | N/A | N/A |
| **Class 21 - Intercompany Claims** | *Impaired*. No distributions shall be made under the Plan on account of Intercompany Claims among the Debtors or any of their subsidiaries and any and all liability on account of such Intercompany Claims shall be deemed discharged on the Effective Date. | No - deemed to reject. | N/A | N/A |

After careful review of PCAA's current business operations, estimated recoveries in a liquidation scenario, and prospects as an ongoing business, PCAA has concluded that the recovery to creditors will be maximized by the going concern sale of substantially all of its assets and liquidation via the Plan of any assets not purchased.

## C.    Solicitation And Acceptance Of Plan

### 1.    General

This Disclosure Statement and other documents described herein are being furnished by PCAA to Holders of Claims against and Equity Interests in PCAA pursuant to the Disclosure Statement Order for the purpose of soliciting votes on the Plan.

A copy of the Disclosure Statement Order and a notice of, among other things, voting procedures and the dates set for objections to and the hearing on confirmation of the Plan (the "Confirmation Hearing Notice") are also being transmitted with this Disclosure Statement. The Disclosure Statement Order and the Confirmation Hearing Notice set forth in detail the deadlines, procedures, and instructions for casting votes to accept or reject the Plan, for filing objections to confirmation of the Plan, the treatment for balloting purposes of certain types of Claims, and the assumptions for tabulating ballots. In addition, detailed voting instructions accompany each ballot, which are color-coded for each Class. Each Holder of a Claim or Equity Interest within a Class entitled to vote should read the Disclosure Statement, the Plan, the Disclosure Statement Order, the Notice of Confirmation Hearing, and the instructions accompanying the ballots in their entirety before voting on the Plan. These documents contain important information concerning how Claims and Interests are classified for voting purposes and how votes will be tabulated.

## 2. Who is Entitled to Vote

Pursuant to the Disclosure Statement Order, the Bankruptcy Court has established [_____], 2010 (the "Record Date") as the record date for determining the Holders of Claims and Equity Interests entitled to vote to accept or reject the Plan. The Holders of Claims in Classes 2 and 6 through 19 are entitled to vote. Holders of Claims in Classes 1, 3, 4 and 5 are unimpaired and consequently are conclusively presumed to accept the Plan and are not entitled to vote. Holders of Equity Interests in Class 20 and Claims in Class 21 will receive or retain no distribution of property under the Plan, are presumed to have rejected the Plan and are not entitled to vote thereon.

## 3. Summary of Voting Procedures

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for voting purposes. If you hold Claims or Equity Interests in more than one Class and you are entitled to vote Claims or Interests in more than one Class, you will receive separate ballots, which must be used for each separate Class. Please vote and return your ballot(s) in accordance with the instructions set forth herein and the instructions accompanying your ballot(s).

TO BE COUNTED, YOUR VOTE INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE INSTRUCTIONS ON THE BALLOT, AND MUST BE **ACTUALLY RECEIVED** BY PCAA'S VOTING AGENT EPIQ BANKRUPTCY SOLUTIONS, LLC (THE "VOTING AGENT") AT (I) VIA FIRST CLASS MAIL, PCAA PARENT, LLC BALLOT PROCESSING CENTER C/O EPIQ BANKRUPTCY SOLUTIONS, LLC, FDR STATION, P.O. BOX 5014, NEW YORK, NY 10150-5014, OR (II) VIA HAND DELIVERY OR OVERNIGHT MAIL, PCAA PARENT, LLC BALLOT PROCESSING CENTER C/O EPIQ BANKRUPTCY SOLUTIONS, LLC, 757 THIRD AVENUE, 3RD FLOOR, NEW YORK, NY 10017, **NO LATER THAN [__:__] [_].M., PREVAILING [_____] TIME, ON [_____], 2010 (THE "VOTING DEADLINE").** BALLOTS RECEIVED AFTER THAT TIME WILL NOT BE COUNTED. FAXED OR ELECTRONIC COPIES OF BALLOTS WILL NOT BE COUNTED.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.  ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED.  **BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO PCAA, THE COURT OR COUNSEL TO PCAA.**

### 4. Inquiries

If you are a Holder of a Claim or Equity Interest entitled to vote on the Plan and did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have questions about the procedures for voting your Claim or Interest, or the packet of materials that you received, please contact the Voting Agent, Epiq Bankruptcy Solutions, LLC (the "<u>Notice and Balloting Agent</u>"), at (i) via first class mail, PCAA Parent, LLC Ballot Processing Center c/o Epiq Bankruptcy Solutions, LLC, FDR Station, P.O. Box 5014, New York, NY 10150-5014, (ii) via hand delivery or overnight mail, PCAA Parent, LLC Ballot Processing Center c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, or (iii) by telephone, at (646) 282-2400.

Anyone wishing to obtain additional copies of the Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact the Notice and Balloting Agent, at (646) 282-2400, or view such documents by accessing the Notice and Balloting Agent's website: http://chapter11.epiqsystems.com/pcaa or the Bankruptcy Court's website: www.deb.uscourts.gov.  Note that a PACER password and login are needed to access documents on the Court's website (https://ecf.deb.uscourts.gov/).

### D. Confirmation Hearing

Pursuant to Section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on [_____], 2010 at [_____] (Prevailing Eastern Time), before The Honorable Mary F. Walrath, United States Bankruptcy Judge.  The Bankruptcy Court has directed that objections, if any, to Confirmation be filed and served so that they are received on or before [_____], 2010 at [__:__] [_].m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any adjourned Confirmation Hearing.

### E. Parties-In-Interest Support Plan

The Debtors believe that the Plan provides for a greater potential recovery for Holders of Claims than would be available under any alternative chapter 11 plan or liquidation under chapter 7 of the Bankruptcy Code.  The Debtors believe that the Plan is in the best interests of Holders of Claims and Equity Interests, and recommend that all Holders of Claims eligible to vote, vote to accept the Plan.  In addition, the Supporting Parties support acceptance of the Plan.

## F.     Overview Of Chapter 11 Process

The filing of a chapter 11 bankruptcy petition creates a bankruptcy "estate" comprising all of the property interests of the debtor.  Unless a trustee is appointed by the Bankruptcy Court for cause (no trustee has been appointed in the Chapter 11 Cases), a debtor remains in possession and control of all its assets as a "debtor in possession."  The debtor in possession may continue to operate its business in the ordinary course on a day-to-day basis without Bankruptcy Court approval.  Bankruptcy Court approval is only required for various enumerated kinds of transactions (such as certain financing transactions) and transactions out of the ordinary course of a debtor's business.  The filing of the bankruptcy petition gives rise to what is known as the "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a chapter 11 case without Bankruptcy Court authorization.  The Bankruptcy Court can grant relief from the automatic stay under certain specified conditions or for cause.

The Bankruptcy Code authorizes the creation of one or more official committees to protect the interests of some or all creditors or interest holders.  The fees and expenses of counsel and other professionals employed by such official committees and approved by the Bankruptcy Court are generally borne by a bankruptcy estate.  On February 9, 2010, a Creditors' Committee was appointed in the Chapter 11 Cases, comprised of the following members: AIU Holdings, Inc., V.P. Security Services, Inc., PSE&G, Hartford Parking Property, LLC, and Bus Services, Inc.

A chapter 11 debtor emerges from bankruptcy by successfully confirming a plan of reorganization.  Alternatively, the assets of a debtor may be sold and the proceeds distributed to creditors through a plan of liquidation, such as the Plan.  A plan may be either consensual or non-consensual and provide, among other things, for the treatment of the claims of creditors and interests of shareholders and holders of options or warrants.  The provisions of the Plan are summarized below.  ***See Section V, "Summary of Plan."***

The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the terms for satisfying claims against, and equity interests in, a debtor.  Upon confirmation of a plan, such plan is binding on the debtor, any issuer of securities under the plan, and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the confirmation order discharges a debtor from any debts that arose prior to the date of confirmation of the Plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan has been filed, holders of certain claims against, or equity interests in, a debtor are permitted to vote to accept or reject such plan.  Before soliciting acceptances of the proposed plan, Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.

PCAA is submitting this Disclosure Statement to Holders of Claims against, and Equity Interests in, PCAA to satisfy the requirements of Section 1125 of the Bankruptcy Code.  This Disclosure Statement sets forth specific information regarding PCAA's pre-bankruptcy history, the nature of the Chapter 11 Cases, and the proposed distributions to creditors upon

consummation of the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims and Equity Interests entitled to vote must follow for their votes to be counted.

## III.

## HISTORICAL INFORMATION

### A.    PCAA's Business

#### 1.    Formation and Operations

PCAA Parent, LLC, a Delaware limited liability company, was formed in August 2003 and is a holding company for certain parking related businesses that were acquired and make up the airport parking business.  PCAA's parking business is headquartered in Essington, Pennsylvania.  PCAA Parent, LLC is the parent entity of the other Debtors in these Chapter 11 Cases.  Each of the PCAA entities is a privately owned entity and equity securities in PCAA entities are not listed or traded on any public exchange or market.

PCAA runs the largest domestic off-site airport parking business, operating 31 off-site airport parking facilities comprising over 40,000 parking spaces near 20 major airports across the United States.  PCAA owns or leases its off-airport parking facilities in, among other states, California, Arizona, Colorado, Texas, Georgia, Tennessee, Pennsylvania, Connecticut, New York, New Jersey, and Illinois.  PCAA's locations are strategically positioned near major metropolitan airports and designed to offer customers an efficient and affordable alternative to on-site airport parking.  PCAA has facilities located at seven of the ten busiest domestic airports.  PCAA owns the underlying real property at approximately 70% of its facilities, equating to ownership of nearly two-thirds of its aggregate parking spaces.  The remaining facilities are typically leased on a long-term basis.  Operations on owned land or long-term leased property account for a majority of PCAA's operating income.  PCAA operates under the trademarked banners "AviStar," "FastTrack," and "SkyPark."

#### 2.    Services

PCAA provides a full panoply of parking and related services that maximize convenience for corporate and recreational travelers.  PCAA provides customers with 24-hour secure parking close to airport terminals, as well as frequent transportation via shuttle bus to and from their vehicles and the terminal.  Customers either park their own cars or utilize the company's valet parking services.  Indoor, outdoor, and covered parking options are available at PCAA's facilities.  A shuttle bus fleet provides transit from the parking facility to the airport terminal or from the terminal to the parking facility, as the case may be.  In addition to reserved parking and shuttle services, PCAA provides ancillary services such as car washes and auto repairs at some parking facilities.

#### 3.    Employees

To support its operations, PCAA employs approximately 1,063 employees (the "Employees").  The Employees include approximately 691 full-time workers, 317 part-time

workers, and 55 seasonal workers.  Approximately 20% of the Employees are members of unions and there are four (4) active collective bargaining agreements ("CBAs").  The obligations for Employees under the CBAs in connection with hours worked, overtime, vacation and other benefits vary slightly depending upon each particular CBA.

The day-to-day operations of PCAA's airport parking business are managed by a corporate team primarily located at its Essington, Pennsylvania headquarters.  PCAA has benefitted from the vast industry experience of its senior management team and supporting executives, which, together with PCAA's other Employees, have allowed PCAA to provide high-quality services, establish a competitive position in the market, and strengthen its relationships with customers.

### 4. Financial Information

PCAA has audited financial information for its business as of December 31, 2008, and unaudited financial information as of September 30, 2009.  For the fiscal year ended December 31, 2008, PCAA generated EBITDA of approximately $8.4 million on revenues of approximately $75 million.  As of December 31, 2008, PCAA's consolidated financial statements reflected assets totaling approximately $98 million and liabilities totaling approximately $233 million.  For the nine months ended September 30, 2009, PCAA generated EBITDA of approximately $4.4 million on revenues of approximately $51 million.  As of September 30, 2009, PCAA's unaudited consolidated financial statements reflected assets totaling approximately $94 million and liabilities totaling approximately $233 million.

## B. Prepetition Credit Facilities

### 1. Term Loan Facility

PCAA is party to that certain loan agreement, dated September 1, 2006 (as amended, restated, or supplemented, the "Term Loan Agreement," together with each loan document, guarantee, security agreement, and each other document executed in connection with the Term Loan Agreement, the "Term Loan Documents"), among Parking Company of America Airports, LLC, Parking Company of America Airports Phoenix, LLC, PCAA SP, LLC, and PCA Airports, Ltd., as borrowers (collectively, the "Term Loan Borrowers"), PCAA Parent, LLC, as guarantor (the "Term Loan Guarantor," together with the Term Loan Borrowers, the "Term Loan Obligors"), and Capmark Finance Inc., as lender (formerly known as GMAC Commercial Mortgage Corporation, "CFI"), for the provision of a $195 million term loan (the "Term Loan Facility"), the obligations under which are evidenced by certain promissory notes executed by the Term Loan Borrowers (collectively, the "Term Notes") and are supported by that certain guaranty dated September 1, 2006 (as amended, restated, or supplemented, the "Term Loan Guaranty"), made by PCAA Parent, LLC, as the guarantor, in favor of CFI.

The Term Notes include those certain promissory notes defined in the Term Loan Agreement as (i) "Note A-1," in the aggregate principal amount of $49 million, currently held by Dekabank Deutsche Girozentrale ("Deka"), (ii) "Note A-2," in the aggregate principal amount of $49 million, currently held by Deutsche Hypothekenbank AG ("Deutsche Hypo"), (iii) "Note A-3," in the aggregate principal amount of $49 million, currently held by ING Real Estate

Finance (USA) LLC ("ING," together with Deka and Deutsche Hypo, the "Term Note A Co-Lenders"), (iv) "Note B-1," in the aggregate principal amount of $24 million, originally held by CFI, and (v) "Note B-2," in the aggregate principal amount of $24 million, originally held by Capmark Structured Real Estate, Ltd. ("CSRE").

Pursuant to that certain amended and restated co-lending agreement, dated May 14, 2009, among the agents for the holders of the various Term Notes, among other things, (x) ING was retained as administrative agent for the Term Loan Lenders in respect of the Term Loan Facility (the "Term Loan Agent," together with the agent, trustee, or other representative under each respective Prepetition Facility (as defined below), the "Prepetition Agents"), and (y) the payment rights of the holders of Term Notes, Note B-1 and Note B-2, were subordinated to the Term Note A Co-Lenders. CFI and CSRE subsequently assigned their respective interests in Note B-1 and Note B-2 to the Term Note A Co-Lenders who acquired the Term Notes on a pro rata basis. In their capacity as holders of the Term Notes, the Term Note A Co-Lenders are referred to herein as the "Term Loan Lenders."

As of the Petition Date, the Term Loan Obligors, without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Term Loan Lenders under the Term Loan Documents in the aggregate principal amount of not less than $195,000,000, plus interest thereon and fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees that are chargeable or reimbursable under the Term Loan Documents), charges, Obligations (as defined in the Term Loan Agreement) and all other obligations incurred in connection therewith as provided in the Term Loan Documents (collectively, the "Term Loan Obligations"), which Term Loan Obligations are guaranteed on an unsecured basis by PCAA Parent, LLC under the Term Loan Guaranty and secured by first-priority liens on and security interests in (the "Term Loan Security Interests") certain real and personal property of the Term Loan Borrowers (as further described and defined in the Term Loan Documents, the "Term Loan Collateral").

## 2. Chicago Facility

PCAA is party to that certain loan agreement, dated December 22, 2003 (as amended, restated, or supplemented, the "Chicago Loan Agreement," together with each loan document, guarantee, security agreement, and each other document executed in connection with the Chicago Loan Agreement, the "Chicago Loan Documents"), among PCAA Chicago, LLC, as borrower ("PCAA Chicago"), PCAA Parent, LLC, as guarantor (together with PCAA Chicago, the "Chicago Obligors") under that certain guarantee, dated December 22, 2003 (the "Chicago Guaranty"), and GMAC Commercial Mortgage Bank, as original lender ("GMAC"), for the provision of a loan in the original principal amount of $4,750,000 (the "Chicago Facility"), as evidenced by a certain Promissory Note, dated December 22, 2003. GMAC's interests under the Chicago Loan Agreement, and related documents, was subsequently transferred to Wells Fargo Bank, N.A., as trustee for the registered holders of the securitized pool of loans known as the GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates, Series 2004-C1, its successors and/or assigns (the "Chicago Lender").

As of the Petition Date, the Chicago Obligors, without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Chicago Lender under the Chicago

Loan Documents in the aggregate principal amount of not less than $3.967 million, plus interest thereon and fees, expenses and all other obligations incurred in connection therewith as provided in the Chicago Loan Documents (collectively, the "Chicago Obligations"), which Chicago Obligations are guaranteed on an unsecured basis by PCAA Parent, LLC under the Chicago Guaranty and secured by first-priority liens on and security interests in (the "Chicago Security Interests") certain real and personal property of PCAA Chicago (as further described and defined in the Chicago Loan Documents, the "Chicago Collateral").

**3.     RCL Facility**

PCAA is party to that certain loan agreement, dated April 30, 2004 (as amended, restated, or supplemented, the "RCL Loan Agreement," together with each loan document, guarantee, security agreement, and each other document executed in connection with the RCL Loan Agreement, the "RCL Loan Documents," and together with the Term Loan Documents and the Term Loan Documents, the "Prepetition Loan Documents"), among RCL Properties, LLC ("RCL"), as borrower, certain original guarantors (the "Original RCL Guarantors"), and GMAC, as original lender, for the provision of a loan in the original principal amount of $2,300,000 (the "RCL Facility," together with the Term Loan Facility and Chicago Facility, the "Prepetition Facilities"), as evidenced by a certain Promissory Note, dated April 30, 2004. The Original RCL Guarantors transferred 100% of their membership interest in RCL to PCAA Parent, LLC, and in connection therewith, Macquarie Americas Parking Corporation, a non-debtor affiliate ("MAPC" together with RCL, the "RCL Obligors," and together with the Term Loan Obligors and Chicago Obligors, the "Prepetition Obligors"), guaranteed the obligations of RCL pursuant to that certain guaranty, dated October 5, 2005 (as amended, restated, or supplemented, the "RCL Guaranty"). GMAC's interests under the RCL Loan Agreement, and related documents, was subsequently transferred to LaSalle Global Trust Services, as trustee for the registered holders of the securitized pool of loans known as the GMAC Commercial Mortgage Securities, Inc. Commercial Mortgage Pass-Through Certificates, Series 2004-C2, its successors and/or assigns (the "RCL Lender" and, together with the Term Loan Lenders and the Chicago Lender, the "Prepetition Lenders," together with the Prepetition Agents, the "Prepetition Secured Parties").

As of the Petition Date, the RCL Obligors, without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the RCL Lender under the RCL Loan Documents in the aggregate principal amount of not less than approximately $2.032 million, plus interest thereon and fees, expenses and all other obligations incurred in connection therewith as provided in the RCL Loan Documents (collectively, the "RCL Obligations," together with the Term Loan Obligations and Chicago Obligations, the "Prepetition Obligations"), which RCL Obligations are guaranteed on an unsecured basis by MAPC pursuant to the RCL Guaranty and secured by first-priority liens on and security interests in (the "RCL Security Interests," together with the Term Loan Security Interests and the Chicago Security Interests, the "Prepetition Security Interests") certain real and personal property of RCL (as further described and defined in the RCL Loan Documents, the "RCL Collateral," together with the Term Loan Collateral and Chicago Collateral, the "Prepetition Collateral").

### 4. Prepetition Secured Debt Summary

As of the Petition Date, the Prepetition Obligors' aggregate outstanding indebtedness under the respective Prepetition Facilities was approximately $201 million plus interest.

## C. Events Leading To Chapter 11 Filing

### 1. Adverse Conditions

PCAA's business is directly impacted by macroeconomic trends and by national and regional airline usage. Consequently, PCAA has faced numerous challenges that began in 2008 and continued into 2009. High fuel prices disrupted PCAA's operations by curtailing domestic leisure travel throughout the industry and increasing the company's operational expenses. Operations were further affected by the significant decline in travel by businesses and consumers due to the recession and reduced flights offered by airlines seeking to better manage costs. In addition to these variable factors, PCAA's fixed costs, primarily lease and on-site labor, further diminished financial performance. During the same period that PCAA's costs have been increasing, PCAA's business and revenues have been negatively affected. These factors contributed to PCAA's profitability sharply decreasing.

### 2. Declining Fiscal Performance and Projections

PCAA's management has reacted to the adverse economic trends and distressed profits through aggressive steps to reduce headcount, contain costs, improve customer service and marketing, and seek new sources of revenue. Despite management's efforts, PCAA's operating performance has declined and is projected to decline during the current fiscal year. For the fiscal year ended December 31, 2008, PCAA generated EBITDA of approximately $8.4 million on revenues of approximately $75 million, compared to EBITDA of approximately $14.2 million and revenues of approximately $77 million in 2007. Further, for the nine months ended September 30, 2009, PCAA's unaudited financial records indicate EBITDA of approximately $4.4 million on revenues of approximately $51 million.

### 3. Defaults Under Prepetition Facilities

In addition to the sharp decline in revenues and the worldwide financial crisis, PCAA's indebtedness under the Prepetition Facilities was maturing in 2009 and opportunities to refinance such indebtedness were unavailable. Beginning in early June 2009, it became clear that the Term Loan Borrowers were unable to service the term loans and comply with certain other covenants under the Term Loan Agreement. Consequently, the Term Loan Obligors negotiated and signed a forbearance agreement with the Term Loan Lenders, dated June 10, 2009 (as amended, the "Term Loan Forbearance Agreement"), among the Term Loan Borrowers, PCAA Parent, LLC and the Term Loan Lenders. The forbearance period under the Term Loan Forbearance Agreement was scheduled to expire on August 31, 2009, and, pursuant to succeeding amendments, was extended through December 31, 2009. The material terms of the Term Loan Forbearance during the forbearance period included that: (i) the Term Loan Lenders would forbear from exercising rights and remedies for certain designated defaults including any breaches of certain financial covenants and the non-payment of interest; (ii) interest would accrue at the current interest rate and would be deferred and capitalized; (iii) the business would

not sell, lease or dispose of assets or properties or incur debt, in each case, other than in the ordinary course of business; and (iv) there would be certain limitations on capital expenditures and other payments. The Term Loan Facility matured on September 9, 2009.

The Chicago Facility matured by its terms on January 1, 2009. In light of its inability to satisfy the outstanding amounts and certain other covenants under the Chicago Loan Agreement, PCAA Chicago, LLC negotiated and signed a forbearance agreement with the Chicago Lender, dated April 3, 2009 (the "Chicago Forbearance Agreement"). The Chicago Forbearance Agreement identifies various existing defaults under the Chicago Loan Agreement, including the failure to comply with certain financial and reporting covenants. The forbearance period under the Chicago Forbearance Agreement expired on September 1, 2009, but PCAA and its advisors continued to have discussions with the Chicago Lender and provide updates on PCAA's restructuring efforts leading up to the Petition Date.

The RCL Facility matured by its terms on May 1, 2009. In light of its inability to satisfy the outstanding amounts under the RCL Loan Agreement, RCL Properties, LLC negotiated and signed a forbearance agreement with the RCL Lender, dated August 18, 2009 (as amended, the "RCL Forbearance Agreement," and, together with the Term Loan Forbearance Agreement and the Chicago Forbearance Agreement, the "Forbearance Agreements"), among RCL, MAPC, and the RCL Lender. Under the RCL Forbearance Agreement, the RCL Lender agreed to forebear from exercising its rights under the RCL Loan Agreement until September 15, 2009. The parties negotiated an amendment of the RCL Forbearance Agreement for an extension of the forbearance period until December 31, 2009.

The Prepetition Obligors have approximately $201 million in Prepetition Indebtedness outstanding under their respective Prepetition Facilities. The Prepetition Obligors are unable to continue operating with such debt levels outside of chapter 11 because of the adverse economic conditions and the decreasing revenue and operational performance discussed above. Additionally, the Prepetition Obligors do not have sufficient capital and liquidity with which to repay and/or support the refinancing of their respective debt obligations.

### 4. Restructuring Efforts

Beginning in 2008 and continuing through 2009, PCAA undertook measures to address the financial performance and liquidity struggles of the airport parking business. PCAA developed a comprehensive restructuring and strategic plan designed to grow revenues, improve margins, streamline operations and rationalize underperforming facilities. To facilitate its restructuring efforts, PCAA negotiated with the Prepetition Lenders for the above Forbearance Agreements and discussed with them various restructuring alternatives, including the potential sale of the business or certain assets. In this regard, PCAA's financial advisor, SSG Capital Advisors, LLC ("SSG"), began an active marketing and sale process of the airport parking business. PCAA entered into confidentiality agreements with a number of parties and provided access to an electronic due diligence database. After receiving a number of letters of intent, PCAA entered into further discussions with potential purchasers, which ultimately resulted in the negotiation of a stalking horse asset purchase agreement. PCAA filed a motion to, among other things, establish a bidding and auction process to facilitate a sale, contemporaneously with the

commencement of these Chapter 11 Cases (the "Sale Motion"), and the bidding procedures hearing has been scheduled for February 17, 2010.

To facilitate the sale and restructuring efforts, PCAA and its advisors negotiated the Support Agreement with the Term Loan Lenders, pursuant to which, among other things, certain of such lenders agreed to provide postpetition financing for operation of PCAA's businesses while in chapter 11. As summarized below, PCAA filed a motion seeking approval to obtain debtor-in-possession financing and access to cash collateral. The postpetition financing, Support Agreement, and stalking horse asset purchase agreement require PCAA to meet certain deadlines with respect to the sale and chapter 11 plan process including, among other things, filing a chapter 11 plan on or before February 16, 2010, and conducting the auction and hearing on the Sale Motion and hearing on confirmation of the Plan within structured timeframes.

## IV.

## CHAPTER 11 CASES

### A.     Case Administration

Prior to the Petition Date, PCAA retained SSG, as its financial advisor and investment banker, Milbank, Tweed, Hadley & M\(^c\)Cloy LLP, as its counsel ("Milbank"), and Richards, Layton & Finger, P.A., as its co-counsel ("RLF"), to assist it in exploring and facilitating its restructuring goals. Contemporaneously with the filing of its chapter 11 petitions, PCAA filed applications with the Court seeking approval of the retention of SSG, Milbank and RLF as its professionals (Docket Nos. 21, and 24), as well as the continued employment of certain ordinary course professionals (Docket No. 25), in the Chapter 11 Cases.

Pursuant to an order of the Bankruptcy Court, the Chapter 11 Cases are being jointly administered for procedural purposes only. No request for the appointment of a trustee or examiner has been made and no committees have been appointed or designated in PCAA's Chapter 11 Cases.

PCAA has also filed a motion seeking establishment of certain deadlines for claimants to file proofs of Claim against PCAA (the "Bar Dates") (Docket No. 45). PCAA intends to file its Schedules of Assets and Liabilities and Statement of Financial Affairs (collectively, the "Schedules") within the first 30 days of its cases, as provided under Delaware Local Rule 1007-1. Pursuant to Bankruptcy Rule 3003(c)(2) and any order establishing the Bar Dates, any creditor whose Claim was not included in the Schedules or scheduled as disputed, contingent or unliquidated, and who failed to file a proof of Claim on or before the applicable Bar Date, will not be entitled to vote on the Plan or receive a distribution under the Plan.

### B.     Continuation Of Business After Petition Date

#### 1.     Operations

Since the Petition Date, PCAA has been authorized to continue to manage and operate its businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

In connection therewith, PCAA has continued to deliver its airport parking and related services to customers across its nationwide facilities.

**2.      Financing and Cash Management**

PCAA has filed a motion (the "DIP Motion") seeking authority to obtain, among other related relief, postpetition financing in the aggregate principal amount of $5,000,000 and access to cash collateral (the "DIP Financing") (Docket No. 14). PCAA seeks the DIP Financing in order to finance its operations, maintain business relationships with vendors, suppliers and customers, pay employees, satisfy other working capital and operational needs and administer and preserve the value of its estates as well as to enable it to conduct auction and sale processes for its business and assets. The Bankruptcy Court has granted PCAA's DIP Motion on an interim basis, permitting PCAA to borrow up to $1,000,000, and scheduled the hearing for consideration of the relief requested on a final basis for February 17, 2010 (Docket No. 35).

In addition, the Bankruptcy Court has granted PCAA's motion seeking authority to, among other things, continue use of its cash management system, bank accounts, and business forms (Docket No. 32).

**3.      Contracts and Essential Vendors**

PCAA has reviewed, and continues to review, its business and affairs, including its agreements with suppliers, vendors, lessors, and customers in an effort to identify contracts and leases necessary for the airport parking business. PCAA will file motions to assume or reject certain executory contracts and/or unexpired leases based on their benefit or detriment to the estates. The Bankruptcy Court has already granted, as part of the relief requested in its "first-day" pleadings, PCAA's request to pay essential vendors of its business (Docket No. 40). The Bankruptcy Court has also granted PCAA's motion requesting authority to pay fuel vendors who deliver fuel to support PCAA's shuttle services (Docket No. 31). The foregoing relief will help PCAA maintain the vital services of its fuel and other essential vendors, without which PCAA would be unable to sustain its operations.

**4.      Customer Programs**

The Bankruptcy Court has granted PCAA's motion seeking authority to continue its customer loyalty and discount programs and honor obligations in connection therewith (Docket No. 38). The relief provided in this order will allow PCAA to continue its positive relationship with its valued customer base at a time when the loyalty and support of its customers is extremely critical.

**5.      Utilities**

On the Petition Date, PCAA filed a motion (the "Utilities Motion") seeking, among other relief, to prohibit its utility companies from discontinuing their services to PCAA and implement procedures for the provision of adequate protection (Docket No. 7). The Bankruptcy Court has entered a bridge order, prohibiting utility companies from discontinuing their services until such time as a Final Order on the relief requested in the Utilities Motion is entered by the Bankruptcy

Court (Docket No. 41).  The Utilities Motion is scheduled for a hearing for relief on a final basis on February 17, 2010.

### 6. Employees

As discussed, PCAA employs over 1,000 Employees throughout its organization.  The Bankruptcy Court has granted PCAA's motion seeking authority to, among other things, continue paying wages and maintain benefits for its Employees (Docket No. 36).

### 7. Taxes and Insurance

The Bankruptcy Court has entered orders granting PCAA's motions seeking authority to (i) pay certain prepetition taxes and fees to its regulatory authorities (Docket No. 37), and (ii) continue its workers' compensation and other insurance programs maintained in the ordinary course of PCAA's businesses (including the renewal and/or replacement of those policies and agreements that may expire during these cases) (Docket No. 39).  PCAA has also filed a motion seeking authority to, among other things, enter into an insurance premium financing agreement with Flatiron Capital, a Division of Wells Fargo Bank, N.A. (Docket No. 62).

### 8. Sale Motion

Contemporaneously with the filing of its chapter 11 petitions, PCAA filed the Sale Motion, seeking entry of an order, pursuant to Sections 105, 363, 365 and 1146 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014, (a) establishing proposed bidding procedures for the potential sale of all or substantially all of PCAA's assets (the "Bidding Procedures"), (b) authorizing and scheduling a date and time to hold an auction to solicit higher or otherwise better bids for PCAA's assets (the "Auction"), (c) scheduling a date and time for hearing (the "Sale Hearing") to consider an order approving a sale (the "Sale Order"), (d) approving cure amount procedures, (e) setting objection deadlines, (f) approving the stalking horse protection and (g) approving the Sale of all or substantially all of PCAA's assets. The proposed hearing for consideration of the Bidding Procedures is scheduled for February 17, 2010.  The Bidding Procedures incorporate the stalking horse credit bid by Corinthian-Bainbridge ZKS Holdings, LLC.  To the extent the Bidding Procedures are approved, qualified bids by third parties shall be due April 10, 2010, and, assuming at least one such bid is submitted, an Auction will subsequently be held on April 20, 2010.  In accordance with the Bidding Procedures, PCAA will announce the successful bid at the end of the Auction and thereafter file a notice that PCAA will seek Bankruptcy Court approval of such successful bid at the Sale Hearing.

The proposed Bidding Procedures Order is the first stage of PCAA's exit strategy.  It is contemplated that PCAA will seek entry of a Sale Order simultaneously with confirmation of the Plan.  Accordingly, voting for the Plan is voting for PCAA to sell all or substantially all of its assets to the Purchaser(s).

## C. Employee Incentive Plan

On February 16, 2010, PCAA filed a motion (the "Employee Incentive Motion") seeking entry of an order, pursuant to sections 363(b), 503(c)(3) and 105(a) of the Bankruptcy Code,

authorizing and approving PCAA's implementation of a sale-related employee incentive plan with respect to the sale of PCAA's assets, and payments to participants thereunder (Docket No. __). On _____, 2010, the Bankruptcy Court entered an order granting the Employee Incentive Motion, authorizing and approving the Employee Incentive Plan and the Employee Incentive Plan Payments (Docket No. __).

## V.

## SUMMARY OF PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, TO THE EXHIBITS ATTACHED THERETO, AND TO THE PLAN SUPPLEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN PCAA UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST AND INTERESTS IN PCAA AND OTHER PARTIES IN INTEREST.

## A.  Treatment Of Administrative Expense Claims And Priority Tax Claims

### 1.  Administrative Expense Bar Dates

All Other Administrative Expense Claims (other than DIP Financing Claims) that are not otherwise paid in the ordinary course of the Debtors' business shall be filed with the Bankruptcy Court not later than ten (10) days before the date scheduled for the Confirmation Hearing (the "Administrative Expense Bar Date"), and objections (if any) to such Other Administrative Expense Claim shall be filed no later than forty-five (45) days after the Effective Date.  Any Holder of an Other Administrative Expense Claim who fails to file a timely request for the payment of an Other Administrative Expense Claim as provided in this paragraph: (a) shall be forever barred, estopped and enjoined from asserting such Other Administrative Expense Claim against each of the Debtors, any Purchaser or the Liquidating Trust Assets (or filing a request for the allowance thereof), and each of the Debtors, their property, and the Liquidating Trust Assets shall be forever discharged from any and all indebtedness or liability with respect to such Other Administrative Expense Claim; and (b) such Holder shall not be permitted to participate in any distribution under the Plan on account of such Other Administrative Expense Claim.

## 2. Treatment of Other Administrative Expense Claims

Each Holder of an Allowed Other Administrative Expense Claim shall, in full and final satisfaction of such Allowed Other Administrative Expense Claim, be paid either (i) in Cash, in full, from the Sale Proceeds on, or as soon as practicable following, the later of the (x) Effective Date and (y) date such claim becomes due and payable in the ordinary course of business, or (ii) on such other terms and conditions as may be agreed between the Holder of such Claim, on the one hand, and the Debtors or the Liquidating Trustee (as the case may be), on the other hand.

For the avoidance of doubt, each Holder of an Allowed DIP Financing Claim shall, in full and final satisfaction of such Allowed DIP Financing Claim, be paid in full, in Cash, from the Sale Proceeds on the earlier of the closing of the Sale or the Effective Date, unless the Holder consents to other treatment, and all commitments under the DIP Facility Agreement shall be cancelled. The DIP Financing Claims shall be paid, first, from the proceeds of First Lien Collateral (as defined in the DIP Credit Agreement) and, thereafter, from the proceeds of Second Lien Collateral (as defined in the DIP Credit Agreement). Notwithstanding anything herein or in the Plan to the contrary, the Liens and security interests securing the DIP Financing Claims shall continue in full force and effect until such time as the Allowed DIP Financing Claims have been paid in full and in Cash, after which such Liens and security interests shall be deemed cancelled, released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

## 3. Treatment of Professional Fee Claims

Notwithstanding anything herein or in the Plan to the contrary, all entities seeking awards by the Bankruptcy Court of Professional Fee Claims for compensation for services rendered or reimbursement of expenses incurred prior to the Effective Date shall (a) file, on or before the date that is thirty (30) days after the Effective Date their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court, within five (5) Business Days of entry of such order. The Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course of business and without the need for Bankruptcy Court approval.

## 4. Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim shall, in full and final satisfaction of such Allowed Priority Tax Claim, be paid in full through deferred Cash payments from the Sale Proceeds in an aggregate principal amount equal to the amount of the Allowed Claim plus interest on the unpaid portion at the rate of 4% per annum from the Effective Date through the date of payment thereof (which may be no later than five (5) years after the date of the order for relief).

**B.     Treatment Of Allowed Claims.**

    **1.     Class 1 – Priority Non-Tax Claims**

The Plan will not alter any of the legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims.  Each Holder of an Allowed Priority Non-Tax Claim (including, as applicable, Allowed Employee Priority Claims) shall, in full and final satisfaction of such Priority Non-Tax Claim, be paid in full, in Cash, on the Effective Date from the Sale Proceeds, unless the Holder of such Allowed Priority Non-Tax Claim consents to other treatment.

    **2.     Class 2 – Term Loan Secured Claims**

The Term Loan Secured Claims shall be Allowed under this Plan in an amount not less than $195,000,000 plus accrued and unpaid interest and fees. Each Holder of an Allowed Term Loan Secured Claim shall receive, in full and final satisfaction of such Allowed Term Loan Secured Claim, its Pro Rata share of:  (i) Cash on the Effective Date from the Sale Proceeds in respect of its Term Loan Collateral, or (ii) such other treatment as may be agreed upon with the Holder of such Allowed Term Loan Secured Claim, on the one hand, and the Debtors, on the other hand, in each case, after satisfaction of Administrative Expense Claims and Priority Claims, as applicable.  Pursuant to the Sale, it is contemplated that assets on which the Holders of Allowed Term Loan Secured Claims have Liens shall be sold to the Purchaser free and clear of such Liens, which Liens shall attach solely to the proceeds of such Holders' Collateral.  On the full payment or other satisfaction of the obligations set forth in this paragraph, the Liens securing the Allowed Term Loan Secured Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

    **3.     Class 3 – Chicago Secured Claims**

The Chicago Secured Claims shall be Allowed under the Plan in an amount not less than $3,967,000 plus accrued and unpaid interest and fees.  Each Holder of an Allowed Chicago Secured Claim shall, in full and final satisfaction of such Allowed Chicago Secured Claim, (i) be paid in full, in Cash, on the Effective Date from the Sale Proceeds in respect of its Chicago Collateral, or (ii) receive such other treatment as may be agreed upon with the Holder of such Allowed Chicago Secured Claim, on the one hand, and the Debtors, on the other hand, in each case, after satisfaction of Administrative Expense Claims and Priority Claims, as applicable. Pursuant to the Sale, it is contemplated that assets on which the Holders of Chicago Secured Claims have Liens shall be sold to the Purchaser free and clear of such Liens, which Liens shall attach solely to the proceeds of such Holders' Collateral.  On the full payment or other satisfaction of the obligations set forth in this paragraph, the Liens securing the Allowed Chicago Secured Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

### 4. Class 4 – RCL Secured Claims

The RCL Secured Claims shall be Allowed under the Plan in an amount not less than $2,032,000 plus accrued and unpaid interest and fees. Each Holder of an Allowed RCL Secured Claim shall, in full and final satisfaction of such Allowed RCL Secured Claims, (i) be paid in full, in Cash on the Effective Date from Sale Proceeds in respect of its RCL Collateral, or (ii) receive such other treatment as may be agreed upon with the Holder of such Allowed RCL Secured Claim, on the one hand, and the Debtors, on the other hand, in each case, after satisfaction of Administrative Expense Claims and Priority Claims, as applicable. Pursuant to the Sale, it is contemplated that assets on which the Holders of RCL Secured Claims have Liens shall be sold to the Purchaser free and clear of such Liens, which Liens shall attach solely to the proceeds of such Holders' Collateral. On the full payment or other satisfaction of the obligations set forth in this paragraph, the Liens securing the Allowed RCL Secured Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

### 5. Class 5 – Other Secured Debt Claims

Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim: (i) Cash on, or as soon as practicable following, the Effective Date, equal to the Allowed amount of such Other Secured Claim; (ii) treatment that leaves unaltered the legal, equitable and contractual rights to which such Allowed Other Secured Claim entitles the Holder of such Claim; (iii) reinstatement of the Allowed portion of such Other Secured Claim; or (iv) such other treatment as may be agreed upon with the Holder of such Allowed Other Secured Claim, on the one hand, and the Debtors, on the other hand. On the full payment or other satisfaction of the obligations set forth in this paragraph, the Liens securing the Allowed Other Secured Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

### 6. Classes 6 through 19 – General Unsecured Claims

In full and final satisfaction of Allowed General Unsecured Claims, on, or as soon as practicable following, the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of:

> i. Distributable value allocated to the specific Debtor entity such General Unsecured Claim is Allowed against for distribution purposes after satisfaction, as applicable, in full of all Allowed DIP Financing Claims, Allowed Administrative Expense Claims, Allowed Priority Claims, and Allowed Prepetition Lender Claims; _provided_, _that_, no Holder of a General Unsecured Claim shall receive any distribution in excess of the Allowed amount of its General Unsecured Claim; _provided_, _further_, that to the extent the Allowed amount of all General Unsecured Claims asserted

against a specific Debtor entity has been satisfied in full, any residual value will be distributed to the equity of any such Debtor entity; and

ii. 100% of the Liquidating Trust Interests in the Liquidating Trust (as further set forth in Article V of the Plan).

### 7. Class 20 – Equity Interests

On the Effective Date, all Equity Interests of the Debtors (including any and all Claims subordinated under Section 510(b) of the Bankruptcy Code that are in any way arising from, of or in connection with such Equity Interests) shall be deemed cancelled and of no further force and effect, whether surrendered for cancellation or otherwise. Holders of Equity Interests of the Debtors shall not receive or retain any property under the Plan on account of such Equity Interests after giving effect to the transactions contemplated by the Plan (including any distribution of residual value).

### 8. Class 21 – Intercompany Claims

No distributions shall be made under the Plan on account of Intercompany Claims among the Debtors or any of their subsidiaries and any and all liability on account of such Intercompany Claims shall be deemed discharged on the Effective Date.

### C. The Liquidating Trust

The "Liquidating Trust" means the liquidating trust established on the Effective Date, in accordance with the Plan and Liquidating Trust Agreement, for the benefit of the Liquidating Trust Beneficiaries to which the Liquidating Trust Assets will be transferred and liquidated in accordance with the terms of the Plan and the Liquidating Trust Agreement. The Liquidating Trust shall conduct no business and shall qualify as a liquidating trust pursuant to Treasury Regulations §301.7701-4(d).

### 1. Establishment of Liquidating Trust

On the Effective Date, the Debtors and the Liquidating Trustee, on their own behalf and on behalf of Holders of Allowed General Unsecured Claims (including Term Loan Lender Deficiency Claims) in Classes 6 through 19, shall execute the Liquidating Trust Agreement and shall take all other steps necessary to establish the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries in accordance with the Plan.

### 2. Funding of Liquidating Trust

The Liquidating Trust will be irrevocably funded with the (i) Remaining Assets, (ii) Causes of Action and proceeds thereof, and (iii) Cash in the sum of $25,000 from the Sale Proceeds that would otherwise be distributed to Holders of General Unsecured Claims (the "*Liquidating Trust Funding*"), on the Effective Date of the Plan.

### 3. Appointment of Liquidating Trustee

The Liquidating Trustee shall be appointed by the Holders of Allowed Term Loan Secured Claims unless such Claims are paid off in full, in Cash from the Sale Proceeds of their Term Loan Collateral, in which case the Liquidating Trustee shall be appointed by the Holders of Liquidating Trust Interests in accordance with the Liquidating Trust Agreement, or as otherwise determined by the Bankruptcy Court.

### 4. Transfer and Vesting of Liquidating Trust Assets in Liquidating Trust

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Liquidating Trust Assets become available, the Debtors shall be deemed to have automatically transferred to the applicable Liquidating Trust all of their right, title and interest in and to all of such additional Liquidating Trust Assets, and in accordance with Section 1141 of the Bankruptcy Code, all such assets shall automatically irrevocably vest in the Liquidating Trust free and clear of all Claims and Liens, subject only to the Allowed Claims of the applicable Liquidating Trust Beneficiaries, as set forth in the Plan, and the reasonable fees and expenses of administering the Liquidating Trust, including, without limitation, the reasonable fees and expenses of the Liquidating Trustee, as provided in the Liquidating Trust Agreement. Thereupon, the Debtors shall have no interest in or with respect to such additional Liquidating Trust Assets or the Liquidating Trust. In connection with the vesting and transfer of the Liquidating Trust Assets, including the Causes of Action and Remaining Assets, any attorney-client privilege, work-product protection or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidating Trust shall vest in the Liquidating Trust. The Debtors and the Liquidating Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges, protections and immunities. For the avoidance of doubt, the Liquidating Trust shall not be vested with the Excluded Actions

### 5. Liquidating Trustee's Authority and Duties

From and after the Effective Date, the Liquidating Trustee shall serve as trustee of the Liquidating Trust and shall have all powers, rights and duties of a trustee, as set forth in the Liquidating Trust Agreement. Among other things, the Liquidating Trustee shall: (i) hold and administer the Liquidating Trust Assets, including the Remaining Assets and Causes of Action, (ii) have the sole authority and discretion on behalf of the Liquidating Trust to evaluate and determine strategy with respect to the Causes of Action and Remaining Assets, and to litigate, settle, transfer, release or abandon and/or compromise in any manner any and all such Causes of Action or Remaining Assets on behalf of the Liquidating Trust on any terms and conditions as it may determine in good faith based on the best interests of the Liquidating Trust Beneficiaries, (iii) have the power and authority to retain, as an expense of the Liquidating Trust, attorneys, advisors, other professionals and employees as may be appropriate to perform the duties required of the Liquidating Trustee hereunder or in the Liquidating Trust Agreement, (iv) make distributions to the Liquidating Trust Beneficiaries as provided in the Liquidating Trust Agreement and the Plan, (v) have the right to receive reasonable compensation for performing services as the Liquidating Trustee and to pay the reasonable fees, costs and expenses of any counsel, professionals, advisors or employees as may be necessary to assist the Liquidating

Trustee in performing the duties and responsibilities required under the Plan and the Liquidating Trust Agreement, (vi) file, litigate, settle, compromise or withdraw objections to Claims as set forth in Article VIII.A of the Plan, and (vii) have the right to provide periodic reports and updates to its Liquidating Trust Beneficiaries regarding the status of the administration of the Liquidating Trust Assets, including the Causes of Action and Remaining Assets, and the assets, liabilities and transfers of the Liquidating Trust. For the avoidance of doubt, the Liquidating Trust shall not be funded with, and the Liquidating Trustee shall not have any authority or duties with respect to, the Excluded Actions.

## D. Directors and Officers Tail Insurance

On the Effective Date the Debtors shall purchase, continuing director and officer insurance coverage for a tail period of six years.

## E. Executory Contracts And Unexpired Leases

### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases

Any executory contracts or unexpired leases that have not expired by their own terms on or prior to the Effective Date, (i) which the Debtors have not assumed and assigned or rejected with the approval of the Bankruptcy Court (whether as part of the Sale or otherwise), or (ii) that are not the subject of a motion to assume the same pending as of the Effective Date, shall be deemed rejected by the Debtors on the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy Code, except to the extent that the Debtors identify any executory contracts or unexpired leases in the Plan Supplement which the Debtors do not intend to reject

### 2. Rejection Claims; Cure of Defaults

*If the rejection of an executory contract or unexpired lease results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a Proof of Claim that has been timely Filed, shall be forever barred and shall not be enforceable against the Debtors or the Liquidating Trust, as applicable, or their properties, successors or assigns, unless a Proof of Claim is timely Filed with the Claims Agent and served upon the Debtors or the Liquidating Trustee and their respective counsel on or before (x) thirty (30) days after the later to occur of (a) the Effective Date and (b) the date of entry of an order by the Bankruptcy Court authorizing rejection of a particular executory contract or unexpired lease, or (y) such other date as may be ordered by the Bankruptcy Court.*

*Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Debtors to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, the cure payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving*

*the assumption. Pending the Bankruptcy Court's ruling on such dispute, the executory contract or unexpired lease at issue shall be deemed assumed by the Debtors unless otherwise ordered by the Bankruptcy Court.*

**F.    Conditions Precedent To Confirmation and Effective Date Of Plan**

**1.    Conditions Precedent to Confirmation**

The following are conditions precedent to confirmation of the Plan that must be (i) satisfied or (ii) waived in accordance with the Plan:

a.    The Sale Order shall have been entered by the Bankruptcy Court.

b.    The entry of an order by the Bankruptcy Court finding that the Disclosure Statement, which is in form and substance satisfactory to the Debtors and to the Term Loan Lenders, contains adequate information pursuant to Section 1125 of the Bankruptcy Code.

c.    The entry of the Confirmation Order by the Bankruptcy Court in form and substance satisfactory to the Debtors, the Term Loan Lenders and the DIP Lenders.

d.    The Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance satisfactory to the Debtors and, to the extent adverse thereto, the Term Loan Lenders and the DIP Lenders.

e.    The occurrence of the Confirmation Date.

**2.    Conditions Precedent to Effective Date**

The following are conditions precedent to the Effective Date of the Plan that must be (i) satisfied or (ii) waived in accordance with the Plan:

a.    Confirmation shall have occurred and the Confirmation Order shall have been entered by the Bankruptcy Court.

b.    The Closing Date shall have occurred.

c.    There shall not be in effect on the Effective Date any (i) Order entered by a U.S. court, (ii) any order, opinion, ruling or other decision entered by any other court or governmental entity or (iii) United States or other applicable law staying, restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by the Plan.

d.    All other actions and documents necessary to implement the Plan shall have been effected or executed, including execution of the Liquidating

Trust Agreement in form and substance satisfactory to the Debtors and, to the extent adverse thereto, to the Term Loan Lenders and counsel to the DIP Lenders.

e.      The Liquidating Trust Agreement shall have been fully executed and the Liquidating Trust Assets shall have been transferred to the Liquidating Trust.

Only the Debtors may waive the conditions listed above without notice to parties in interest or the Bankruptcy Court and without a hearing. If the Confirmation Order is vacated, the Plan shall be null and void in all respects and nothing contained in this Disclosure Statement or the Plan shall: (1) constitute a waiver or release of any Claims by or against, or any Equity Interests in, PCAA; (2) prejudice in any manner the rights of PCAA or any other party; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors in any respect.

## G.    Release, Exculpation, Injunctive And Related Provisions

### 1.    Mutual Releases by Releasees

*"Releasees" means the Purchaser, the Debtors, the Liquidating Trustee, each of the Holders of Equity Interests, each of the DIP Lenders, the DIP Agent, each of the Term Loan Lenders, the Administrative Agent, any Creditors' Committee and each member thereof, and each of their respective successors and predecessors and current and former control persons, shareholders, members, officers, directors, employees, affiliates and agents (and each of their respective attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons).*

*As of the Effective Date, for good and valuable consideration, including, without limitation, the services of the Releasees to facilitate the Sale, the Plan and the expeditious restructuring of the Debtors, each of the Releasees shall be deemed to have unconditionally released and discharged one another from any and all Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any Claims that could be asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Releasees or their subsidiaries would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person or Entity, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided that these releases will have no effect on the liability of any Releasee arising from any act, omission, transaction, agreement, event or other occurrence, constituting willful misconduct, gross negligence, fraud or criminal conduct. The releases set forth in this paragraph shall be binding upon and shall inure to the benefit of the Liquidating Trustee and any chapter 7 trustee in the event that the Chapter 11 Cases are converted to chapter 7.*

### 2.    Releases by Holders of Claims

*As of the Effective Date, for good and valuable consideration, each Holder of a Claim that has affirmatively voted to accept the Plan, or who, directly or indirectly, is entitled to*

*receive a distribution under the Plan, including Persons entitled to receive a distribution via an attorney or agent shall be deemed to have unconditionally released and discharged the Releasees from any and all Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any Claims that could be asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Holder of a Claim would have been legally entitled to assert in its own right (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, in any way relating or pertaining to (w) the purchase or sale, or the rescission of a purchase or sale, of any security of the Debtors, (x) the Debtors or the operation or conduct of the business of the Debtors and their subsidiaries, (y) the Chapter 11 Cases and/or (z) the negotiation, formulation and preparation of the Sale and/or the Plan, or any related agreements, instruments or other documents; <u>provided</u> that these releases will have no effect on the liability of any Releasee arising from any act, omission, transaction, agreement, event or other occurrence, constituting willful misconduct, gross negligence, fraud or criminal conduct.  The releases set forth in this paragraph shall be binding upon and shall inure to the benefit of the Liquidating Trustee and any chapter 7 trustee in the event that the Chapter 11 Cases are converted to chapter 7.*

**3.  Injunction**

*Except as otherwise expressly provided in the Plan, all Holders of Claims and Equity Interests shall be permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against the Purchaser, the Debtors, their respective Estates or assets, or the other Releasees unless a previous order modifying the stay provided under Section 362 of the Bankruptcy Code was entered by the Bankruptcy Court; (b) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Purchaser, the Debtors, their respective Estates or assets, or the other Releasees; and (c) creating, perfecting, or enforcing any encumbrance of any kind against the property or interests in property of the Purchaser, the Debtors, their respective Estates or assets, or the other Releasees, in each case in respect of any Claims arising prior to the Petition Date.*

**4.  Exculpation**

*The Purchaser, the Debtors, the Liquidating Trustee, the DIP Lenders, the DIP Agent, the Term Loan Lenders, the Administrative Agent, the Creditors' Committee, and their respective successors, predecessors, control persons, shareholders, members, officers, directors, employees, affiliates and agents (and their respective attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons) shall neither have nor incur any liability to any Person or Entity (including any Holder of a Claim or Equity Interest) for any pre- or post-petition act taken or omitted to be taken in connection with or related to the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation or occurrence of the Effective Date, the Disclosure Statement, the Plan, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or*

*omitted to be taken in connection with, or in contemplation of, the restructuring of the Debtors.*

**H.  Miscellaneous Provisions**

**1.  Plan Supplement**

The Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court or its designee during normal business hours.  Holders of Claims and Equity Interests may obtain a copy of the Plan Supplement by contacting the Voting Agent, or by visiting http://chapter11.epiqsystems.com/pcaa.  The documents contained in the Plan Supplement are an integral part of the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

**2.  Dissolution of Creditors' Committee**

Upon the Effective Date, the Creditors' Committee shall be deemed dissolved, except with respect to, and to the extent of any applications for Professional Fee Claims or Creditors' Committee Member Expenses, and the Creditors' Committee Members and the Professionals retained by the Creditors' Committee shall be relieved and discharged of all duties related to the Chapter 11 Cases.

**3.  Payment of Statutory Fees**

All fees payable pursuant to Section 1930(a) of Title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to Section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first, responsibility for which shall belong to the Liquidating Trustee and Debtors, as applicable.

**4.  Modification of Plan**

Subject to the limitations contained in the Plan:

The Plan may be amended or modified by the Debtors (a) before the Confirmation Date, to the extent permitted by Section 1127 of the Bankruptcy Code; (b) after the Confirmation Date and prior to substantial consummation of the Plan, as defined in Section 1101(2) of the Bankruptcy Code, to the extent the Debtors institute proceedings in the Bankruptcy Court, pursuant to Section 1127(b) of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order or to accomplish such matters as may be necessary or appropriate to carry out the purposes and effects of the Plan; *provided*, *however*, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or Orders of the Bankruptcy Court; or (c) after the entry of the Confirmation Order, upon order of the Bankruptcy Court in accordance with Section 1127(b) of the Bankruptcy Code; *provided*, *further*, that the Plan will not be amended, modified or revoked without the consent of the Debtors, and the consent of the DIP Lenders and the Term Loan Lenders to the extent any amendment, modification or revocation is adverse to the DIP Lenders or Term Loan Lenders.

The Debtors reserve the right to modify or amend the Plan upon a determination by the Bankruptcy Court that the Plan is not confirmable pursuant to Section 1129 of the Bankruptcy Code. To the extent permissible under Section 1127 of the Bankruptcy Code without the need to re-solicit acceptances, the Debtors reserve the right to sever any provisions of the Plan that the Bankruptcy Court finds objectionable.

After the Effective Date, the Liquidating Trustee may amend or modify, upon order of the Bankruptcy Court, the Plan in accordance with Section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 5. Revocation of Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization or liquidation. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto, shall be deemed null and void, and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, any Debtor or any other Person, (b) prejudice in any manner the rights of such Debtor or any other Person, or (c) constitute an admission of any sort by any Debtor or any other Person.

### 6. Successors and Assigns

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or Entity.

### 7. Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained therein, or the taking of any action by any Debtor with respect to the Plan, this Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

### 8. Section 1146 Exemption

Pursuant to Section 1146(a) of the Bankruptcy Code, under the Plan, (i) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors; (ii) the creation, modification, consolidation or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment or recording of any lease or sublease; or (iv) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection

with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan shall not be subject to any document recording tax, mortgage recording tax, stamp tax or similar government assessment, and the appropriate state or local government official or agent shall be directed by the Bankruptcy Court to forego the collection of any such tax or government assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or government assessment.

All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in the Chapter 11 Cases, whether in connection with a sale pursuant to Section 363 of the Bankruptcy Code or otherwise, shall be deemed to be or have been done in furtherance of the Plan.

## VI.

## SUMMARY OF CERTAIN DISTRIBUTABLE ASSETS

### A.      Litigation

Prior to the Effective Date, except as otherwise provided in the Plan or in such case that the Asset Purchase Agreement is consummated prior to the Effective Date, any and all Causes of Action, and the Excluded Actions, under any theory of law or fact, including, without limitation, under the Bankruptcy Code, accruing to or assertable by PCAA will remain assets or property of the Estates.  On the Effective Date all Causes of Action except the Excluded Actions will be transferred to the Liquidating Trust and become Liquidating Trust Assets.  From and after the Effective Date, the Liquidating Trustee will have the sole right to, and may litigate or settle any Cause of Action.

### B.      Sale Distributions

Under the Asset Purchase Agreement, the proceeds from the Sale will be allocated among the businesses conducted at the properties of the Debtors.  PCAA will make distributions of these proceeds of the Sale required under the Plan in accordance with the priorities set forth in and the other provisions of the DIP Credit Agreement and the Plan.  Whenever any distribution to be made in accordance with the foregoing is due on a day other than a Business Day, such distribution shall be made, without interest, on the immediately succeeding Business Day, but any such distribution will have been deemed to have been made on the date due.

### C.      Liquidating Trust Distributions

The Liquidating Trustee, on behalf of the Liquidating Trust, or such other Entity as may be designated in accordance with the Liquidating Trust Agreement, will make the distributions to Liquidating Trust Beneficiaries required under the Plan in accordance with the Liquidating Trust Agreement and in accordance with the priorities set forth herein and the other provisions of the Plan, and administer and liquidate any assets in the Liquidating Trust and otherwise wind down the Estates, including, without limitation, the following:  (a) general administration costs (*e.g.*, trustee/trust fees, etc.), (b) access to and review of information for any and all potential Claims, (c) access to and review of information for any and all Causes of Action, (d) analysis and

assessment related to Claims objection/resolution, (e) analysis and assessment related to Causes of Action, (f) preparation of Claims objection/resolution, (g) preparation of Causes of Action (excluding the actual prosecution thereof) and (h) distribution of proceeds (*e.g.*, claims agent, etc.). Whenever any distribution to be made under the Plan or the Liquidating Trust Agreement is due on a day other than a Business Day, such distribution shall be made, without interest, on the immediately succeeding Business Day, but any such distribution will have been deemed to have been made on the date due.

The Liquidating Trust Assets, including all proceeds from the liquidation thereof, shall be distributed to the Liquidating Trust Beneficiaries by the Liquidating Trustee in the following order of priority:

a. *First,* to satisfy the expenses of administering the Liquidating Trust, including, without limitation, reasonable fees and expenses of any attorneys, advisors, other professionals and employees employed by the Liquidating Trustee; and

b. *Second,* to the Holders of Liquidating Trust Interests, in accordance with the Pro Rata Liquidating Trust Interests afforded to the Liquidating Trust Beneficiaries (as determined by the Liquidating Trustee upon segregation of the Liquidating Trust Assets attributable to the Debtor(s) against which such Liquidating Beneficiaries hold General Unsecured Claims).

## VII.

## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST AND INTERESTS IN PCAA SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND ALL OTHER RELATED DOCUMENTS. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION. RISKS AND UNCERTAINTIES NOT PRESENTLY KNOWN TO PCAA OR THAT IT CURRENTLY DEEMS IMMATERIAL MAY ALSO HARM ITS BUSINESS.

### A. Risk That Distributions Will Be Less Than Estimated

A substantial amount of time could elapse between the Effective Date and the receipt of a final distribution under the Plan for certain Holders of Claims as a result of, among other reasons, (i) such Holders having substantial and/or complicated Disputed Claims; and (ii) PCAA's estimate of allowable Claims being contested at an estimation hearing.

The projected distributions and recoveries set forth in this Disclosure Statement and the liquidation analysis in Exhibit 3 hereto are based on PCAA's current estimates of Allowed Claims. PCAA projects that the Claims asserted against PCAA's Estates will be resolved in and reduced to an amount that approximates its estimates. However, there can be no assurance that PCAA's estimates will prove accurate. Distributions to creditors also will be affected by the

amount of cash PCAA and/or the Liquidating Trustee are able to realize from further recoveries on account of, among other things, the Remaining Assets and the Causes of Action, as well as the costs of PCAA in continuing to administer the Chapter 11 Cases and wind down PCAA's estates.

PCAA and the Liquidating Trustee reserve their respective rights to object to the amount or classification of any Claim. Thus, the estimates set forth in this Disclosure Statement cannot be relied upon by any creditor whose Claim is subject to a successful objection. Any such creditor may not receive the estimated Distributions set forth herein and the Plan.

**B.    Financial Information Disclaimer**

**1.    Information Presented is Based on PCAA's Books and Records; No Audit was Performed**

While PCAA has endeavored to present information fairly in this Disclosure Statement, because of the complexity of its financial matters, PCAA's books and records upon which this Disclosure Statement is based might be incomplete or inaccurate. The financial information contained herein, unless otherwise expressly indicated, is unaudited.

**2.    Forward Looking Statements Are Not Assured; Actual Results May Vary**

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various classes that might be allowed.

While PCAA believes that its financial projections are reasonable, there can be no assurance that they will be realized, resulting in recoveries that could be significantly less than projected.

**C.    Business Factors**

**1.    PCAA's Business is Affected by Geopolitical Events, the U.S. Economy and Varying Economic and Business Cycles of its Customers**

PCAA's airport parking business is vulnerable to geopolitical events, the U.S. economy and the varying economic and business cycles of its customers. The off-airport parking business has been under distress for the last two years from a multitude of factors. The off-site airport parking segment is directly dependent on enplanement numbers which in turn are impacted by and geopolitical events, and domestic and global economic conditions. For example, the recent worldwide economic crisis has curtailed consumer and business spending. As a result, fewer customers are traveling via air or otherwise are finding cheaper transportation alternatives, and thus, such travelers are not in need of off-airport parking services. Short-term pressure on the industry may also result from further capacity consolidation by U.S. carriers. As in the past,

airline bankruptcies may lead to flight cuts that in turn may disrupt the flow of airline passengers into off-airport parking facilities.  Finally, the high cost of energy adversely affects the airport parking business.  Increasing fuel prices would force carriers to raise fares sharply which, coupled with the economic downturn, would weaken demand for flights and, consequently, off-airport parking services.  Increased fuel prices would also negatively impact the company's operating expenses, given its need to utilize a fleet of busses and vans to shuttle customers.

Finally, a domestic terrorist attack, similar to that which occurred on September 11th, 2001, could have a negative impact on the company's operating performance as it would result in a sharp downturn in air travel.

The foregoing factors may continue to impact the volumes of corporate and recreational travel and, in turn, the utilization of off-site airport parking.  Any decline in travel or misfortunes in the airline industry could reduce PCAA's business and profitability and could have a material adverse affect on PCAA's results from operations and financial conditions.

## 2. Effect of Competition Within Airport Parking Industry

Off-site airport parking operators face competition from on-site airport parking services, other off-airport parking providers, and other modes of transport such as taxis, private vehicle concierge services, and public transportation.  PCAA competes with various national and regional off-airport parking providers.  Certain of PCAA's principal competitors may be better equipped to withstand market conditions within the airline industry.  There can be no assurance that PCAA's services will be able to compete successfully with the services of competitors, which could result in the loss of customers and, as a result, decrease revenues and profitability.

## 3. Loss of Customers

If some of PCAA's existing customers ceased doing business with PCAA, or if PCAA were unable to generate new customers, PCAA could experience an adverse impact on its business, financial condition and results of operations.

## 4. Reliance on Key Personnel

PCAA's success depends on the continued contributions of its senior management.  PCAA's current financial position makes it difficult for it to retain key employees.  There can be no assurances that PCAA would be able to find qualified replacements for these individuals if their services were no longer available.  The loss of services of one or more members of the senior management team could have a material adverse effect on PCAA's business, financial condition and results of operations.

## D. Litigation Risks

To the extent that distributions to certain Classes may be derived, in whole or in part, based upon recoveries from Causes of Action asserted by the Creditors' Committee and/or the Liquidating Trustee, there can be no assurance that any such Causes of Action will produce recoveries that will enhance the distributions to be made to Holders of Claims under the Plan.

Notwithstanding PCAA's best efforts to provide reasonable estimates of the expected return to the Holders of Claims, there is always a possibility that the efforts of the Liquidating Trust will be more expensive or less successful than predicted. Additionally, there may be significant delay before any distribution is made on account of Allowed Claims, given the uncertainties of litigation.

In addition, pursuant to the Asset Purchase Agreement, substantially all such Causes of Action are released. In the case that the Asset Purchase Agreement is consummated prior to the Effective Date, these releases may result in few or no Causes of Action remaining as property of the Estates. This may significantly impact the recoveries expected from the Causes of Action.

For the reasons set forth in this Disclosure Statement, the Debtors believe that the very same risks described herein are present in and significantly greater to creditors in a chapter 7 case.

## E. Bankruptcy Risks

### 1. Objection to Classifications

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. Unliquidated Claims

Several Claims or groups of Claims against PCAA are currently unliquidated and have been estimated, individually or as a group, for purposes of determining the estimated recoveries listed above in Section II. These unliquidated Claims include, without limitation, Administrative Expense Claims. The potential exists for such Claims to be ultimately liquidated in amounts exceeding, on an individual or aggregate basis, the estimates used or in a higher priority than described in the Plan. In such a scenario, estimated recoveries for Holders of Claims in all classes could be less than estimated herein.

### 3. Risk of Non-Confirmation of Plan

Even if the Classes entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a chapter 11 plan is not likely to be followed by the liquidation or the need for further financial reorganization unless, as here, such liquidation is proposed in the plan, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if PCAA were liquidated under chapter 7 of the Bankruptcy Code. The Debtors believe that the Plan satisfies all the requirements for confirmation of a chapter 11 plan under the Bankruptcy Code. There can be no assurance, however, that the Bankruptcy Court would also conclude that the requirements for confirmation of the Plan have been satisfied.

### 4. Failure to Complete the Sale Transaction

If the Sale transaction is not approved by the Bankruptcy Court or not completed for any reason, PCAA's business as well as the recoveries of the holders of claims and equity interests may be negatively impacted. PCAA would also be subject to several risks, including having to negotiate a stand-alone plan of reorganization or an alternative sale transaction, which may not create as much value as the contemplated sale transaction. PCAA could also be forced to liquidate assets, which may result in smaller recoveries for all parties.

### VIII.

### VOTING REQUIREMENTS

On [_____], 2010, the Bankruptcy Court entered the Disclosure Statement Order that, among other things, approved this Disclosure Statement, set voting procedures, and scheduled the Confirmation Hearing. A copy of the Disclosure Statement Order and the Confirmation Hearing Notice are enclosed with this Disclosure Statement as part of the solicitation package. The Disclosure Statement Order sets forth in detail, among other things, procedures governing voting deadlines and objection deadlines. The Disclosure Statement Order, the Confirmation Hearing Notice, and the instructions attached to the ballot should be read in connection with this Section VIII of the Disclosure Statement.

If you have any questions about the procedure for voting your Claims or Interests or the packet of materials you received, please contact:

via phone:

(646) 282-2400

via first class mail:

PCAA Parent, LLC Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station
P.O. Box 5014
New York, NY 10150-5014

via hand delivery or overnight mail:

PCAA Parent, LLC Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

Anyone wishing to obtain additional copies of the Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact the Notice and Balloting Agent, at (646) 282-2400, or view such documents by accessing the Notice and Balloting Agent's website:

http://chapter11.epiqsystems.com/pcaa or the Bankruptcy Court's website: www.deb.uscourts.gov. Note that a PACER password and login are needed to access documents on the Court's website (https://ecf.deb.uscourts.gov/).

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures of PCAA concerning the Plan have been adequate and have included information concerning all distributions made or promised by PCAA in connection with the Plan and the Chapter 11 Cases. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law.

In particular, in order to confirm the Plan, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that the Plan: (i) has been accepted by the requisite votes of all Classes of Impaired Claims and Interests unless approval will be sought under Section 1129(b) of the Bankruptcy Code in respect of one or more dissenting Classes; (ii) is "feasible," which means that there is a reasonable probability that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization; and (iii) is in the "best interests" of all Holders of Claims or Equity Interests, which means that such Holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors believe that the Plan satisfies all of these conditions. ***See Section IX, "Confirmation of Plan."***

## A.    Voting Deadline

This Disclosure Statement and the appropriate ballot(s) are being distributed to all Holders of Claims and Equity Interests who are entitled to vote on the Plan. There is a separate ballot designated for each Impaired voting Class in order to facilitate vote tabulation; however, all ballots are substantially similar in form and substance, and the term "ballot" is used without intended reference to the ballot of any specific Class of Claims or Interests.

**IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER, IN ORDER TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT BY NO LATER THAN THE VOTING DEADLINE, THAT IS, BY NO LATER THAN [_____], 2010 AT [   :   ] [ ].M. (PREVAILING [_____] TIME). ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN. ONLY BALLOTS CONTAINING ORIGINAL SIGNATURE PAGES WILL BE COUNTED.**

## B.    Holders Of Claims Entitled To Vote

The Holder of a Claim against or Equity Interest in PCAA that is Impaired under the Plan is entitled to vote to accept or reject the Plan if the Plan provides a distribution in respect of such Claim or Interest. **NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, NO DISPUTED CLAIM OR DISPUTED INTEREST WILL BE COUNTED FOR ANY PURPOSE IN DETERMINING WHETHER THE REQUIREMENTS OF SECTION 1126(c) OF THE BANKRUPTCY CODE HAVE BEEN MET, UNLESS A CLAIMANT**

**WHOSE CLAIM OR INTEREST IS DISPUTED HAS FILED A MOTION FOR TEMPORARY ALLOWANCE FOR VOTING PURPOSES UNDER BANKRUPTCY RULE 3018(a), AND THE BANKRUPTCY COURT GRANTS SUCH MOTION FOR TEMPORARY ALLOWANCE PRIOR TO THE VOTING DEADLINE**.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to Section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Disclosure Statement Order also sets forth assumptions and procedures for tabulating ballots that are not completed fully or correctly.

The Holders of Claims in Classes 2 and 6 through 19 are entitled to vote. Holders of Claims in Classes 1, 3, 4 and 5 are Unimpaired and consequently are conclusively presumed to accept the Plan and are not entitled to vote. Holders of Equity Interests in Class 20 and Claims in Class 21 will receive or retain no distribution of property under the Plan, are presumed to have rejected the Plan and are not entitled to vote thereon.

**C.      Vote Required For Acceptance By Class**

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims and/or equity interests votes to accept the proposed plan of reorganization, except under certain circumstances. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount of the allowed claims in that class and more than one-half in number of allowed claims in that class, but for that purpose, counts only those who actually vote to accept or reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in dollar amount and a majority in number of the allowed claims in that class <u>actually voting</u> cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, but for that purpose, counts only those who <u>actually vote</u> to accept or reject the plan. Thus a class of interests will have voted to accept the plan if two-thirds of the allowed interests actually voted are voted in favor of acceptance. Holders of Interests who fail to vote are not counted as either accepting or rejecting the Plan.

**D.      Voting Procedures**

**1.      Ballots**

All votes to accept or reject the Plan with respect to any Class of Claims or Equity Interests must be cast by properly submitting the duly completed and executed form of ballot designated for such Class. Holders of Impaired Claims or Equity Interests voting on the Plan should complete and sign the ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan."

**ANY BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL BE AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.**

**ANY BALLOT RECEIVED THAT IS NOT SIGNED OR THAT CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT WILL BE AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.**

Ballots must be delivered to the Voting Agent, at its address set forth above, and received by the Voting Deadline. **THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE HOLDER.** If such delivery is by mail, it is recommended that Holders use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to assure timely delivery.

In accordance with Rule 3018(c) of the Bankruptcy Rules, the ballots are based on Official Form No. 14, but have been modified to meet the particular needs of these Chapter 11 Cases. **PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT**.

In most cases, each ballot enclosed with this Disclosure Statement has been encoded with the amount of the Allowed Claim or Allowed Interest for voting purposes (if the Claim or Interest is a Disputed Claim or Disputed Interest, this amount may not be the amount ultimately Allowed for purposes of distribution), and the Class to which the Claim or Interest has been attributed.

### 2. Withdrawal or Change of Votes on Plan

A ballot may be withdrawn by delivering a written notice of withdrawal to the Voting Agent so that the Voting Agent <u>actually receives</u> such notice prior to the Voting Deadline. Thereafter, withdrawal may be effected only with the approval of the Bankruptcy Court by filing a motion in accordance with Bankruptcy Rule 3018(a).

In order to be valid, a notice of withdrawal must (i) specify the name of the Holder who submitted the votes on the Plan to be withdrawn, (ii) contain the description of the Claims or Interests to which it relates, and (iii) be signed by the Holder in the same manner as on the ballot that the Holder seeks to withdraw. PCAA expressly reserves the absolute right to contest the validity of any such withdrawals of votes on the Plan.

Any Holder who has submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may change such vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed ballot is received with respect to the same Claim, the ballot that bears the latest date will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received.

### 3. Voting Multiple Claims

Separate forms of ballots are provided for voting the various Classes of Claims and Interests. Ballot forms may be copied if necessary. Any person who holds Claims and/or Interests in more than one Class is required to vote separately with respect to each Claim or Interest. Any person holding multiple Claims or Interests within a Class should use a single ballot to vote such Claims or Interests. Please sign and return in accordance with your ballot(s) in accordance with the terms set forth in this Disclosure Statement. **ONLY BALLOTS WITH ORIGINAL SIGNATURES WILL BE ACCEPTED BY THE VOTING AGENT. BALLOTS WITH COPIED SIGNATURES WILL NOT BE ACCEPTED.**

## IX.

## CONFIRMATION OF PLAN

### A. Hearing On Confirmation Of Plan At Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing with respect to the Plan. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Section 1129 of the Bankruptcy Code described below are met.

The Confirmation Hearing is scheduled to commence on [_____], 2010, at [__:__] [_].m. (Prevailing [_____] Time) before The Honorable Mary F. Walrath, United States Bankruptcy Court, District of Delaware, 824 North Market Street, 5th Floor, Wilmington, DE 19801. The Confirmation Hearing may be scheduled concurrently with the Sale Hearing. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

### B. Deadline To Object To Confirmation

Any objection to the confirmation of the Plan must be made in writing, specify in detail (i) the name and address of the objector, (ii) all factual and legal grounds for the objection and (iii) the amount and type of the Claims held by the objector. Any such objection must be filed with the Bankruptcy Court, with a copy to The Honorable Mary F. Walrath's chambers, and served so that it is <u>actually received</u> by the Bankruptcy Court, chambers, and the following parties on or before the Confirmation Objection Deadline, (<u>i.e.</u>, [_____], 2010, at [__:__] [_].m. (Prevailing [_____] Time)): (a) PCAA Parent, LLC, 621 North Governor Printz Boulevard, Essington, Pennsylvania 19029, Attention: Mark Shapiro; (b) counsel for PCAA, Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, One Chase Manhattan Plaza, New York, New York 10005, Attention: Matthew S. Barr and Michael E. Comerford, and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attention: Mark Collins and John H. Knight; (c) the Office of the United States Trustee for the District of Delaware, 844 King Street, Room 2207, Lockbox #35, Wilmington, Delaware 19899-0035; Attention: David Klauder; and (d) counsel to the Creditors' Committee, Lowenstein Sandler PC, 65 Livingston Avenue Roseland, New Jersey 07068, Attention: Bruce D. Buechler and Mary E.

Seymour, and Ashby & Geddes, P.A., 500 Delaware Avenue, 8th Floor, P.O. Box 1150, Wilmington, Delaware 19899, Attention: Ricardo Palacio and Karen B. Skomorucha.

## C. Requirements For Confirmation Of Plan

Among the requirements for confirmation of the Plan are that the Plan (i) is accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) is feasible, and (iii) is in the "best interests" of creditors and equity interest holders that are Impaired under the Plan.

### 1. Requirements of Section 1129(a) of Bankruptcy Code

At the Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in Section 1129(a) of the Bankruptcy Code have been satisfied:

(A) The Plan complies with the applicable provisions of the Bankruptcy Code.

(B) The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(C) The Plan has been proposed in good faith and not by any means forbidden by law.

(D) Any payment made or to be made by PCAA or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

(E) PCAA has disclosed the identity and affiliations of any individual proposed to serve, after Confirmation, as a director, officer or voting trustee of reorganized PCAA, an affiliate of PCAA participating in a plan with PCAA, or a successor to PCAA under the Plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy, and PCAA has disclosed the identity of any insider (as defined in Section 101 of the Bankruptcy Code) that will be employed or retained by reorganized PCAA, and the nature of any compensation for such insider.

(F) Any governmental regulatory commission with jurisdiction, after Confirmation, over the rates of PCAA has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

(G) With respect to each Class of Claims or Equity Interests, each Holder of an Impaired Claim or Equity Interest either has accepted the Plan or will receive or retain under the Plan on account of such Holder's Claim or

Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would so receive or retain if PCAA were liquidated under chapter 7 of the Bankruptcy Code on such date.

(H)     Except to the extent the Plan meets the requirements of Section 1129(b) of the Bankruptcy Code, each Class of Claims or Equity Interests has either accepted the Plan or is not Impaired under the Plan.

(I)      Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and priority claims (including Priority Tax Claims and Priority Non-Tax Claims) will be paid in full on the Effective Date.

(J)      If any Class of Claims is Impaired under the Plan, at least one such Class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider.

(K)     Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of PCAA or any successor to PCAA under the Plan, unless such liquidation or reorganization is proposed in the Plan.

(L)      All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the joint Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

(M)     The Plan provides for the continuation after its effective date of payment of all retiree benefits at the level established pursuant to subsection (e)(1)(B) or (g) of Section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

(N)     All transfers of property of the Plan will be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

The Debtors believe that the Plan meets all the applicable requirements of Section 1129(a) of the Bankruptcy Code, or is otherwise confirmable pursuant to Section 1129(b) of the Bankruptcy Code.

### 2.     Best Interests of Creditors

Confirmation of a Plan requires, among other things, that each Holder of a Claim in an Impaired Class and each Holder of an Equity Interest either:  (a) accepts the Plan; or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the

value such Holder would receive or retain if PCAA were liquidated under chapter 7 of the Bankruptcy Code. This requirement is commonly referred to as the "Best Interests Test."

To determine the value that the Holders of Impaired Claims and Equity Interests would receive if PCAA were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of PCAA's assets and properties in the context of a chapter 7 liquidation case. Section 704 of the Bankruptcy Code requires a chapter 7 trustee to collect and reduce to money the property of the estate as expeditiously as is compatible with the best interests of parties in interest.

The cash available for satisfaction of Allowed Claims would consist of the proceeds resulting from the disposition of PCAA's few remaining assets, augmented by the cash, if any, held by PCAA at the time of the commencement of the chapter 7 case. Any such Cash amount would then be reduced by the amount of any Allowed Claims secured by such assets, the costs and expenses of the liquidation and such additional Administrative Expense Claims and other Priority Claims that may result from the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 would include fees payable to a trustee in bankruptcy, as well as those that might be payable to his or her attorneys and to other professionals that such trustee may engage, plus any unpaid expenses incurred by PCAA during the Chapter 11 Cases that would be allowed in the chapter 7 case, such as compensation for attorneys, appraisers, accountants or other professionals and costs and expenses of PCAA and the Creditors' Committee. Such Administrative Expense Claims would have to be paid in cash, in full from the liquidation proceeds before the balance of those proceeds could be made available to pay other Claims.

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, unless there is unanimous acceptance of the Plan by an impaired Class, PCAA must demonstrate, and the Bankruptcy Court must determine that with respect to such Class, each holder of a Claim will receive property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive if PCAA were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. This requirement is commonly referred to as the "Best Interests of Creditors Test."

The Plan satisfies the Best Interests of Creditors Test. The Plan provides greater recovery to the Holders of Claims than such Holders would receive under a liquidation under chapter 7 because, among other things, the Plan avoids a layer of administrative expense associated with the appointment of a chapter 7 trustee, while increasing the efficiency of administrating PCAA's assets for the benefit of its Creditors.

Moreover, in chapter 7 cases, the chapter 7 trustee would also be entitled to seek a sliding scale commission based upon the funds distributed by such trustee, even though PCAA has already accumulated much of the funds and has already incurred many of the expenses associated with generating those funds. Accordingly, the Debtors believe that there is a reasonable likelihood that PCAA's creditors would "pay again" for the funds accumulated by PCAA, since the chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed. It is also anticipated that a chapter 7 liquidation would result in delay in the distributions to PCAA's creditors. Among other things, a chapter 7 case would trigger a new bar

date for filing claims that would be more than 90 days following conversion of the case to chapter 7. See FED. R. BANKR. P. 3002(c). Hence, a chapter 7 liquidation would not only delay distributions, but raise the prospect of additional claims that were not asserted in the Chapter 11 Cases. Based on the foregoing, the Plan provides an opportunity to bring the greatest return to PCAA's creditors.

### 3. Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of that claim or interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that, on the consummation date, the holder of the claim or interest receives cash equal to the Allowed amount of that claim or, with respect to any interest, any fixed liquidation preference to which the interest holder is entitled or any fixed price at which the debtor may redeem the security.

### 4. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it so long as the plan has been accepted by at least one impaired class. Section 1129(b) of the Bankruptcy Code states that, notwithstanding an impaired class's failure to accept a plan, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

Courts will take into account a number of factors in determining whether a plan discriminates unfairly, including the effect of applicable subordination agreements between parties. Accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that for a sale of any property that is subject to the liens securing such claims that such liens attach to the proceeds of such sale. The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or equity interest any property.

The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (a) the plan provides that each holder of an equity interest in that class receives or retains under the plan, on account of that entity interest, property

of a value, as of the effective date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled or (iii) the value of such interest; or (b) if the class does not receive such an amount as required under (a), no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Plan provides that if any Impaired Class rejects the Plan, PCAA reserves the right to seek to confirm the Plan utilizing the "cram down" provisions of Section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, PCAA will request confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code. PCAA reserves the right to alter, amend, modify, revoke or withdraw the Plan or any Plan exhibit, including to amend or modify it to satisfy the requirements of Section 1129(b) of the Bankruptcy Code, if necessary.

**D.   Alternatives To Confirmation And Consummation Of Plan**

The Plan reflects the negotiations held by PCAA with the Supporting Parties, each of whom support the Plan. The Debtors believe that the Plan affords Holders of Claims and Equity Interests the greatest opportunity for realization on PCAA's assets and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, however, the theoretical alternatives include: (a) liquidation of PCAA under chapter 7 of the Bankruptcy Code or (b) alternative plans of reorganization or liquidation under chapter 11 of the Bankruptcy Code. Thorough consideration of these alternatives to the Plan has led PCAA and the Supporting Parties to conclude that the Plan, in comparison, provides a greater recovery to creditors on a more expeditious timetable, and in a manner that minimizes certain inherent risk in any other course of action available in these Chapter 11 Cases.

**1.   Liquidation Under Chapter 7**

If the Plan is not confirmed, these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. In a liquidation under chapter 7, a trustee or trustees may be elected or appointed to liquidate the assets of PCAA. However, the Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors and interest holders than those provided for in the Plan because, among other reasons, (a) additional administrative expenses resulting from the appointment of and services to be rendered by trustees and attorneys and other professionals to assist such trustee, (b) the relative lack of familiarity with PCAA's businesses that would inevitably hinder such professionals in the management of the estate, and (c) additional expenses and claims, some of which would be entitled to priority, that would be generated during the liquidation. In addition, distributions would be substantially delayed in a chapter 7 liquidation because of the factors set forth above and the need to litigate or otherwise resolve many of the claims settled by the Plan. If these cases are converted to chapter 7, it is likely PCAA's operations would cease and its assets would be liquidated piecemeal under conditions that prioritize expediency over value.

Based on the foregoing and on the liquidation analysis, the Debtors believe that a liquidation of their assets under chapter 7 or otherwise would produce no greater and likely less value for distribution to creditors than that recoverable under the Plan.

## 2. Alternative Plan of Reorganization or Liquidation

If the Plan is not confirmed, PCAA (or if the Bankruptcy Court were not to grant extensions of PCAA's exclusive periods in which to file and solicit a plan, any other party in interest in these Chapter 11 Cases) could propose a different plan or plans. Such plans might involve either a reorganization and continuation of PCAA's businesses, an orderly liquidation of its assets, or a combination of both. With respect to an alternative plan, the Debtors have explored various alternatives in connection with the formulation of the Plan. The Debtors believe that the Plan enables creditors to realize the most value under the circumstances.

## X.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to PCAA and certain Holders of Claims. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. PCAA has not requested and will not request a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as Persons who are related to PCAA within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, investors in pass-through entities, Persons holding Claims as part of an integrated, straddle or conversion transaction, and Holders of Claims who are themselves in bankruptcy) unless otherwise noted herein. Furthermore, this discussion assumes that Holders of Claims hold only Claims in a single Class. Holders of Claims in multiple Classes should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

This discussion assumes that the various debt and other arrangements to which PCAA is a party will be respected for federal income tax purposes in accordance with their form.

THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

IRS CIRCULAR 230 DISCLOSURE:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS SUMMARY (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE TAX CODE.  TAX ADVICE CONTAINED IN THIS SUMMARY (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE SUMMARY.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**A.  Certain U.S. Federal Income Tax Consequences To Holders Of Claims In Connection With Implementation Of Plan**

**1.  Tax Consequences to Holders of Claims in Classes 2 and 6-19**

In general, each Holder of a Term Loan Secured Claim or General Unsecured Claim in Classes 6-19 will recognize gain or loss for federal income tax purposes in an amount equal to the difference between (i) the amount of the Cash and the fair market value of any Liquidating Trust Interests it receives in satisfaction of its Claims (other than any Cash or the value of any Liquidating Trust Interests allocable to accrued but unpaid interest which will be treated as described in Section X.A.2 below) and (ii) the Holder's adjusted tax basis in its Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of such Holder, whether the Claim (or the obligation constituting the Claim) was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.

**2.  Distribution in Discharge of Accrued Interest**

In general, to the extent that any amount of Cash or Liquidating Trust Interests received by a Holder is received in satisfaction of interest that accrued during its holding period, the value of the Cash or Liquidating Trust Interests will be taxable to the Holder as interest income (if not previously included in the Holder's gross income).

Pursuant to the Plan, the parties will treat all amounts transferred to a Holder of an Allowed Claim as allocated first to the principal amount of such Claim, as determined for federal income tax purposes, with any excess allocated to unpaid accrued interest.  There is no assurance that such allocation will be respected by the IRS for federal income tax purposes.

**Each Holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.**

**3.  Gain Attributable to Market Discount**

Under the "market discount" provisions of Section 1276 and 1278 of the Tax Code, the gain realized by a Holder of a Claim that exchanges a Claim for Cash or any Liquidating Trust Interests on the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the Claim (or the debt instrument constituting the

Claim) that accrued on the Holder's Claim during its holding period (unless the Holder elected to include market discount in income as it accrued). In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" (interest required to be paid at least annually in cash or other property other than debt of the issuer) or, (ii) in the case of the debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

**B.    Certain U.S. Federal Income Tax Consequences To Debtors In Connection With Implementation Of Plan**

**1.    Sale of PCAA assets**

A Sale would constitute a taxable sale of the Purchased Assets. PCAA is treated as a partnership for federal income tax purposes and its members are treated as partners. As a partnership, PCAA is not itself subject to federal income tax. Instead, each person treated as a partner in PCAA for tax purposes is required to report separately on its own income tax return its allocable share of PCAA's gains, losses, income, deductions and credits, including any such amounts attributable to the Sale, for PCAA's taxable year ending with or within the partner's taxable year regardless of whether such partner has received any distributions from PCAA. PCAA's gain or loss on the Sale will be equal to the difference between: (i) the amount paid by the Purchaser in connection with the Sale and the amount of certain liabilities assumed by the Purchaser, and (ii) PCAA's adjusted basis in the Purchased Assets.

**2.    Cancellation Of Debt Income**

Cancellation of Debt Income ("CODI") is the amount by which discharged indebtedness (reduced by any unamortized discount) exceeds any consideration given in exchange therefor (less any consideration attributable to accrued interest), subject to certain statutory or judicial exceptions that can apply to limit the amount of CODI (such as where the payment of the cancelled debt would have given rise to a tax deduction). As a result of the implementation of the Plan, and in particular the discharge of, and satisfaction of, Claims for Cash and/or Liquidating Trust Interests, PCAA is expected to have CODI which will be allocated to persons treated as PCAA partners for federal income tax purposes.

There are exceptions to the taxation of CODI for taxpayers that are in bankruptcy or are insolvent (but only to the extent of their insolvency) at the time the CODI is generated. In the case of CODI of an entity taxed as a partnership, a partner's share of partnership CODI is only eligible for the bankruptcy or insolvency exception to the recognition of CODI if the partner is in bankruptcy or is insolvent. As a result, these exceptions may not be available to persons treated as partners in PCAA for federal income tax purposes. If a PCAA partner is subject to tax on its share of PCAA CODI, such partner may be able to reduce any such CODI by its share of ordinary losses, if any, generated in connection with the Sale.

### C. Federal Income Tax Treatment Of Liquidating Trust And Holders Of Beneficial Interests

#### 1. Classification of Liquidating Trust

Holders of Allowed Class 6 through 19 Claims and, to the extent of their Term Loan Lender Deficiency Claims, Holders of Allowed Class 2 Claims will receive Liquidating Trust Interests in connection with the implementation of the Plan. The Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes. In general, a "grantor trust" is not a separate taxable entity. Assuming the Liquidating Trust is classified as a grantor trust, for federal income tax purposes, the assets transferred by PCAA to the Liquidating Trust pursuant to the Plan will be treated as being owned at all times thereafter by the Holders of Allowed Claims that are beneficiaries and, therefore, grantors of such trust. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust will be structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including PCAA, the trustee of the Liquidating Trust and the appropriate Holders of Allowed Claims) are required to treat the Liquidating Trust, for federal income tax purposes, as a grantor trust of which the appropriate Holders of Allowed Claims are the owners and grantors. The following discussion assumes that the Liquidating Trust will be respected as a grantor trust for federal income tax purposes. No ruling from the IRS nor opinion of counsel has been requested concerning the tax status of the Liquidating Trust as a grantor trust. As a result, there can be no assurance that the IRS will treat the Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust, the Holders of Allowed Claims, and PCAA could vary from those discussed herein (including the potential for an entity level tax on any income of the Liquidating Trust).

#### 2. General Tax Reporting by Liquidating Trust and Holders of Beneficial Interests

For all federal income tax purposes, the Plan requires all parties (including PCAA, the trustee of the Liquidating Trust and the appropriate Holders of Allowed Claims) to treat the transfer of assets by PCAA to the Liquidating Trust, for federal income tax purposes, as a transfer of assets directly to the appropriate Holders of Allowed Claims followed by the transfer of such assets by such Holders of Allowed Claims to the Liquidating Trust. Consistent therewith, the Plan requires all parties to treat the Liquidating Trust as a grantor trust of which such Holders of Allowed Claims are the owners and grantors. Thus, such Holders of Allowed Claims will be treated as the direct owners of a specified undivided interest in the assets of the Liquidating Trust for all federal income tax purposes (which assets will have a tax basis equal to their fair market value on the date transferred to the Liquidating Trust). The Plan requires the trustee of the Liquidating Trust to determine the fair market value of the assets transferred to the Liquidating Trust as of the date the assets are transferred to the Liquidating Trust and, further requires all parties, including beneficiaries of the Liquidating Trust, to consistently use such valuations in filing any required returns and reports with the IRS. Accordingly, except as discussed below in connection with the taxation of the Disputed Claims Reserve (defined in Section X.C.3 below), the Plan requires each Holder of an Allowed Claim that is a beneficiary of

the Liquidating Trust to report on its federal income tax return its allocable share of any income, gain, loss, deduction or credit recognized or incurred by the Liquidating Trust, in accordance with its relative beneficial interest. The character of items of income, gain, loss deduction, and credit to any beneficiary and the ability of such beneficiary to benefit from any deduction or losses will depend on the particular situation of such beneficiary.

The federal income tax reporting obligation of a trust beneficiary is not dependent upon the Liquidating Trust distributing any cash or other proceeds. Therefore, a beneficiary may incur a federal income tax liability with respect to its allocable share of the income of the Liquidating Trust whether or not the Liquidating Trust makes any concurrent distribution to the beneficiary. In general, a distribution by the Liquidating Trust to a beneficiary of an interest in such trust will not be taxable to such beneficiary because the beneficiary is already regarded for federal income tax purposes as owning the underlying assets. Beneficiaries are urged to consult their tax advisors regarding the appropriate federal income tax treatment of distributions from the Liquidating Trust. The trustee of the Liquidating Trust will file with the IRS returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and will also send to each applicable beneficiary of the Liquidating Trust, a separate statement setting forth such beneficiary's share of items of income, gain, loss, deduction, or credit and will instruct the beneficiary to report such items on its federal income tax return.

### 3. Federal Income Tax Treatment of Disputed Claims Reserve

Subject to definitive guidance from the IRS, or a court of competent jurisdiction to the contrary (including the receipt by the trustee of the Liquidating Trust of a private letter ruling if either trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the trustee), the Liquidating Trust Trustee shall (a) treat any assets of the Liquidating Trust allocable to, or retained on account of, Disputed Claims (the "Disputed Claims Reserve") as a "disputed ownership fund" governed by Treasury Regulation 1.468B-9, and (b) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes. Accordingly, a Disputed Claims Reserve will be treated for federal income tax purposes as a C corporation and fully taxable on any income allocable to assets it holds. Any income on the assets of a Disputed Claims Reserve will be treated as subject to tax on a current basis, and all distributions pursuant to the Plan will be made net of provisions for taxes and subject to withholding and reporting requirements set forth in the Plan. All parties (including Debtors, the trustee of the Liquidating Trust, and the Holders of Allowed Claims) shall report for tax purposes consistent with the foregoing.

### D. Information Reporting And Backup Withholding

Certain payments, including payments in respect of accrued interest or OID are generally subject to information reporting by the payer to the IRS. Moreover, such reportable payments are subject to backup withholding in certain circumstances. Under the Tax Code's backup withholding rules, a Holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless the Holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the Holder is a U.S. person, the taxpayer identification

number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's United States federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

[Remainder of Page Intentionally Left Blank]

# XI.

## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is preferable to any alternatives because it will provide the greatest recoveries to holders of Claims and Interests. Any alternative to confirmation of the Plan, such as a chapter 7 liquidation or attempts to confirm another plan of reorganization or liquidation, would involve significant delays, uncertainty, and substantial additional administrative costs.  Moreover, as described above, the Debtors believe that the Plan maximizes value for all parties in interest as compared to a chapter 7 liquidation.

Dated:  February 16, 2010

> PCAA PARENT, LLC, on behalf of itself and its affiliated debtors and debtors in possession
>
> By:  /s/ Charles Huntzinger_____
>        Name:  Charles Huntzinger
>        Title:  President and Chief Executive Officer